**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JERRY HOBBS, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. |
| | ) | |
| DOMENIC CAPPELLUTI, CHARLES SCHLETZ | ) | |
| and WILLIAM VALKO of the Waukegan Police | ) | Judge: |
| Department; ANDREW JONES of the Vernon Hills | ) | |
| Police Department; KEVIN HARRIS of the Zion | ) | **JURY TRIAL** |
| Police Department; TIMOTHY JONITES of the | ) | **DEMANDED** |
| of the Lake County Sheriff's Office; THOMAS | ) | |
| DERKEN of the Buffalo Grove Police Department; | ) | |
| ROBERT DEVER, of the Lake County Sheriff's Office, | ) | |
| JOHN DOE, a police officer whose name and employer | ) | |
| are currently unknown to plaintiff; LAKE COUNTY; | ) | |
| MARK C. CURRAN JR., the Sheriff of Lake County; | ) | |
| the CITY OF WAUKEGAN the CITY OF ZION; | ) | |
| the VILLAGE OF VERNON HILLS; | ) | |
| and the Village of Buffalo Grove, | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT**

Plaintiff JERRY HOBBS, by his undersigned attorneys, for his complaint against

defendants DOMENIC CAPPELLUTI, ANDREW JONES, CHARLES SCHLETZ, WILLIAM

VALKO, KEVIN HARRIS, TIMOTHY JONITES, THOMAS DERKEN, ROBERT DEVER,

JOHN DOE, COUNTY OF LAKE,  MARK C. CURRAN JR., THE CITY OF WAUKEGAN,

THE CITY OF ZION, THE VILLAGE OF VERNON HILLS and the VILLAGE OF BUFFALO

GROVE, states:

1

## INTRODUCTION

1.      Jerry Hobbs is an innocent man who was wrongly charged with the murder of his beloved daughter Laura and her friend Krystal as a result of the unconstitutional actions of the police officers who are named as defendants in this suit.   Those police officers coerced Plaintiff, through extreme psychological abuse as well as physical force, into giving a false confession to the murders.   Their unconstitutional actions resulted in the filing of false murder charges against Plaintiff and caused the charges to be maintained for over five years as Plaintiff languished in jail—despite the emergence of DNA evidence that was completely inconsistent with Plaintiff's false confession.   The actions of the defendants have irreparably damaged Plaintiff's reputation and his relations with his family and friends, and have caused Plaintiff extreme emotional distress and other psychological trauma that continues to the present day and will forever haunt Plaintiff's life. The actions of the police officer defendants were committed pursuant to policies and practices of their employers, Lake County, the Sheriff of Lake County, the City of Waukegan, the City of Zion, the Village of Vernon Hills and the Village of Buffalo Grove, which are therefore liable for their actions.

## JURISDICTION AND VENUE

2.      This is a civil rights action brought pursuant to 42 U.S.C. § 1983 et seq.; the Judicial Code, 28 U.S.C. §§ 1331 and 1343(a); the Constitution of the United States; and supplemental jurisdiction, as codified in 28 U.S.C. § 1367(a).

3.      This Court has jurisdiction of the action pursuant to 28 U.S.C. § 1331.  Venue is proper under 28 U.S.C. § 1391(b) because the events giving rise to Plaintiff's claims occurred in

2

this judicial district and the parties reside, or, at the time the events took place, resided in this judicial district.

**PARTIES**

4.      Plaintiff Jerry Hobbs is currently a resident of the State of Texas.  At the time of the events underlying this action, Plaintiff was a resident of Zion, Illinois.

5.      Defendant Domenic Cappelluti was at all times relevant to this action employed as an officer in the Waukegan Police Department. At the time of some or all of the wrongdoing alleged in this complaint Cappelluti was assigned to the Lake County Major Crimes Task Force.

6.      Defendant Andrew Jones was at all times relevant to this action employed as an officer in the Vernon Hills Police Department. At the time of some or all of the wrongdoing alleged in this complaint Jones was assigned to the Lake County Major Crimes Task Force.

7.      Defendant Charles Schletz was at all times relevant to this action employed as an officer in the Waukegan Police Department. At the time of some or all of the wrongdoing alleged in this complaint Schletz was assigned to the Lake County Major Crimes Task Force.

8.      Defendant Kevin Harris was at all times relevant to this action employed as an officer in the Zion Police Department. At the time of some or all of the wrongdoing alleged in this complaint Harris was assigned to the Lake County Major Crimes Task Force.

9.      Defendant Timothy Jonites was at all times relevant to this action employed as an officer in the Lake County Sheriff's Office.  At the time of some or all of the wrongdoing alleged in this complaint Jonites was assigned to the Lake County Major Crimes Task Force.

10.      Defendant William Valko was at all times relevant to this action employed as a commander in the Waukegan Police Department.  At the time of some or all of the wrongdoing

alleged in this complaint Valko was assigned to the Lake County Major Crimes Task Force. At all times relevant to this action, defendant Valko was a direct supervisor of several defendants, including Schletz, Harris and Cappelluti, and supervised these defendants in the investigation and interrogation of Plaintiff.

11.     Defendant Thomas Derken was at all times relevant to this action employed as an officer in the Buffalo Grove Police Department.  At the time of some or all of the wrongdoing alleged in this complaint Derken was assigned to the Lake County Major Crimes Task Force.

12.     Defendant Robert Dever was at all times relevant to this action employed as an officer in the Lake County Sheriff's Office.  At the time of some or all of the wrongdoing alleged in this complaint Dever was assigned to the Lake County Major Crimes Task Force.

13.     Defendant Mark C. Curran Jr. is the Sheriff of Lake County, Illinois, and the employer of defendants Jonites and Dever, and is responsible for the policies and practices of the Lake County Sheriff's Office. He is sued in his official capacity.

14.     Defendant John Doe is an officer assigned to the Lake County Major Crimes Task Force whose name is unknown to Plaintiff at this time.

15.     The Lake County Major Crimes Task Force is an organization formed by, *inter alia*, the State's Attorney of Lake County, the Lake County Sheriff, and the police chiefs of several municipal police departments in Lake County, and is involved in investigations of certain major crimes which occur in Lake County.

16.     Defendant County of Lake ("Lake County") is a political and governmental subdivision of the State of Illinois. Defendant Lake County is liable for the actions of defendants Jonites, Dever and Curran pursuant to its obligation to indemnify them. Lake County is

4

additionally responsible for the policies and practices of the Lake County Major Crimes Task Force.

17.      Defendant City of Waukegan is a duly incorporated municipal corporation and was the employer of defendants Cappelluti, Schletz and Valko and is liable for their actions which violate Illinois law pursuant to the doctrine of *respondeat superior*. Defendant City of Waukegan is additionally responsible for the policies and practices of the Waukegan Police Department.

18.      Defendant City of Zion is a duly incorporated municipal corporation and was the employer of defendant Harris and is liable for his actions which violate Illinois law pursuant to the doctrine of *respondeat superior*. Defendant City of Zion is additionally responsible for the policies and practices of the Zion Police Department.

19.      Defendant Village of Vernon Hills is a duly incorporated municipal corporation and was the employer of defendant Andrew Jones and is liable for his actions which violate Illinois law pursuant to the doctrine of *respondeat superior*. Defendant Village of Vernon Hills is additionally responsible for the policies and practices of the Vernon Hills Police Department.

20.      Defendant Village of Buffalo Grove is a duly incorporated municipal corporation and was the employer of defendant Thomas Derken and is liable for his actions which violate Illinois law pursuant to the doctrine of *respondeat superior*. Defendant Village of Buffalo Grove is additionally responsible for the policies and practices of the Buffalo Grove Police Department.

21.      Each of the individual police officer defendants named above engaged in the conduct complained of under color of state law and in the course and scope of his employment

5

with the municipal police department with which he is affiliated and the Lake County Major Crimes Task Force.  Each of the individual police officer defendants is sued in his individual capacity, except for Mark Curran, who is sued in his official capacity as Sheriff of Lake County.

## ALLEGATIONS OF FACT

### The Murders of Laura Hobbs and Krystal Tobias

22.      On Sunday, May 8, 2005, Mothers Day, Plaintiff lived at 2015 Gilboa, Zion, Illinois, with Sheila Hollabaugh; three children who had been born to the couple, Laura Hobbs, aged 8, Jerry Hobbs Jr., aged 10, and Jeremy Hobbs, aged 6; and another of Sheila's children, Meagan, aged 13.

23.      The family spent part of the day together flying kites at Illinois Beach State Park, and then returned home where some of the family stayed indoors, while Laura was allowed to go off to play outside, riding her bicycle.

24.      Laura was supposed to return by 7:00 p.m., and when she did not the family began to search for her. The family soon learned that Krystal Tobias, aged 9, who was Laura's best friend, was also missing.

25.      During the evening, Jerry, Sheila and the older children, Meagan and Jerry Jr., with help from Sheila's father Arthur and his wife Emily, searched the neighborhood for Laura, including nearby Beulah Park, where children often played.  The search was unsuccessful, and Plaintiff and Sheila contacted the local police to report that their daughter was missing.

26.      Plaintiff searched for much of the night for Laura, but it was difficult to search in the dark in Beulah Park, parts of which were heavily wooded and unlit.

27.      At daybreak, Plaintiff and Arthur resumed their search and returned to the park.

6

In the light of day, Plaintiff discovered the bodies of his daughter Laura and her friend Krystal, with obvious, horrendous, wounds. The two girls had been savagely murdered. Each girl was stabbed multiple times about her head, face and body and Laura had been sexually assaulted.

28.     Plaintiff was and is completely innocent of these murders. He had no connection whatsoever to this crime.

29.     The Lake County Major Crimes Task Force, which included officers from the Lake County Sheriffs Department, Waukegan, Zion, Vernon Hills and Buffalo Grove, took charge of the investigation. The murder was intensively covered in the Chicago and Lake County media and the Task Force officers were immediately under enormous pressure to swiftly solve the crime.

30.     No physical evidence at the crime scene, nor any other reliable evidence, pointed to the possibility that Plaintiff had committed the murder or was in any way involved in the crime.

### The Coercion of Plaintiff's Confession

31.     Shortly after Plaintiff found the bodies, officers from the Zion police department asked Plaintiff to come to the Zion police station and Plaintiff agreed to do so.

32.     After an initial interview at the Zion police station, defendants Schletz and Harris came to the Zion station and informed Plaintiff that they needed him to come with them to another location so that they could question him further. At around 10 a.m., on May 9, 2005, Plaintiff was transported to a police facility in Waukegan, located at 13 N. Genesee Street.

33.     At that location Plaintiff was placed in a small room with no windows and no clock.   During the 20 hours that Plaintiff would remain at 13 N. Genesee Street, it was impossible for him to know the time of day or, as the hours went by, whether it was day or night.

34.     Defendants Schletz and Harris began to interrogate Plaintiff by questioning him about Laura and Krystal, and how he had found the bodies.  Defendants knew that Plaintiff was exhausted at the time the interrogation commenced and had not slept at all the night before.  In addition to sleep deprivation, Plaintiff was manifestly shattered by the murders of his daughter and her friend, and repeatedly broke down over the course of the interrogation that followed.

35.     Notwithstanding plaintiff's obviously fragile state, the individual police officer defendants conducted a 20-hour physically and psychologically coercive interrogation that culminated in Plaintiff's signing a written confession to the murders of Laura Hobbs and Krystal Tobias and later reading that false confession in front of a video camera.

36.     The facility at 13 N. Genesee Street was equipped with recording equipment which would have made it possible to video tape the entirety of the interrogation of Plaintiff. The defendants elected not to use that equipment.

37.     At the time the defendants commenced their interrogation of Plaintiff there was no evidence linking Plaintiff in any way to the murders.  The defendants lacked probable cause to arrest Plaintiff.

38.     At no time during the interrogation did any of the defendants inform plaintiff that he was free to leave.  In fact, a reasonable person in Plaintiff's position would not have believed that he was free to leave the interrogation.  Among other things, Plaintiff had been driven to the site of the interrogation in a police vehicle and had no independent transportation home; the

interrogation was conducted in quarters within the police station, most of it in a small, windowless interrogation room; Plaintiff was subjected to an increasingly hostile, accusatory and aggressive interrogation by a number of police officers; and Plaintiff's protestations of innocence were ridiculed and belittled by those police officers, who consistently and emphatically informed Plaintiff that he was guilty of murder.

39.     During one of the breaks in the interrogation Plaintiff attempted to leave by opening the door to the interrogation room.  Plaintiff  was confronted by defendant Jonites who was positioned immediately outside the room, guarding it to prevent Plaintiff from leaving, and who held up his hand and indicated to Plaintiff that he should not leave the room and that he should wait for the return of defendants Schletz and Harris, who were questioning Plaintiff at that time.

40.     As the interrogation progressed, Plaintiff became increasingly emotionally and physically exhausted.  Each time the defendant police officers left the interrogation room to take breaks, Plaintiff repeatedly attempted to get some rest by lying on the floor.  When the detectives returned, they resumed their interrogation of Plaintiff, never asking whether Plaintiff needed a break because of emotional and physical exhaustion.

41.     The physically and psychologically coercive interrogation tactics that the defendants employed over the course of 20 hours included, but are not limited to, the following:

- Defendants Schletz and Harris, with the active advice and encouragement of their commander, William Valko, aggressively and forcefully questioned Plaintiff and soon began to suggest that he must have been involved in their murders.

9

- Defendants Schletz and Harris repeatedly told plaintiff to describe in detail the appearance of the bodies when he discovered them, including the positioning of the dead girls' limbs, and asked whether he could see the faces of Laura and Krystal.

- Defendants Schletz and Harris produced graphic photographs of the girls' dead bodies showing their multiple wounds and blood-soaked clothing, and forced Plaintiff to look at them.  When Plaintiff was unable to look at the mutilated body of his daughter, Schletz grabbed his head and forced him to face the photograph. As he did so, Schletz knocked Plaintiff to the ground.

- Defendants Schletz and Harris ignored Plaintiff's repeated requests for an opportunity to speak with a lawyer, and, notwithstanding those requests, continued to insistently and aggressively accuse Plaintiff of murdering his daughter and her friend.

- Schletz and Harris told Plaintiff that he could be allowed to go home if he took and passed a Voice Stress Analysis (VSA) test, which they falsely represented was a technology that could determine whether someone was lying. The VSA test is in fact widely discredited and the United States Department of Justice has concluded that it is no better in determining deception among arrestees than flipping a coin.

- Defendant Jonites purported to administer a VSA test to Plaintiff on four separate occasions.  After completing the purported test, Jonites falsely

informed Plaintiff that he had failed; that the test conclusively showed that Plaintiff was lying; and that Plaintiff needed to tell Schletz and Harris what he had done to the two girls.

- Defendant Schletz repeatedly taunted Plaintiff, at one point making obscene suggestions about the girls' genitalia and underwear, and suggesting that Plaintiff would like to seize Schletz's gun. When Plaintiff, disgusted by Schletz's suggestions, would not look at Schletz and placed his hand over his face, Schletz grabbed his hand and forcefully moved it away.

- Defendant Cappelluti employed the tactic of telling Plaintiff that he should pray with Cappelluti and should tell Cappelluti in his prayers what he had done to his daughter. Like Schletz and Harris, Cappelluti repeatedly and insistently accused Plaintiff of murdering his daughter and her friend.

- Defendants Schletz and Cappelluti falsely told Plaintiff that there was physical evidence which established that he was guilty of the murders, and that evidence technicians were going to come to test his clothing and that this would show the presence of blood.

- Defendants Schletz, Harris, Jonites, Dever, Derkens and John Doe all confronted Plaintiff and interrogated Plaintiff as a group, with Dever telling Plaintiff that he possessed a special camera that would reveal evidence on Plaintiff's clothing which would show Plaintiff's guilt.

- Defendant Dever told other officers to take Plaintiff's clothes, and

11

Plaintiff was forced by defendants Schletz, Harris, Jonites, Derkens and John Doe to take off all of his clothes.  Defendant Harris came back into the room with a see-through blue paper suit which he instructed Plaintiff to put on.   At this time, Plaintiff broke down crying and Dever told the other officers to "get this piece of shit out of here."

- Throughout the final hours of the interrogation, Plaintiff was only allowed to wear a see-through paper suit.

- Defendant Cappelluti advised Plaintiff that he had a fellow officer who was outside the room who was not too happy with what had happened to the girls, and that Plaintiff would not want him to come into the room. When Plaintiff continued to maintain his innocence and refused to confess Cappelluti and Schletz left the room, with Cappelluti saying to Plaintiff, "I warned you."

- Defendant Jones, an extremely large man, then entered the room, alone, and began to interrogate Plaintiff, threatening that God would punish him for killing the girls. When Plaintiff responded that he did not kill the girls, Jones punched him in the side of his head, causing his head to hit the wall. Jones then threatened that if Plaintiff responded to being hit he would kill him and make up a story that Plaintiff had attempted to seize his gun. As Jones turned to leave he threatened, "Don't make me have to come back in here."

12

- Following the physical and psychological abuse at the hands of defendant Jones, defendants Schletz and Cappelluti resumed the interrogation of Plaintiff and demanded that he confess to the murders.

42.     At this point, Plaintiff had been in police custody for about twenty hours; had not slept for two nights; had not been allowed to leave the police station; had been detained in rooms with no windows so that he was unable to determine whether it was day or night; was unable to determine what time it was; had been stripped of his clothes and forced to wear a see-through paper outfit so that he was practically naked; had been subjected to intense and relentless interrogation by the defendants who had repeatedly and continually accused him of killing his daughters; had been physically forced to examine photographs of the mutilated bodies of his daughter and her friend; had been denied access to a lawyer even though he had requested one; had been beaten and threatened with further violence; all after enduring the most traumatic experience that a father could have: finding his daughter's body, lifeless and bloodied. As a result of all of these factors, among others, Plaintiff's will was overborne. Plaintiff told the defendant police officers that he would say he did it and they should take him to a judge.

43.     Schletz and Cappelluti then concocted a story which they fed to Plaintiff to parrot back to them, telling him to say that he was angry at Laura for playing with Krystal, that he tried to get Laura to come home but she resisted, that he struck Laura, and that he had a knife and stabbed Krystal and Laura to death, then moved their bodies to the location where they were found.

44.     While Schletz and Cappelluti were forcing Plaintiff to give this false inculpatory statement they became dissatisfied with Plaintiff's performance. Cappelluti left the room and

Jones entered. Jones sat down next to Plaintiff, crowding him into the corner in a manner which led Plaintiff to believe that he would punch him again if Plaintiff did not come up with a story that was satisfactory to the defendants.

45.     Plaintiff then gave a story that was satisfactory to these defendants, in which he falsely acknowledged that he had murdered Laura and Krystal.

46.     Schletz then typed up the account that Plaintiff had been forced to give.  Schletz and Jones reentered the room and told Plaintiff to sign the confession. Believing that if he did not he would be subjected to additional physical abuse and psychological coercion, Plaintiff signed the paper involuntarily and against his will.

47.     Later that day, Schletz, Jones, Cappelluti and Harris drove Plaintiff to Beulah Park where  they met John Doe.  These defendants told Plaintiff to show them where he had thrown the knife used in the murders. When Plaintiff was unable to do so, since he had not been involved in the murders and had not thrown a knife anywhere, Schletz told Harris to take Plaintiff to Jones to return him to the car. When Jones placed Plaintiff in the car he punched him in the side and said that Plaintiff had made him look bad in front of his commander.

48.     Following these events, Plaintiff was driven back to a police station and was taken to a room where Cappelluti, Jones, Schletz and Harris instructed him to read in front of a video camera the statement which he had signed.

49.     Plaintiff recanted the statement at that time, telling defendant Schletz that the statement was a bunch of made-up lies.  Jones then punched Plaintiff in the head and threatened that if Plaintiff did not read the statement before the camera he would accuse Sheila, Laura's mother, of also being involved in the murders.  As a result of this additional physical and

14

psychological coercion, Plaintiff read the statement in front of the camera.

50.     Defendant Commander William Valko was present at 13 N. Genesee during the interrogation of Plaintiff; was present for and participated in meetings among and between the defendant detectives; and knew about, approved of, and ratified the physical and psychological coercion of Plaintiff by defendants Schletz, Harris, Cappelluti, Jones, Jonites, Dever, Derken and others.

## Plaintiff's Prosecution

51.     Based upon the false inculpatory statement, which the defendants had coerced from him, Plaintiff was charged with the murders of his daughter, Laura Hobbs, and her best friend, Krystal Tobias.

52.     Based upon the false inculpatory statement Plaintiff was thereafter denied bond at a bond hearing and was detained in the Lake County Jail.

53.     Based upon the false inculpatory statement and the heinous nature of the crime, the Lake County State's Attorney gave notice that the State of Illinois would seek the death penalty against Plaintiff.

54.     Defendants Schletz, Cappelluti, Jones, Valko, Harris, Jonites, Derken, Dever, and Doe, working individually and together, prepared false reports in which they falsely stated that Plaintiff's inculpatory statement was voluntary and which failed to record their physical and psychological coercion of Plaintiff and that his inculpatory statement had been concocted by them and was false.

55.     In late August, 2006, at a hearing on Plaintiff's motion to suppress his confession, defendants Schletz, Harris, Jonites and Cappelluti all testified falsely that the confession was

given voluntarily and without coercion, and that Plaintiff never requested a lawyer.

56.     On May 9, 2005, Forensic Pathologist Nancy Jones performed autopsies on each of the victims, taking vaginal, rectal, and oral swabs from each victim, as well as swabs of foreign bodies and samples from the victims' hands.

57.     Subsequently, at the request of Plaintiff's criminal defense lawyers and pursuant to court order, these swabs and other evidence were delivered for testing to Serological Research Institute (SERI), a laboratory which is certified to do forensic testing, including testing of evidence for the presence of biological materials and DNA.

58.     On August 29, 2007, SERI issued a report which stated that there was spermatozoa and semen from an unknown male on a vaginal swab taken from Laura Hobbs at her autopsy in 2005; spermatozoa and semen from an unknown male on a rectal swab taken from Laura Hobbs; spermatozoa and semen from an unknown male on an oral swab taken from Laura Hobbs; spermatozoa and semen on the blue jean skort which Laura Hobbs had been wearing at the time of her murder; and biological material from an unknown male on swabs taken from Laura Hobbs's right and left hands.

59.     The report further stated that DNA testing established that Jerry Hobbs was excluded as the source of any of the semen, spermatozoa or biological material, and that a single male was the source of all of that material. The report further stated that the DNA profile was suitable for entry into local, state and national databases in order to identify the actual perpetrator.

60.     At no time following the revelation of this exonerating evidence did the defendant police officers take any steps to reveal that Plaintiff's confession—the sole remaining "evidence"

16

that he was guilty of the murders—was, in fact, involuntary and the product of physical and psychological coercion which they had inflicted on Plaintiff.

61.     On November 12, 2008, Plaintiff's criminal defense attorneys moved for a review of his bond on the basis of the DNA findings described in the preceding paragraphs. The attorneys also requested a search of the latent DNA profile in state and national databases in order to identify the real perpetrator.

62.     On December 2, 2008, the Circuit Court of Lake County conducted a hearing on Plaintiff's motion for review of his bond in light of the new DNA evidence. At that time, based solely on the false inculpatory statement which the defendant police officers had coerced from Plaintiff, the Circuit Court judge denied the motion. Plaintiff thereafter continued to be detained in the Lake County Jail.

### Plaintiff's Exoneration

63.     On June 24, 2010, a search of the national offender databases revealed a match between the DNA profile found on and in Laura Hobbs and her clothing and the DNA profile of one Jorge Torrez, a former Zion resident and a friend of Krystal Tobias's brother. Torrez's profile was on the national offender databases because he was charged with sex offenses in the Commonwealth of Virginia. Torrez was subsequently convicted of the Virginia offenses.

64.     On August 4, 2010, based on this match, the Lake County States Attorney dismissed the charges against Jerry Hobbs, and he was released from custody. At the time of his release, Plaintiff had spent more than five years unjustly confined in the Lake County jail.

17

**Plaintiff's Damages**

65.     As a direct result of defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Plaintiff sustained injuries and damages, including loss of his freedom for over five years, pain and suffering, severe mental anguish, emotional distress, loss of income, inadequate medical care, humiliation, indignities and embarrassment, degradation, permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and freedom of speech and expression.

**The Defendants Acted Pursuant to a Conspiracy**

66.     The defendants, acting jointly and with other unnamed persons, including other police and prosecutorial investigative, supervisory, and command personnel, together, and under color of law, reached an understanding, engaged in a course of conduct, engaged in a joint action, and otherwise conspired among and between themselves to deprive Plaintiff of his constitutional rights, and did deprive Plaintiff of these rights, including his rights to be free from unreasonable arrest and seizure, from wrongful confinement and imprisonment and from coercive interrogation.  The defendants also denied Plaintiff his right to an attorney, his rights to access to the Courts and to a fair and impartial criminal proceeding, and his right to due process as protected by the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

18

67.    In furtherance of this conspiracy, during the afternoon of May 9, as Plaintiff's coercive interrogation was underway, several defendants, including Schletz, Harris, Cappelluti, Jones, Valko and Jonites, met together at the Zion police station where they reviewed the facts of the case, including the complete lack of any reliable evidence that Plaintiff had any involvement with the crime.  At that time, these defendants agreed and determined that they should continue their aggressive and forceful interrogation of Plaintiff in an effort to force him to confess to involvement in the murders.   The subsequent coercion of Plaintiff's false confession was undertaken by these defendants and the other named individual defendants in furtherance of that agreement.

68.    Also in furtherance of this conspiracy or conspiracies, the defendants, together with their co-conspirators, each committed one or more of the overt acts set forth above, including, but not limited to, the wrongful arrest, imprisonment, charging and prosecution of Plaintiff; the fabrication, manipulation, alteration, and coercion of false and unreliable inculpatory evidence against Plaintiff, including Plaintiff's confession; the failure to expose and/or stop the malicious prosecution, false imprisonment, and wrongful conviction of Plaintiff; the repeated deception of prosecuting attorneys, the grand jury and judges, by, *inter alia*, making knowing misstatements and the presentation of this knowingly false and incomplete evidence to those persons; the giving of false testimony and the filing of false and incomplete statements and reports; the suppression and destruction of favorable, exculpatory evidence; the failure to come forward with a truthful account of the events; and the other acts set forth above.

69.    The conspiracy or conspiracies, joint actions and overt acts continue to this date, have caused and continue to cause Plaintiff's constitutional rights to be violated and the pain,

suffering, fear, mental anguish, detention, imprisonment, humiliation, defamation of character and reputation, loss of freedom and companionship, and other injuries as set forth above.

## COUNT I
### (42 U.S.C. § 1983 – Coerced Confession)

70.     Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

71.     The actions of defendants Harris, Cappelluti, Schletz, Valko, Jonites, Jones, Derken, Dever and Doe individually, jointly, and in conspiracy, in coercively interrogating Plaintiff and forcing him to give false and fabricated admissions to the murders of Laura Hobbs and Krystal Tobias, violated Plaintiff's Fifth Amendment right to be free from compulsory self-incrimination, as made applicable to the states through the Fourteenth Amendment.

WHEREFORE, Plaintiff demands judgment against these defendants for compensatory damages, and, because these defendants acted maliciously, willfully, wantonly, and/or with reckless disregard for Plaintiff's constitutional rights, for punitive damages, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

## COUNT II
### (42 U.S.C. § 1983 – Denial of Due Process)

72.     Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

73.     The actions of defendants Harris, Cappelluti, Schletz, Valko, Jonites, Jones, Derken, Dever and Doe individually, jointly, and in conspiracy, in coercively interrogating Plaintiff and forcing him to give false and fabricated admissions to the murders of Laura Hobbs and Krystal Tobias, were shocking to the conscience and thereby violated Plaintiff's Fourteenth Amendment right to due process.

WHEREFORE, Plaintiff demands judgment against these defendants for compensatory damages, and, because these defendants acted maliciously, willfully, wantonly, and/or with reckless disregard for Plaintiff's constitutional rights, for punitive damages, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

### COUNT III
### (42 U.S.C. § 1983 4th and 14th Amendment Claim for Malicious Prosecution)[1]

74.     Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

75.     Defendants Harris, Cappelluti, Schletz, Valko, Jonites, Jones, Derken, Doe and Dever, despite knowing that probable cause did not exist to arrest and prosecute Plaintiff for the murders of Laura and Krystal, acted individually and in concert to cause Plaintiff to be arrested and prosecuted for that crime, thereby violating Plaintiff's right pursuant to the Fourth and Fourteenth Amendments of the United States Constitution to be free from unreasonable searches and seizures and to due process.

76.     Specifically, despite the fact that the defendants were aware of information that probable cause did not exist to arrest Plaintiff, the defendants intentionally caused Plaintiff to be arrested and prosecuted for the murders of Laura and Krystal. Furthermore, the defendants intentionally withheld from and misrepresented to prosecutors, judges and the grand jury facts

---

[1] Plaintiff recognizes that the Seventh Circuit Court of Appeals has held that there is no cause of action for malicious prosecution under 42 U.S.C. § 1983, under either a Fourth or a Fourteenth Amendment theory. This issue has not yet been determined by the United States Supreme Court and Plaintiff is pleading this count in order to preserve this issue for potential review by the United States Supreme Court and for potential reconsideration by the Seventh Circuit.

77.     that further vitiated probable cause against Plaintiff as set forth above, and failed to investigate evidence which would have led to the actual assailant.  The defendants performed the above-described acts deliberately, with reckless disregard for the truth, and with malice.

78.     As a direct and proximate result of the defendants' actions, Plaintiff was wrongly charged and imprisoned and was deprived of his freedom for more than five years, and suffered the other grievous and continuing injuries and damages as set forth above.

WHEREFORE, Plaintiff demands judgment against these defendants for compensatory damages, and, because these defendants acted maliciously, willfully, wantonly, and/or with reckless disregard for Plaintiff's constitutional rights, for punitive damages, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

### COUNT IV
### (42 U.S.C. § 1983 *Monell* Policy Claim Against the City of Waukegan)

79.     Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

80.     Upon information and belief, the actions of Schletz, Cappelluti and Valko as alleged above, were done pursuant to one or more interrelated *de facto* policies, practices and/or customs of the defendant City of Waukegan, its Police Department, Police Board, and/or City Council.

81.     Upon information and belief, at all times material to this complaint, the City of Waukegan and its Police Department had interrelated *de facto* policies, practices, and customs which included, *inter alia*:

a)      filing false reports and giving false statements and pursuing and obtaining wrongful prosecutions and false imprisonments on the basis of such reports and statements;

b)	failing to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control police officers, particularly those who were repeatedly accused of wrongful imprisonments, malicious prosecutions and wrongful convictions and of making false reports and statements;

c)	maintaining a police code of silence, pursuant to which police officers refused to report or otherwise covered up instances of police misconduct, and/or the fabrication, suppression and destruction of evidence of which they were aware, despite their obligation under the law and police regulations to do so;

d)	covering up, suppressing and withholding exonerating, exculpatory, and/or other evidence favorable to criminal defendants;

e)	engaging in abusive interrogations which were designed to coerce confessions.

82.	These interrelated policies, practices and customs, as set forth above, both individually and together, were maintained and implemented with deliberate indifference; encouraged, *inter alia*, the fabrication, manipulation, and alteration of evidence, the making of false statements and reports, the giving of false testimony, and the pursuit and continuation of wrongful convictions and false arrests and imprisonments; and were, separately and together, a direct and proximate cause of the unconstitutional acts committed by the named defendants and their co-conspirators, and the injuries suffered by Plaintiff.

83.	Additionally, the failure to properly train, discipline, monitor, control, assign, transfer, supervise, and counsel the police defendants was done with deliberate indifference and acted as a direct and proximate cause of the injuries to Plaintiff.

WHEREFORE, Plaintiff demands judgment against the City of Waukegan for compensatory damages, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

**COUNT V**
**(42 U.S.C. § 1983 *Monell* Policy Claim Against Lake County Sheriff Mark Curran Jr.)**

84.     Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

85.     Upon information and belief, the actions of defendants Jonites and Dever as alleged above, were done pursuant to one or more interrelated *de facto* policies, practices and/or customs of Lake County Sheriff Mark Curran Jr. , the Lake County Sheriff's Office and the Lake County Major Crimes Task Force.

86.     Upon information and belief, at all times material to this complaint, defendant Lake County Sheriff's Office had interrelated *de facto* policies, practices, and customs which included, *inter alia*:

        a)     filing false reports and giving false statements and pursuing and obtaining wrongful prosecutions and false imprisonments on the basis of such reports and statements;

        b)     failing to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control police officers, particularly those who were repeatedly accused of wrongful imprisonments, malicious prosecutions and wrongful convictions and of making false reports and statements;

        c)     maintaining a police code of silence, pursuant to which police officers refused to report or otherwise covered up instances of police misconduct, and/or the fabrication,

24

suppression and destruction of evidence of which they were aware, despite their obligation under the law and police regulations to do so;

d)      covering up, suppressing and withholding exonerating, exculpatory, and/or other evidence favorable to criminal defendants;

e)      engaging in abusive interrogations which were designed to coerce confessions.

87.      These interrelated policies, practices and customs, as set forth above, both individually and together, were maintained and implemented with deliberate indifference; encouraged, *inter alia*, the fabrication, manipulation, and alteration of evidence, the making of false statements and reports, the giving of false testimony, and the pursuit and continuation of wrongful convictions and false arrests and imprisonments; and were, separately and together, a direct and proximate cause of the unconstitutional acts committed by the named defendants and their co-conspirators, and the injuries suffered by Plaintiff.

88.      Additionally, the failure to properly train, discipline, monitor, control, assign, transfer, supervise, and counsel the police defendants was done with deliberate indifference and acted as a direct and proximate cause of the injuries to Plaintiff.

WHEREFORE, Plaintiff demands judgment against Lake County Sheriff Mark Curran in his official capacity for compensatory damages, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

**COUNT VI**
**(42 U.S.C. § 1983 *Monell* Policy Claim Against the City of Zion)**

89.     Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

90.     Upon information and belief, the actions of defendant Harris as alleged above, were done pursuant to one or more interrelated *de facto* policies, practices and/or customs of the defendant City of Zion its Police Department, Police Board, and/or City Council.

91.     Upon information and belief, at all times material to this complaint, the City of Zion and its Police Department had interrelated *de facto* policies, practices, and customs which included, *inter alia*:

        a)      filing false reports and giving false statements and pursuing and obtaining wrongful prosecutions and false imprisonments on the basis of such reports and statements;

        b)      failing to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control police officers, particularly those who were repeatedly accused of wrongful imprisonments, malicious prosecutions and wrongful convictions and of making false reports and statements;

        c)      maintaining a police code of silence, pursuant to which police officers refused to report or otherwise covered up instances of police misconduct, and/or the fabrication, suppression and destruction of evidence of which they were aware, despite their obligation under the law and police regulations to do so;

        d)      covering up, suppressing and withholding exonerating, exculpatory, and/or other evidence favorable to criminal defendants;

e) engaging in abusive interrogations which were designed to coerce confessions.

92. These interrelated policies, practices and customs, as set forth above, both individually and together, were maintained and implemented with deliberate indifference; encouraged, *inter alia*, the fabrication, manipulation, and alteration of evidence, the making of false statements and reports, the giving of false testimony, and the pursuit and continuation of wrongful convictions and false arrests and imprisonments; and were, separately and together, a direct and proximate cause of the unconstitutional acts committed by the named defendants and their co-conspirators, and the injuries suffered by Plaintiff.

93. Additionally, the failure to properly train, discipline, monitor, control, assign, transfer, supervise, and counsel the police defendants was done with deliberate indifference and acted as a direct and proximate cause of the injuries to Plaintiff.

WHEREFORE, Plaintiff demands judgment against the City of Zion for compensatory damages, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

## COUNT VII
### (42 U.S.C. § 1983 *Monell* Policy Claim Against the Village of Vernon Hills)

94. Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

95. Upon information and belief, the actions of defendant Jones, as alleged above, were done pursuant to one or more interrelated *de facto* policies, practices and/or customs of the defendant Village of Vernon Hills its Police Department, Police Board, and/or Village Council.

96.     Upon information and belief, at all times material to this complaint, the Village of Vernon Hills and its Police Department had interrelated *de facto* policies, practices, and customs which included, *inter alia*:

a)      filing false reports and giving false statements and pursuing and obtaining wrongful prosecutions and false imprisonments on the basis of such reports and statements;

b)      failing to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control police officers, particularly those who were repeatedly accused of wrongful imprisonments, malicious prosecutions and wrongful convictions and of making false reports and statements;

c)      maintaining a police code of silence, pursuant to which police officers refused to report or otherwise covered up instances of police misconduct, and/or the fabrication, suppression and destruction of evidence of which they were aware, despite their obligation under the law and police regulations to do so;

d)      covering up, suppressing and withholding exonerating, exculpatory, and/or other evidence favorable to criminal defendants;

e)      engaging in abusive interrogations which were designed to coerce confessions.

97.     These interrelated policies, practices and customs, as set forth above, both individually and together, were maintained and implemented with deliberate indifference; encouraged, *inter alia*, the fabrication, manipulation, and alteration of evidence, the making of false statements and reports, the giving of false testimony, and the pursuit and continuation of wrongful convictions and false arrests and imprisonments; and were, separately and together, a

28

direct and proximate cause of the unconstitutional acts committed by the named defendants and their co-conspirators, and the injuries suffered by Plaintiff.

98.     Additionally, said failure to properly train, discipline, monitor, control, assign, transfer, supervise, and counsel the police defendants was done with deliberate indifference and acted as a direct and proximate cause of the injuries to plaintiff.

WHEREFORE, Plaintiff demands judgment against the Village of Vernon Hills for compensatory damages, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

## COUNT VIII
### (42 U.S.C. § 1983 *Monell* Policy Claim Against the Village of Buffalo Grove)

99.     Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

100.    Upon information and belief, the actions of defendant Derken as alleged above, were done pursuant to one or more interrelated *de facto* policies, practices and/or customs of the Defendant Village of Buffalo Grove, its Police Department, Police Board, and/or Village Council.

101.    Upon information and belief, at all times material to this complaint, the Village of Buffalo Grove and its Police Department had interrelated *de facto* policies, practices, and customs which included, *inter alia*:

a)      filing false reports and giving false statements and pursuing and obtaining wrongful prosecutions and false imprisonments on the basis of such reports and statements;

b)      failing to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control police officers, particularly those who were repeatedly accused of

29

wrongful imprisonments, malicious prosecutions and wrongful convictions and of making false reports and statements;

c)      maintaining a police code of silence, pursuant to which police officers refused to report or otherwise covered up instances of police misconduct, and/or the fabrication, suppression and destruction of evidence of which they were aware, despite their obligation under the law and police regulations to do so;

d)      covering up, suppressing and withholding exonerating, exculpatory, and/or other evidence favorable to criminal defendants;

e)      engaging in abusive interrogations which were designed to coerce confessions.

102.    These interrelated policies, practices and customs, as set forth above, both individually and together, were maintained and implemented with deliberate indifference; encouraged, *inter alia*, the fabrication, manipulation, and alteration of evidence, the making of false statements and reports, the giving of false testimony, and the pursuit and continuation of wrongful convictions and false arrests and imprisonments; and were, separately and together, a direct and proximate cause of the unconstitutional acts committed by the named defendants and their co-conspirators, and the injuries suffered by Plaintiff.

103.    Additionally, said failure to properly train, discipline, monitor, control, assign, transfer, supervise, and counsel the police defendants was done with deliberate indifference and acted as a direct and proximate cause of the injuries to plaintiff.

WHEREFORE, Plaintiff demands judgment against the Village of Buffalo Grove for compensatory damages, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

### COUNT IX
### (Malicious Prosecution Claim under Illinois law)

104.    Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

105.    The criminal proceedings against Plaintiff were terminated in his favor on August 4, 2010.

106.    Defendants Harris, Cappelluti, Schletz, Valko, Jonites, Jones, Derken, Dever and Doe individually, jointly, and in conspiracy, by coercing a confession from Plaintiff and by deceiving the prosecutors who prosecuted Plaintiff's case, initiated and continued a malicious prosecution without probable cause against Plaintiff.

WHEREFORE, Plaintiff demands judgment against these defendants for compensatory damages, and, because these defendants acted maliciously, willfully, wantonly, and/or with reckless disregard for Plaintiff's constitutional rights, for punitive damages, plus the costs of this action, and such other relief as this Court deems equitable and just.

### COUNT X
### (Intentional Infliction of Emotional Distress Claim under Illinois law)

107.    Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

108.    The extreme and outrageous conduct of defendants Harris, Cappelluti, Schletz, Valko, Jonites, Jones, Derken, Dever and Doe as set forth above, which was intentional or reckless, caused and continues to cause severe emotional distress to Plaintiff.

31

WHEREFORE, Plaintiff demands judgment against defendants for compensatory damages, plus the costs of this action, and such other relief as this Court deems equitable and just.

## COUNT XI
### (Conspiracy Claim under Illinois law)

109. Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

110. The actions of defendants Harris, Cappelluti, Schletz, Valko, Jonites, Jones, Derken, Dever and Doe as set forth above, constituted the tort of conspiracy under Illinois law.

WHEREFORE, Plaintiff demands judgment against these defendants for compensatory damages, and, because these defendants acted maliciously, willfully, wantonly, and/or with reckless disregard for Plaintiff's constitutional rights, for punitive damages, plus the costs of this action, and such other relief as this Court deems equitable and just.

## COUNT XII
### (Respondeat Superior Claims)

111. Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

112. At all times relevant to this complaint defendants Schletz, Valko and Cappelluti acted as agents of, and in the scope of their employment with, defendant City of Waukegan.

113. At all times relevant to this complaint defendant Harris acted as an agent of, and in the scope of his employment with, defendant City of Zion.

114. At all times relevant to this complaint defendant Jones acted as an agent of, and in the scope of his employment with, defendant Village of Vernon Hills.

115. At all times relevant to this complaint defendant Derken acted as an agent of, and in the scope of his employment with, defendant Village of Buffalo Grove.

32

116.    At all times relevant to this complaint defendants Jonites and Dever acted as agents of, and in the scope of their employment with, defendant Lake County Sheriff Mark Curran Jr. and the Lake County Sheriff's Office.

117.    The defendant municipalities and defendant Curran are liable for the torts of their respective agents which violated state law under the doctrine of *respondeat superior*.

WHEREFORE, Plaintiff demands judgment against the City of Waukegan, the City of Zion, the Village of Vernon Hills, the Village of Buffalo Grove and Lake County Sheriff Mark Curran for compensatory damages, plus the costs of this action, and such other relief as this Court deems equitable and just.

## COUNT XIII
### (745 ILCS 10/9-102 Claims)

118.    Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

119.    Defendants City of Waukegan, City of Zion, Village of Buffalo Grove and Village of Vernon Hills were the respective employers of each of the defendants at all times relevant to this complaint, as set forth above.

120.    Defendant Lake County is obligated to indemnify Mark Curran, Robert Dever and Timothy Jonites for any judgment against them or settlement they enter into.

121.    Defendants committed the acts alleged above in the scope of their employment as employees of the respective municipalities

122.    Pursuant to 745 ILCS 10/9-102, each governmental entity set forth above is liable to pay all judgments and settlements entered against any of its employees acting within the scope of his employment.

WHEREFORE, Plaintiff demands judgment against each of the municipalities for any judgment or settlement entered against any defendant employed by it as damages, costs and interest, and for whatever additional relief this Court deems equitable and just.

## JURY DEMAND

Plaintiff demands trial by jury.

Respectfully submitted,

**JERRY HOBBS**


/s/ Locke Bowman                                 /s/ John L. Stainthorp

| | |
|---|---|
| Locke E. Bowman | John L. Stainthorp |
| Julia Rickert | People's Law Office |
| RODERICK MACARTHUR JUSTICE CENTER | 1180 N. Milwaukee |
| Northwestern University School of Law | Chicago, IL 60642 |
| 375 East Chicago Avenue | 773 235-0070 |
| Chicago, Illinois 60611 | 773 235-6699 (Fax) |
| (312) 503-0844 | Stainthorp@aol.com |
| (312) 503-1272 (Fax) | |