## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **JERRY HOBBS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 10 C 7649** |
| | ) | |
| **DOMENIC CAPPELLUTI, CHARLES SCHLETZ** | ) | **Honorable Joan Lefkow** |
| **and WILLIAM VALKO, of the Waukegan Police** | ) | |
| **Department; CITY OF WAUKEGAN; ANDREW** | ) | **Magistrate Judge** |
| **JONES, of the Vernon Hills Police Department;** | ) | **Geraldine Soats Brown** |
| **VILLAGE OF VERNON HILLS; KEVIN HARRIS,** | ) | |
| **of the Zion Police Department; CITY OF ZION,** | ) | |
| **THOMAS DERKEN of the Buffalo Grove Police** | ) | |
| **Department; VILLAGE OF BUFFALO GROVE;** | ) | |
| **Lake County State's Attorney MICHAEL WALLER;** | ) | |
| **Assistant Lake County State's Attorney, MICHAEL** | ) | |
| **MERMEL; Assistant Lake County State's Attorney** | ) | |
| **JEFF PAVLETIC; Assistant Lake County State's** | ) | |
| **Attorney, COUNTY OF LAKE; Laboratory Director** | ) | |
| **GARTH GLASSBURG, Analyst KELLY** | ) | |
| **LAWRENCE, NORTHEASTERN ILLINOIS** | ) | |
| **REGIONAL CRIME LABORATORY and** | ) | |
| **UNKNOWN POLICE OFFICERS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## SECOND AMENDED COMPLAINT

NOW COMES Plaintiff, JERRY HOBBS, by and through his attorneys, Kathleen

T. Zellner & Associates, P.C., and complaining of Defendants, DOMENIC

CAPPELLUTI, CHARLES SCHLETZ, WILLIAM VALKO, CITY OF WAUKEGAN,

ANDREW JONES, VILLAGE OF VERNON HILLS, KEVIN HARRIS, CITY OF

ZION, THOMAS DERKEN, VILLAGE OF BUFFALO GROVE, MICHAEL WALLER,

MICHAEL MERMEL, JEFF PAVLETIC, COUNTY OF LAKE, GARTH

1

GLASSBURG, KELLY LAWRENCE, NORTHEASTERN ILLINOIS REGIONAL

CRIME LABORATORY and UNKNOWN POLICE OFFICERS, and states as follows:

### Factual Summary

On May 9th, 2005, within hours of discovering the bodies of Laura Hobbs

(hereinafter referred to as "Laura") and Krystal Tobias (hereinafter referred to as

"Krystal"), the defendants concluded what can best be described as a botched

investigation of the murders.  Jerry Hobbs (hereinafter referred to as "Jerry") was easy

prey for the defendants as they interrogated him for over twenty hours in marathon

sessions that involved extreme mental and physical abuse.  Having just discovered the

twisted and butchered bodies of his daughter and her friend, he was in the most fragile

mental state imaginable, and the defendants seized the opportunity to pressure him into

giving a false confession.  Probable cause to arrest and prosecute was based exclusively

upon the false confession.

### Failure to Corroborate Jerry's Alleged Confession

The defendants knew the substance of Jerry's confession was untrue on its face

and was contradicted by the DNA findings.  No efforts were made to contact any of the

national experts or agencies who study and collect data on violent crimes.  A simple

inquiry to one of these experts or agencies would have ruled Jerry out as a potential

suspect, because there are no reported cases in the United States where a parent, in order

to discipline their child, stabbed the child multiple times, including in the child's eyes,

sexually assaulted her and then stabbed the child's friend multiple times.  Less than 10%

2

of child murder cases involving a sexual assault are committed by a parent. In the vast majority of child murder cases where a parent is the perpetrator, the other parent is murdered, and the motive is not discipline, but revenge.

In their rush to frame Jerry, no efforts were made to determine if Laura had been the victim of past abuse by either parent. The autopsy made no mention of prior sexual abuse. No inquiries were made to Laura's doctor or teachers about whether she was being abused. The Illinois Department of Children and Family Services also found that there was no prior abuse. Family members, if asked, would have attested to the fact that Laura was very attached to her father and was thrilled that he was living with them. Further investigation would have revealed that Jerry was very indulgent with Laura, rarely told her no, and never disciplined her. Jerry spent almost all of his free time with his children. Despite earlier episodes of drinking and using drugs when he was much younger, Jerry did not use drugs and rarely drank after he moved in with his family.

Further investigation of the crime scene and the autopsy report would have revealed that neither Laura nor Krystal had defensive wounds, so there was no struggle as the confession alleged. A sexual assault would not have been ruled out simply because the girls were dressed, as the defendants thought, because in at least one-third of sexual homicides, the victim is redressed. The positioning of Laura's and Krystal's shoes would have been significant to an expert on sexual homicides as suggesting a certain type of sexual predator.

There is also readily available data of the psychological effect on parents of having their child murdered. It is well known by psychologists that parents of murdered children suffer from numbness and a form of emotional anesthesia following their child's

death. The vast majority of these parents express prolonged periods of constricted affect and feelings of extreme detachment. Jerry's behavior during the interrogation could not have been used to establish probable cause because of the extraordinary emotional shock he suffered when he discovered his daughter. The line that separates aggressive law enforcement from impermissible conduct lies several standard deviations removed from the conduct at issue here.

## Defendants Waller, Pavletic, and Mermel

The Lake County State's Attorney, Defendant Michael Waller (hereinafter referred to as "Defendant Waller") rather than stopping this affront to the Constitution and the laws of Illinois, joined in, mobilizing the full power of the office in an effort to control the prosecution and build a case against an innocent man. Defendants Waller and Assistant Lake County State's Attorney Jeffrey Pavletic (hereinafter referred to as "Defendant Pavletic") were present for a briefing about the interrogation at 4:40 a.m. on May 10, 2005. It was apparent at that briefing that constitutional violations had occurred at the interrogation. They knew or should have known the confession was false. Defendant Waller praised Defendant Commander William Valko (hereinafter referred to "Defendant Valko") and all members of the task force for their "professionalism" and "extraordinary efforts in resolving this case." Waller knew all about the "extraordinary" efforts made to frame Jerry. The State's Attorney's Office, among other things, set out to manipulate and conceal evidence that would disprove the confession on its face. The alleged confession omitted the crucial detail that Laura had been sexually assaulted.

4

Defendant Waller became aware that the confession was false after DNA testing confirmed that there was a sexual assault of Laura Hobbs.

Jerry's confession was contradicted by the autopsy report and subsequent DNA testing. The autopsy report verified that neither Laura nor Krystal had defensive wounds and yet the confession described both girls struggling with Jerry. The DNA confirmed the motive of the crime was clearly a sexual assault which was also readily apparent from the injuries, the positioning of the bodies, and placement of the victim's shoes.

As further proof the State's Attorney's Office was acting maliciously, after they had received DNA confirmation of a sexual assault on Laura Hobbs, Defendant Michael G. Mermel (hereinafter referred to as "Defendant Mermel") issued a ridiculous series of statements. Defendant Mermel stated that the semen that was found inside of Laura and on her clothes was the result of her playing around the crime scene where couples went and had sex. A competent forensic scientist would reject this statement as "bogus" because environmental DNA has a very short lifespan. It would be destroyed by ultra-violet rays, condensation and fluctuating temperatures. The concentration of semen would have to be in exactly the same concentration and location as the semen that was ultimately found inside Laura. DNA does not migrate from one location to another. If Mermel's theory was correct, there would have been multiple DNA profiles, not simply one profile. The only explanation for the presence of semen on Laura's oral, vaginal and rectal swabs is that she was sexually assaulted. No prosecutor acting in good faith would claim otherwise. Mermel also said that the semen was not in "any significant area of Laura Hobbs' body." The truth is semen was found in every orifice of Laura Hobbs' body. Although scientifically unsupportable, the cruel reality of Mermel's mindset was

to deprive an innocent man of his freedom and subject him to all of the mental distress that comes from being unjustly incarcerated.  There was no probable cause for Jerry's arrest, prosecution and incarceration.

Finally, after languishing in a prison cell for over 5 years, 2 full years after the discovery of the exculpatory DNA, Jerry was released.  In one last malicious swipe at Jerry's reputation, Defendant Waller commented that no one from his office would be fired over the case and no apology would be made to Jerry.  On the day of Jerry's release, after the case against Jerry was dismissed, and the prosecution terminated, Defendant Waller, without the slightest hint of compassion, defiantly stated, "I have studied this case and I don't believe law enforcement did anything wrong."  Defendant Waller also stated after the case against Jerry was dismissed, and the prosecution terminated, that he was "not convinced that Hobbs didn't have a role in the killings" but he "didn't believe the case could be proved beyond a reasonable doubt."  Apparently Defendant Waller believed they had framed Jerry fair and square.  Months after Jerry was released, Defendant Mermel advised a national news organization that the evidence demonstrated that Jerry is guilty.  Defendant Pavletic made similar statements.  The misconduct involved here, the framing of Jerry for a crime he did not commit, lies at the core of what Congress sought to prevent in the Civil Rights statutes.  It is unfathomable that the Reconstruction Congress would somehow silently have provided immunity for this kind of misconduct.

### Jurisdiction and Venue

1.     This is a civil rights action brought pursuant to 42 U.S.C. §1983 et seq.; the Judicial Code, 28 U.S.C. §§1331 and 1343(a); and the Constitution of the United States.  This Court also has and supplemental jurisdiction as codified in 28 U.S.C. §1367(a).

2.     This Court has jurisdiction of the action pursuant to 28 U.S.C. § 1331. Venue is proper under 28 U.S.C. §1391(b) because the events giving rise to Plaintiff's claims occurred in this judicial district and the parties resided, at the time the events took place, in this judicial district.

3.     This Court also has diversity jurisdiction pursuant to 28 U.S.C. §1332(a)(1), as Plaintiff is a citizen of the State of Texas, no defendant is a citizen of Texas, and the amount in controversy is greater than $75,000.

### The Parties

4.     Plaintiff Jerry Hobbs is currently a resident and citizen of the State of Texas.  At the time of the events underlying this action, Jerry was a resident and citizen of Lake County, Illinois.

5.     Defendant Domenic Cappelluti ("hereinafter referred to as "Defendant Cappelluti") was at all times relevant herein employed as a police officer in the Waukegan Police Department and assigned to the Lake County Major Crimes Task Force at the time of some of the wrongdoing alleged in the Second Amended Complaint.

6.     Defendant Charles Schletz ("hereinafter referred to as "Defendant Schletz") was at all times relevant herein employed as a police officer in the Waukegan Police Department and assigned to the Lake County Major Crimes Task Force at the time of some of the wrongdoing alleged in the Second Amended Complaint.

7.     Defendant William Valko was at all relevant times to this action employed as a commander in the Waukegan Police Department.  At the time of some or all of the wrongdoing alleged in this complaint Valko was assigned to the Lake County Major Crimes Task Force.  At all times relevant to this action, Defendant Valko was a direct supervisor of several defendants, including Schletz, Harris and Cappelluti, and supervised these defendants in the investigation and interrogation of plaintiff.

8.     Defendant City of Waukegan is a duly incorporated municipal corporation and at all relevant times was the employer of Defendants Cappelluti, Schletz and Valko. The City of Waukegan is liable for the wrongful acts of the Defendants Cappelluti, Schletz and Valko while acting within the scope of their employment pursuant to its statutory obligation to indemnify them.

9.     Defendant Andrew Jones (hereinafter referred to as "Defendant Jones") was at all times relevant herein employed as a police officer in the Vernon Hills Police Department and assigned to the Lake County Major Crimes Task Force at the time of some of the wrongdoing alleged in the Second Amended Complaint.

10.     Defendant Village of Vernon Hills is a duly incorporated municipal corporation and at all relevant times was the employer of Defendant Jones.  The Village of Vernon Hills is liable for the wrongful acts of Defendant Jones while acting within the scope of his employment pursuant to its statutory obligation to indemnify him.

11.     Defendant Kevin Harris (hereinafter referred to as "Defendant Harris") was at all times relevant herein employed as a police officer in the Zion Police Department and assigned to the Lake County Major Crimes Task Force at the time of some of the wrongdoing alleged in the Second Amended Complaint.

12.     Defendant City of Zion is a duly incorporated municipal corporation and at all relevant times was the employer of Defendant Harris.  The City of Zion is liable for the wrongful acts of Defendant Harris while acting within the scope of his employment pursuant to its statutory obligation to indemnify him.

13.     Defendant Thomas Derken (hereinafter referred to as "Defendant Derken") was at all times relevant herein employed as a police officer in the Buffalo Grove Police Department and assigned to the Lake County Major Crimes Task Force.

14.     Defendant Village of Buffalo Grove is a duly incorporated municipal corporation and at all relevant times was the employer of Defendant Derken.  The Village of Buffalo Grove is liable for the wrongful acts of Defendant Derken while acting within the scope of his employment pursuant to its statutory obligation to indemnify him.

15.     The Lake County Major Crimes Task Force is an organization formed by, *inter alia*, the State's Attorney of Lake County, the Lake County Sheriff, and the police chiefs of several municipal police departments in Lake County, and is involved in investigations of certain major crimes which occur in Lake County.

16.     Defendant Michael J. Waller is the acting Lake County State's Attorney, and was the Lake County State's Attorney at all times relevant herein.  Defendant Waller is responsible for supervising all prosecutions and is a member of the Lake County Major Crimes Task Force.   Defendant Waller is sued in his individual capacity.

9

17. Defendant Michael G. Mermel is an Assistant State's Attorney in the Lake County State's Attorney Office, and was so employed at all times relevant herein. Defendant Mermel is a member of the Lake County Major Crimes Task Force. Defendant Mermel is sued in his individual capacity.

18. Defendant Jeff Pavletic is an Assistant State's Attorney in the Lake County State's Attorney Office, and was so employed at all times relevant herein. Defendant Pavletic is a member of the Lake County Major Crimes Task Force. Defendant Pavletic is sued in his individual capacity.

19. Defendant Garth Glassburg is the Laboratory Director employed by the Northeastern Illinois Regional Crime Lab; Defendant Kelly Lawrence is a forensic analyst employed by the Northeastern Illinois Regional Crime Lab. Both Defendant Glassburg and Defendant Lawrence were so employed at all times relevant herein and are each sued in their individual capacity. The Northeastern Illinois Regional Crime Laboratory is a crime lab that performs forensic testing located in Vernon Hills, Illinois.

20. Defendant County of Lake (hereinafter referred to as "Lake County") is a governmental entity within the State of Illinois which consists in part of the Lake County State's Attorney's Office (hereinafter referred to as "SAO").

21. Defendant Lake County is liable for the wrongful acts of Defendants Waller, Mermel, and Pavletic pursuant to its statutory obligation to indemnify them.

22. Lake County is responsible for the policies and practices of the Lake County Major Crimes Task Force and its State's Attorneys Office, through the action of Defendant Waller, and Defendants Pavletic, Mermel and other Assistant State's Attorneys and employees.

23. Defendant Unknown Police Officers (hereinafter referred to as "Defendant Unknown Police Officer") were at all times relevant herein assigned to the Lake County Major Crimes Task Force and their names are unknown to Plaintiff at this time.

24. Each of the individual police officer defendants named above engaged in the conduct complained of under color of state law and in the course and scope of his employment with the municipal police department with which he is affiliated and the Lake County Major Crimes Task Force.

25. Each of the individual police officer defendants is sued in his individual capacity.


## Allegations of Fact

### The Murders of Laura Hobbs and Krystal Tobias

26. On Sunday, May 8, 2005, Mother's Day, Jerry lived at 2015 Gilboa, Zion, Illinois, with Sheila Hollabaugh (hereinafter referred to as "Sheila"). Three children born to the couple also lived at the address: Laura, 8 years of age, Jerry Hobbs, Jr. (hereinafter referred to as "Jerry Jr."), 10 years of age, and Jeremy Hobbs (hereinafter referred to as "Jeremy"), 6 years of age. Another child of Sheila's, Meagan Smith (hereinafter referred to as "Meagan"), 13 years of age, also lived with the family.

27. This close knit family spent part of the day together flying kites at Illinois Beach State Park, and then returned home. Jerry, Jerry Jr., Jeremy and Sheila stayed indoors and watched the Lord of the Rings Trilogy. Laura went outside to play, riding her bicycle.

11

28.     Laura was supposed to return by dark, at approximately 7:00 p.m., and when she did not Jerry and Jerry Jr.began to search for her.  They soon learned that Laura's best friend, Krystal, 9 years of age, was also missing.

29.     During the evening, Jerry, Sheila, Meagan, Jerry Jr., Sheila's father Arthur and his wife Emily searched the neighborhood for Laura, including nearby Beulah Park, where children often played.  The search was unsuccessful, and Jerry and Sheila contacted the local police to report that their daughter was missing.

30.     Jerry searched most of the night for Laura, but it was difficult to search in Beulah Park because parts of it were heavily wooded and unlit.  The police also searched the park and surrounding neighborhood throughout the evening.

31.     After a sleepless night, Jerry and Arthur resumed their search and returned to the park at daybreak.

32.     Because Jerry was a skilled outdoorsman, he discovered the bodies of his daughter and her friend Krystal.  The two bodies were lying face up, two to three feet apart, in a grassy, open area.  Both girls had been repeatedly stabbed and beaten about the face and head.

33.     Eight year old Laura, who weighed sixty pounds, and was four feet four inches tall, was stabbed twenty times, in the neck, back, abdomen, left and right flanks and both eyes.  Her face had deep purple bruising, she had multiple linear abrasions on her arms, thighs, lower legs and her back.  Significantly, Laura had no defensive wounds, showing there was not a struggle.  Obviously, she was caught by surprise.  This is a blatant contradiction of the confession that Jerry was forced to sign, stating both girls fought with him and he physically overpowered them.  The pathologist, Nancy Jones,

M.D., who performed the autopsies did not rule out a sexual assault. No such opinion was offered because it would be impossible to know this without DNA testing. The vaginal, rectal and oral swab DNA testing was not done until August 29, 2007 and confirmed a sexual assault of Laura.

34.     Nine year old Krystal, who weighed sixty four pounds and was four feet three inches, had eleven stab wounds to her neck, right axilla, left upper abdomen, left lower abdomen, mid abdomen, liver, hemothorax, and hemoperitoneum. She had multiple abrasions, bruises, hemorrhages, both subgaleal and petechial, and cerebral edema. Again, no defensive wounds were noted, demonstrating there was not a struggle, in contradiction to the confession Jerry was forced to sign. The existence of a sexual assault was not determined until DNA testing was completed on August 29, 2007. There were no autopsy findings that either girl had ever been physically or sexually abused prior to May 8, 2005.

35.     Jerry, an innocent father, collapsed on the spot, sobbing and moaning uncontrollably. He and Laura had been very close. He never abused her, was very indulgent with her, and never disciplined her. Laura was very attached to Jerry and very happy he was now living with her mother.

36.     The Lake County Major Crimes Task Force (hereinafter "the Task Force") included officers from the Lake County Sheriff's Department, Waukegan, Zion, Vernon Hills and Buffalo Grove, as well as members of the Lake County State's Attorney's Office. The murder was intensively covered in the Chicago and Lake County media, and the defendants believed they were under enormous pressure to make an arrest, prosecute someone and obtain a conviction. Sadly, not only did they frame an innocent man, but

they let the real killer escape and he continued to sexually assault and attempt to murder other females.

37.     No forensic evidence at the crime scene, or any other reliable evidence, pointed to even a remote possibility that Jerry had murdered or sexually assaulted Laura, or murdered Krystal.  Any qualified violent crime expert would have instantly classified this as a sexual homicide.  No experienced and honest police officer or prosecutor would conclude that because a victim was clothed and there was no visible evidence of sexual trauma, there had been no sexual assault.


**Jerry Hobbs' Arrest, Interrogation and Coerced Confession**

38.     The final product of the interrogation was a one page fabricated document, created and typed by the police and signed by Jerry, which the police allege contain Jerry's confession to these horrific murders.  Jerry disputes the veracity of the alleged statement, and claims that his signature on that document is the result of physical and mental coercion over a lengthy period of time. The alleged statement that came out of this interrogation constituted the State's only evidence against Jerry.  There is no physical evidence linking Jerry to the murders, only the alleged "gut feelings" of the defendants who rushed to falsely arrest, charge and prosecute him.

39.     Jerry's formal education ended after the third grade.  His vocabulary and understanding of the meaning of words was at the third grade level.

40.     The defendants instantly created a theory that was completely refuted by the autopsy and forensic evidence.  The theory was that these murders were motivated by a parent who lost control when disciplining his child and brutally killed her and her

14

friend. No search of any of the national data banks for violent crimes contains such a case. The theory was unprecedented and bizarre from the outset.

41.     Shortly after Jerry found the bodies, he was taken to the Zion police station and placed under arrest. Jerry had no transportation to leave the police department. He was never told that he was under arrest or that he was free to leave. He was kept confined in two rooms for the next twenty hours, and he was interrogated approximately twenty-five different times, usually in a tag team style approach that has been severely criticized by police interrogation experts throughout the world.

42.     After an initial interrogation at the Zion police station, Defendants Schletz and Harris informed Jerry that he needed to come with them to another location so that they could question him further. At around 10:00 a.m. on May 9, 2005, Jerry was transported to the Waukegan Police Department, located at 13 N. Genesee Street.

43.     At that location Jerry was kept in a small windowless room with no clock. For the next 20 hours, Jerry remained at 13 N. Genesee Street where he was psychologically and physically terrorized until he broke down and signed a one page typed confession created and forced upon him by several of the defendants.


### Violation of *Miranda* Rights

44.     Prior to his arrest, Jerry was not fully informed of his *Miranda* rights.

45.     The facility at 13 N. Genesee Street was equipped with recording equipment that would have made it possible to videotape the entirety of the interrogation of Jerry. For obvious reasons, all defendants involved in the interrogation elected not to use that equipment to record their illegal actions during the next twenty hours.

First Interrogation: Schletz and Harris

46.    Defendant Schletz came into the room and sat immediately next to Jerry. Schletz told Jerry he would like him to sign a form that "just said Jerry was agreeing to let them ask questions." They told him the form was "nothing really" and it was to help Jerry help the police. Jerry did not read the form and Schletz did not read it to him. Upon information and belief, this form was a Miranda waiver form that Jerry was tricked into signing.

47.    Defendants Schletz and Harris began to interrogate Jerry about Laura and Krystal, and how he had discovered the bodies.

48.    Defendants knew that Jerry was exhausted at the time the interrogation commenced, and that he had not slept the preceding twenty four hours. In addition to sleep deprivation, Jerry was in shock about the murders of Laura and Krystal. He was completely traumatized by finding the two mutilated bodies. He repeatedly broke down crying over the course of the interrogation.

49.    This first "session" lasted approximately an hour and fifty-five minutes. During this interrogation, an officer sat in a chair by the door to the interrogation room, blocking the exit. From the moment Jerry was placed in the room he was under arrest without probable cause. A reasonable person in Jerry's position would not have believed he was free to leave the interrogation. Among other things, Jerry had been driven to the interrogation in a police vehicle and had no independent transportation home.

Second Interrogation: Schletz and Harris

50. Jerry was left alone in the room for a period of time. Upon their return, Schletz and Harris resumed their interrogation of Jerry. They asked him about how the bodies were laying, how far Jerry was from the bodies and why Jerry hadn't gone up to the bodies to check if the girls were still alive. They told Jerry his timeline did not match up with theirs and wanted him to tell the story again.

51. Schletz told Jerry that the girls' shoes were off. Schletz showed Jerry pictures of the girls' bodies, so that Jerry knew Krystal's eyes were open. Schletz told Jerry how many times the bodies had been stabbed. Providing crime scene photographs and crime scene details known only to the killer to a potential suspect violates every proper interrogation method used by law enforcement in the United States.

52. Jerry demonstrated how far he was from the bodies by pointing from himself to the wall. This was approximately five (5) feet but Schletz insisted that Jerry said it was twenty feet. If it were twenty feet, the defendants could claim Jerry was lying because he would not have been able to describe the injuries in such detail. Schletz and Harris left the room again.


Third Interrogation: Schletz and Harris

53. As the interrogation progressed, Jerry became increasingly emotionally and physically exhausted. Each time defendant police officers left the interrogation room to take breaks; Jerry repeatedly attempted to get some rest by lying on the floor. When the officers returned, they resumed their interrogation of Jerry, never asking whether he

needed a break because of emotional and physical exhaustion. The defendant officers took numerous breaks over the course of the interrogation.

Fourth Interrogation: Schletz and Harris

54. Schletz and Harris came in and Jerry got up off the floor. Schletz began asking Jerry how he was able to find the bike and girls so quickly that morning. Jerry responded that he just stumbled across the bike. He had been following deer tracks.

55. Jerry began crying and told them that he didn't ask to find the girls, he just did. Jerry had gone down that trail because it was the only one he saw. Schletz then got a map and asked Jerry to show everywhere he had searched.

56. Jerry explained the path he had taken. Schletz and Harris left and Jerry lay down on the floor again because of his emotional and physical exhaustion.

Fifth Interrogation: Schletz, Harris

57. Schletz and Harris came in and again Jerry got off the floor. Schletz asked Jerry what happened to Laura and Krystal and then accused Jerry of killing them. Jerry adamantly denied having anything to do with the murders and told them they were looking at the wrong man.

58. Schletz told Jerry there would be physical evidence linking him to the crime scene. Jerry repeatedly said no and provided his alibi. Schletz and Harris told him that his alibi wasn't verified because Sheila was sleeping from 5:00-7:00 p.m. and Jerry Jr. said he didn't see Jerry in the house at that time. Jerry Jr. was subjected to extreme coercion and manipulation in an effort to get him to implicate his father.

59.     Schletz then had Jerry sign a consent to search form for the search of his house.  Schletz told Jerry there would be physical evidence that would link him to the crime.  Of course no physical evidence ever developed against him because Jerry did not commit the crime.

60.     Schletz and Harris left the room and Jerry smoked a cigarette.  Upon finishing the cigarette, he opened the door to leave.  An officer blocked Jerry's exit from the room, held up his hand, and indicated that Jerry could not leave the room.

61.     Jerry stayed in the room, took off his shoes, pulled off his jacket to put under his head as a pillow, and closed his eyes.  Clearly, he was totally exhausted and should have been allowed to leave.


Sixth Interrogation: Schletz and Harris

62.     The more Jerry resisted, the more verbally abusive the officers got.  He was emotionally, mentally and physically distraught and exhausted.

63.     Schletz asked Jerry what the spots on his jacket were and pulled the jacket away from Jerry, handing it to Harris.

64.     Schletz continued asking the exact same questions over and over again and kept accusing Jerry of killing Laura and Krystal.   He asked Jerry to describe how the girls looked.  Jerry persisted in his denials.

65.     Schletz then asked Harris for the crime scene photographs and started laying them out on the table.  Jerry would not look at the photos and looked at the wall. He began crying and saying he didn't kill his little girl.

66. Defendants Schletz and Harris produced graphic photographs of the girls' dead bodies showing their multiple wounds and blood-soaked clothing and forced Jerry to look at them. When Jerry was unable to look at the mutilated body of his daughter, Schletz grabbed his head and forced him to face the photograph. As he did so, Schletz knocked Jerry to the ground. Schletz then shoved a picture of Laura's battered and stabbed face in Jerry's face and Jerry turned away. Schletz asked what the photo looked like and Jerry said Laura "didn't have a face" because her face was so mutilated. Schletz tried to show another photograph. Jerry would not look, Schletz put his hand around the back of Jerry's neck to turn his head and force him to look. Jerry stiffened and Schletz yanked him out of the chair, throwing him to the floor. Schletz and Harris stood over him and told him that he had to tell them why he killed the girls because they knew he had done it.

67. Jerry then asked for a lawyer. Jerry's requests for a lawyer were ignored. Schletz took another horrific crime scene photograph of Laura and showed it to Jerry. Schletz kept repeating that Jerry killed Laura and Krystal. No proper interrogation technique permits an officer to show crime scene photographs of the victims to a potential suspect during an interrogation.

68. Schletz and Harris told Jerry that he would be allowed to go home if he took and passed a Voice Stress Analysis (VSA) test, which they falsely represented as a technology that could determine whether someone was lying. The VSA test is in fact widely discredited, and the United States Department of Justice has concluded that it is no better in determining deception among arrestees than flipping a coin.

20

Seventh, Eighth and Ninth Interrogations: Schletz, Harris

69.    An Officer purported to administer a VSA test to Jerry on four separate occasions. After completing the purported tests, Jerry was falsely informed that he had failed; that the tests conclusively showed that Jerry was lying; and that Jerry needed to tell Schletz and Harris what he had done to the two girls.

Tenth Interrogation: Schletz and Harris

70.    Schletz walked in the room with papers rolled up in his hand. He told Jerry that Jerry needed to tell him the truth about what happened in the woods with the girls. Jerry told him he didn't know and that he did not kill the girls. Schletz said that the test results had told him otherwise. Schletz hit Jerry across the head with the paper and said the test didn't lie.

71.    Again, Jerry asked for a lawyer. Schletz told him that he had "gotten all the lawyers he was getting." No lawyer was ever contacted for Jerry by the defendants. Jerry put his hand over his eyes and looked to the wall and stopped talking. Jerry's efforts to invoke his Fifth Amendment right to silence were held against him by the defendants that later testified this was another indicia of his guilt.

72.    Defendant Schletz then began saying things like: "How did their neck feel when you cut it?" "Did you see their panties?" and "Did you stab them in the pussy?" Schletz lied and said Jerry could go home shortly, but if they found any evidence connecting Jerry to the crime, Jerry was going to wish he had never come to Zion.

73.    Defendant Schletz repeatedly taunted Jerry, at one point making obscene suggestions about the girls' genitalia and underwear, and suggesting that Jerry might like

21

to seize Schletz's gun and if he did Schletz would then have justification for killing him. When Jerry, disgusted by Schletz's suggestions, would not look at Schletz and placed his hand over his face, Schletz grabbed his hand and forcefully moved it away.

Eleventh Interrogation: Schletz and Cappelluti

74.    Cappelluti said that the way Jerry went and found the girls in the woods was like winning the lottery. He told Jerry it was like a miracle and asked whether he had a special gift. Cappelluti asked if Jerry believed in God. When Jerry said yes, Cappelluti said he would pray for Laura. Jerry began crying. Cappelluti's opinion that Jerry must have committed the murder because he found the girls is preposterous in light of the fact that the real killer, Jorge Torrez, was nowhere near the scene. Why would Jerry lead police to the body? It would be the last thing the killer would do.

75.    Cappelluti told Jerry to move his hands from his face and to start telling the truth. Jerry told him he had been telling the truth but that they didn't want to hear what he was saying.

76.    Schletz lied and told Jerry that Art thought it was "odd" that Jerry went straight to the trail, and Sheila was sleeping for two hours and Jerry Jr. said he didn't see Jerry in the house at that time.

77.    Cappelluti lied and said there was an eyewitness who said they had seen Jerry in the woods on a mountain bike. Schletz said they found a baseball cap under one of the girls and that it must be Jerry's cap. Cappelluti said the evidence technicians would discover blood on Jerry's clothes. Of course, there was no blood on Jerry's clothes.

78.     Schletz left the room and Cappelluti prayed with Jerry, holding his hand.

Twelfth Interrogation: Schletz, Harris, Derken and Valko

79.     Schletz and Harris took Jerry into a big room with a camera. An officer stood by the camera with Derken and Valko behind him. Jerry was told how the camera worked and was advised this was Jerry's chance to tell them what happened. Jerry said he didn't kill his little girl. Jerry was called a liar and told that it was known he did it and a test would be performed with a light that would show evidence all over Jerry.

80.     Jerry told them there was nothing on his clothes. The lights were turned out and shined on Jerry's clothes. There was a mark on Jerry's pant leg and Jerry said when he was crying he wiped his nose there. They told him to hold his hands out and asked where he got bruises. Jerry said those weren't bruises, they were scars from work. Then they asked Jerry about scratches and Jerry said those were probably from his search in the woods. Schletz told him to "stop lying."

81.     Defendants Schletz, Harris, Derken and Unknown Police Officers all confronted Jerry and interrogated him as a group; Jerry was advised that they possessed a special camera that would reveal evidence on Jerry's clothing which would show Jerry's guilt.

82.     Officers took Jerry's clothes, and Jerry was forced by Defendants Schletz, Harris, Derken and Unknown Police Officers to take off all of his clothes. Defendant Harris came back into the room with a see-through paper suit which he instructed Jerry to put on. At this time, Jerry broke down crying and an officer told the other officers to "get this piece of shit out of here."

23

83.    An officer said he was going to take pictures of the blood on Jerry's clothes so the jury could see what kind of a liar he was because they all knew Jerry killed those two little girls.  Jerry was put back into the interrogation room.

84.    Defendants Schletz and Harris, with the active advice and encouragement of their commander, Defendant Valko, aggressively and forcefully questioned Jerry and accused Jerry of having been involved in the murders.

Thirteenth Interrogation: Schletz and Cappelluti

85.    Cappelluti told Jerry that everybody knew he killed the girls but they wanted to know why.  Cappelluti told Jerry if he told them why Cappelluti would make sure Jerry was taken straight to the hospital.  Jerry again denied killing his little girl. Schletz stated "bullshit Jerry you just show up in town and now your little girl and her friend are dead and everybody we talked to, including your family, thinks you did it. Jerry was told his family had not even called about him and had abandoned him.

86.    Defendant Cappelluti advised Jerry that he had a fellow officer who was outside the room who was not happy about what happened to the girls, and that Jerry would not want him to come into the room.  When Jerry continued to maintain his innocence and refused to confess as Cappelluti and Schletz left the room, Cappelluti said, "I warned you."

Fourteenth Interrogation: Jones

87.    Defendant Jones, an extremely large man, then entered the room, alone, and began to interrogate Jerry, threatening that God would punish him for killing the

girls. When Jerry responded that he did not kill the girls, Jones punched him in the side

of his head, slamming his head into the wall. Jones then threatened that if Jerry

responded to being hit, he would kill him and make up a story that Jerry had attempted to

seize his gun. As Jones turned to leave he threatened, "Don't make me have to come

back in here."

Fifteenth Interrogation: Schletz and Cappelluti

88.     Following the physical and psychological abuse at the hands of defendant

Jones, defendants Schletz and Cappelluti resumed the interrogation of Jerry and

demanded that he confess to the murders.

89.     Again, the tag team continued with Schletz and Cappelluti asking Jerry

what happened to the girls. Jerry responded, asking whether they wanted him to say he

killed his little girl and that they did not want to hear the truth. Schletz said, "well then

tell us some lies Jerry."

90.     At this point, Jerry had been in police custody for at least twenty hours,

had not slept for two nights, had not been allowed to leave the police station, had been

detained in rooms with no windows so that he was unable to determine whether it was

day or night, was unable to determine what time it was, had been stripped of his clothes

and forced to wear a see-through paper outfit so that he was practically naked, had been

subjected to intense and relentless interrogation by the defendants who had repeatedly

and continually accused him of killing his daughter, had been physically forced to

examine gruesome photographs of the mutilated bodies of his daughter and her friend,

had been denied access to a lawyer even though he had requested one, had been beaten

and threatened with further violence, all after enduring the most traumatic experience that a father could: finding his daughter's body, lifeless and bloodied. As a result of all of these factors, among other, Jerry's will was overborne. Jerry told the defendant police officers that he would say he did it and they should take him to a judge. Jerry believed a judge would see the defendants forced him to confess.

91.     Schletz and Cappelluti then concocted a ridiculous story about Jerry looking for the girls, finding them, and trying to get Laura to go home. According to the defendants' story, Krystal attacked him and he flipped out and stabbed them a total of 31 times. Jerry would not agree to write out this story so they did it for him.

92.     Schletz told Jerry that he hit Laura so hard she fell on the ground and didn't get back up. Schletz asked where the knife came in. Jerry in a desperate state of mind, interjected that Krystal came after him with a potato peeler. Jerry thought a judge would toss out the case because a potato peeler could not have inflicted those wounds.

93.     While Schletz and Cappelluti tried to force Jerry to give this false inculpatory statement, and he resisted, Cappelluti left the room and Jones entered.


Sixteenth Interrogation: Schletz and Jones

94.     Jones sat down next to Jerry, crowding him into the corner in a manner that led Jerry to believe that he would punch him again if Jerry did not come up with a story that was satisfactory to the defendants.

95.     Jerry persisted in his denials.

96.     Schletz said they were going to bring some paper in and for Jerry to write everything down and for Jerry to write an apology letter to Sheila and Krystal's mother.

Seventeenth Interrogation: Harris

97.     Harris brought in paper and a pen and told Jerry to start writing out the concocted story.

Eighteenth Interrogation: Schletz

98.     Jerry refused to write anything down.  Schletz walked into the room and said that he would just type it up because Jerry told him he was not going to "write those lies down."

Nineteenth Interrogation: Cappelluti

99.     Cappelluti walked in and asked Jerry whether he was going to write and tell the families that he was sorry for what he had done.  Jerry told Cappelluti that he would not write out the concocted story.

100.    Cappelluti responded by threatening to return Jones and Schletz to the room and then left the room carrying the paper.

Twentieth Interrogation: Schletz and Jones

101.    Schletz and Jones entered the room, looming over Jerry.  Schletz slid the statement he had typed up in front of Jerry and ordered him to sign it.  Jerry did not want to sign these lies. However, he knew Jones was going to punch him until he did what they demanded, so he signed it.

Twenty-First Interrogation: Harris, Schletz, Jones, Cappelluti and Unknown Police Officers

102.    Harris came in with County clothes/uniform and took the paper suit away. Schletz and Harris handcuffed Jerry.  They walked him downstairs to the car where Jones and Cappelluti were standing.  Schletz put Jerry in the backseat and Schletz and Jones sat on either side of him.  Schletz told Jerry everybody was "happy."  They said Jerry was going to show them where the knife was.  Jerry was afraid if he said anything he would be physically attacked by Jones and Schletz.  He figured at the park he could get some help.  He walked down the trail and showed them where he found the girls.   There were three other officers at the scene on the other side of the creek.

103.    The above named defendant officers kept telling Jerry to tell where the knife was and he said that there was no knife and that he didn't kill the girls.  He again stated that he didn't do it.  The defendants had Jones take Jerry back to the car where Jones began punching him in his side.

Twenty-Second Interrogation: Harris and Schletz

104.    They returned to a new, larger interrogation room.  Schletz put Jerry in front of a camera and ordered him to read the typed statement.  Jerry told Schletz it was a "bunch of lies," and Jones again punched him in the head.  Jones told Harris to go get Sheila, as they were now going to charge her as well.  The threat of them charging Sheila was more than Jerry could stand, so he finally agreed to read their fabricated statement to save Sheila.  He feared what would happen to their surviving children if they lost their mother and father.

105.    First, they videotaped Jerry saying yes when Schletz asked him if statements were correct to his knowledge.  Apparently the first video established that Jerry was not participating, so Defendants re-did the video.  The defendant officers and prosecutors did not disclose the first video to Jerry's defense counsel at any point during his prosecution.  The first video has never been viewed by anyone except the defendants. After Jerry finished, he told Schletz that they made him say all the lies.  Schletz responded by asking Jerry who Jerry thought people would believe.  Schletz then told Jerry that he was going to get the death penalty "for sure."

106.    A few hours later, one of the jail guards took Jerry out of his cell to where Schletz was standing.  Schletz told Jerry that they hadn't found the knife and Jerry responded, "I did not kill the girls and I can't show you a knife that does not exist and that all that stuff is lies you made up."  A guard overheard this and wrote a report documenting this conversation.

107.    Notwithstanding Jerry's obviously fragile state, the individual police officer defendants conducted a 20-hour plus physically and psychologically coercive interrogation that culminated in Jerry signing a typed confession, fabricated by the defendants, to the murders of Laura and Krystal.  Jerry read that false confession in front of a video camera.

108.    At the time the defendants commenced their interrogation of Jerry, there was no evidence linking Jerry in any way to the murders.  The defendants lacked probable cause to arrest Jerry after they coerced him into signing a typed statement that they prepared.

109.    Defendant Valko was present at 13 N. Genesee during the interrogation of Jerry. Valko was present for and participated in meetings among and between the defendant officers; and knew about, approved of and ratified the physical and psychological coercion of Jerry performed by Defendants Schletz, Harris, Cappelluti, Jones, Derken and Unknown Police Officers.

110.    Defendants Waller and Pavletic were present during the videotaping of Jerry's false confession. They ratified the actions of the defendant officers in the interrogation. The defendants from the Lake County State's Attorney's Office participated in concealing that Jerry's confession was false so that the prosecution of him could continue. The defendant officers referred to Defendants Waller and Pavletic as "our bosses," demonstrating the control the State's Attorney had over the investigation. Waller was acting in an investigatory capacity rather than in the capacity of an advocate.

111.    Schletz met with Defendants Waller and Pavletic during the course of the interrogation to review the progress they were making with Jerry. Defendants Waller and Pavletic were aware of the events that occurred during the interrogation.

112.    Defendants Waller, Pavletic, Mermel controlled and directed the investigation after Jerry's arrest. They attended the "round table" meetings at the Zion Police Department and were brief about all the developments in the case. At no point did Defendants Waller, Pavletic and Mermel stop the prosecution of Jerry until they were forced to by public pressure in August, 2010. They acted in bad faith up to and after the release of Jerry. Defendants Waller, Pavletic, Mermel are immune only if the Constitution condones framing an innocent man.

## Malicious Prosecution

113.  Based upon the false inculpatory statement that the defendants had coerced from him, Jerry was charged with the murders of Laura and Krystal. A bond hearing was held on May 11, 2005, which laid out the prosecution's theory.

114.  Because he was framed for the murders and incarcerated, Jerry was not allowed to attend his daughter's funeral; Jerry was never mentioned in Laura's obituary. In another crushing blow to his emotional state, Jerry learned later that Jorge Torrez, his daughter's killer, did attend her funeral.

115.  Based upon the false inculpatory statements concocted by certain defendants, Jerry was thereafter denied bond at a bond hearing and was detained in the Lake County Jail.

116.  Based upon the false inculpatory statement and the heinous nature of the crime, the Lake County State's Attorney gave notice that the State of Illinois would seek the death penalty against Jerry. No other evidence but Jerry's coerced statement implicated him in the crime. Defendants Waller, Pavletic and Mermel knew the coerced statement was false.

117.  Defendants Schletz, Cappelluti, Jones, Valko, Harris, Derken and Unknown Police Officers, working individually and together, prepared false reports in which they falsely stated that Jerry Hobbs's inculpatory statement was voluntary and that failed to record their physical and psychological coercion of Jerry and that his inculpatory statement had been concocted by them and was false. Some of their notes from the investigation and their interrogation of Jerry were destroyed, in violation of 725 ILCS 5-114/13.

31

118.    There was no physical evidence connecting Jerry to the two murders. The failure of the Defendant prosecutors to dismiss the charges against Jerry after receiving the DNA exclusion of him demonstrates their complicity in framing an innocent man.

**Grand Jury**

119.    The pattern of deception of the courts and public continued with the presentation to the Grand Jury. Assistant Commander Meadie, with the help of the prosecutor, falsely testified to the Grand Jury that Jerry's clothes had blood on them. He also lied to the Grand Jury by testifying there was one interview that was videotaped after the typed statement was prepared when the fact is there were two videotapes made of two interviews. The grand jurors were never told how long Jerry was interrogated or what took place over the course of the interrogation, nor were they shown the first videotape. Meadie also falsely told the Grand Jury that Jerry described "in detail" knives that were found at his home. Meadie also falsely represented that knives taken from the home matched the description of the knife that the police claim Jerry provided.

120.    At the Grand Jury hearing, the prosecutor represented no time of death had been established by referring to an off the record conversation. While this was technically true, the elaboration on that diminished the State's burden, discouraged further investigation and questions regarding a legitimate area of inquiry, and provided evasive/false information. In this case, fly eggs were noted on the victim's body, but they were never recovered nor sent to the appropriate experts to determine the time of death. The fact that off the record conversations occurred between the grand jurors and the

prosecutor demonstrates that the grand jurors were coached by the prosecutor to bring a true bill against Jerry.

## Motion to Suppress

121.    In late August, 2006, at a hearing on Jerry's motion to suppress his confession, Defendants Schletz, Harris and Cappelluti all testified falsely that the confession was given voluntarily and without coercion, and that Jerry never requested a lawyer.

122.    Mermel was involved in introducing Jerry's fabricated confession at the motion to suppress.

## Delays of DNA Testing and Acting on Results

123.    During the autopsies of Laura and Krystal, the medical examiner, Nancy Jones, M.D., took vaginal, rectal and oral swabs to preserve potential DNA evidence. On May 12, 2005, at 2:45 p.m., Defendant Derken, with the knowledge of Defendants Waller and Pavletic, told the Northeastern Illinois Regional Crime Laboratory not to do DNA testing on the swabs.

124.    The prosecution did everything it could to obstruct the criminal defense's opportunities to participate in and conduct their own testing. The prosecution made misrepresentations to the Court regarding the defense request to have their own forensic expert present for testing at the Northeastern Illinois Regional Crime Laboratory, telling Judge Fred Foreman that the lab would have to shut down and no other testing could

occur because of confidentiality and contamination issues.  This assertion has no basis in fact or in science.

125.  The Northeastern Illinois Regional Crime Laboratory took direction from the Lake County State's Attorney's Office.  The lab technicians were told which, if any, tests to perform for the purpose of corroboration and which tests not to perform. Defendant prosecutors controlled the Northeastern Illinois Regional Crime Laboratory by directing the method of the tests performed, the individuals who could be present when the tests were performed and the release date of the test results to the defense attorneys.

126.  On December 13, 2005, Jerry's attorney, David Brodsky wrote a letter to the crime lab addressing the issue that someone from the SAO had told the crime lab not to speak with Brodsky's office regarding this case.  Brodsky stated, "there was an improper aura of secrecy surrounding the evidence."

127.  In that same letter, Attorney Brodsky further wrote:

> I was surprised when you informed me that you had been directed not to speak to me any more regarding your work on this case (that you were told to direct all of my inquires to the States Attorneys Office).  The state of the physical evidence and the lack of any forensic or physical evidence linking Mr. Hobbs to this crime are of paramount importance to the defense.  Transparency in testing and interpretation of the forensic and physical evidence is essential to a fair and honest determination.  I am at a loss as to what can be gained from such secrecy except to favor one side over the other.  I hope that is not the case, but I do not know what other conclusion to draw.  I urge you to revisit that policy with those who directed you, and join me in adopting procedures that will favor an open and honest interpretation as to the meaning of the evidence.

128.  Significantly, no DNA testing was requested by the prosecutors or Sheriff's Office on behalf of the Defendant prosecutors on the vaginal, oral and rectal swabs.  The only examination done on these items by the Northeastern Illinois Regional Crime Laboratory was a microscopic one which did not reveal the presence of

spermatozoa.  Laura Hobbs' vaginal, rectal and oral swabs had a complete nuclear profile of her killer Jorge Torrez.

129.    The Northeastern Illinois Regional Crime Laboratory failed to perform forensic testing it was obligated perform and delayed releasing items to the defense at the direction of the prosecutors.

130.    The Northeastern Illinois Regional Crime Laboratory employee Kelly Lawrence failed to perform testing she was obligated to perform because of directions from the Defendant prosecutors as to the test they wanted to perform.

131.    Upon information and belief, Kelly Lawrence will testify that when evidence is submitted to the Northeastern Illinois Regional Crime Laboratory it is sent by a law enforcement agency; typically they need some background on a case before they do any testing because they do not want to compromise evidence.  For example, in a case involving a bloody baseball bat, she would need to know why the bat needed to be tested – i.e. the blood might be tested to determine if it matches the victim, and/or she might look for prints to determine who was holding the bat.  Normally, the law enforcement agency (i.e. the sheriff or the police) provides the lab the background and instructs in the testing.  The Northeastern Illinois Regional Crime Laboratory also performs testing at the direction of the Lake County States Attorney's Office when that office wishes to corroborate a theory after initial testing has been completed.  She is often in contact with prosecutors.

**The Physical Evidence Proves Jerry Hobbs' Innocence**

132.     On May 9, 2005, forensic pathologist Nancy Jones, M.D., performed autopsies on each of the victims, taking vaginal, rectal and oral swabs from each victim, as well as swabs of foreign bodies and samples from the victims' hands.

133.     Subsequently, at the request of Jerry's criminal defense lawyers and pursuant to court order, these swabs and other evidence were delivered for testing to Serological Research Institute (SERI), a laboratory which is certified to do forensic testing, including testing of evidence for the presence of biological materials and DNA.

134.     On August 29, 2007, SERI issued a report which stated that there was spermatozoa and semen from an unknown male on a vaginal swab taken from Laura at her autopsy in 2005; spermatozoa and semen from an unknown male on a rectal swab taken from Laura; spermatozoa and semen from an unknown male on an oral swab taken from Laura; spermatozoa and semen on the blue jean skirt which Laura had been wearing at the time of her murder; and biological material from an unknown male on swabs taken from Laura's right and left hands.

135.     The report further stated that DNA testing established that Jerry was excluded as the source of any of the semen, spermatozoa or biological material, and that a single male was the source of all of that material. The report further stated that the DNA profile was suitable for entry into local, state and national databases in order to identify the actual perpetrator.

136.     As soon as this report was received, Jerry should have been released. Probable cause never existed to continue the prosecution.

137.    Illinois Rule of Professional Conduct 3.3(a)(1) states that "a lawyer shall not knowingly make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." Defendants Mermel and Pavletic repeatedly violated this rule throughout Jerry's prosecution.

138.    The prosecution made false and malicious representations to the Court regarding the DNA. For example, Mermel stated in open court that the defense reports showed "one errant sperm which is impossible to deposit by the offender." This is false. He also stated to the Chicago Tribune, "None of the sperm they found was in significant place." This is also false. Spermatozoa (plural) was found on oral, vaginal and anal swabs taken from Laura Hobbs and the quantity was sufficient enough to create a full nuclear DNA profile.

139.    Defendant Mermel also stated in open court that, "It doesn't have the underlying P30 base substrate that would be left with an offender, a killer, leaving his sperm on her." This is scientifically and factually false. All of the items (vaginal swabs, anal swabs and material from Laura's skort) showed positive results when tested for the P30 substrate (which is found in seminal fluid).

140.    At no time following the revelation of this exonerating evidence did the defendant police officers take any steps to reveal that Jerry's confession—the sole remaining "evidence" that he was guilty of the murders – was, in fact, involuntary and the product of physical and psychological coercion of Jerry.

141.    On November 12, 2008, Jerry Hobbs' criminal defense attorneys moved for a review of his bond on the basis of the DNA findings described in the preceding

37

paragraphs. The attorneys also requested a search of the latent DNA profile in state and national databases in order to identify the real perpetrator.

142. On December 2, 2008, the Circuit Court of Lake County conducted a hearing on Jerry's motion for review of his bond in light of the new DNA evidence. At that time, based solely on the false inculpatory statement which the defendant police officers had coerced from Jerry, and the misrepresentations made by defendant Mermel, the circuit court denied the motion. Jerry remained in the Lake County Jail.

143. At the time of the exclusionary DNA results, Defendants Waller, Mermel and Pavletic did not have jurisdiction to continue the prosecution of Jerry. There was absolutely no chance Jerry could have been found guilty beyond a reasonable doubt.

### Jerry Hobbs' Release

144. On June 24, 2010, a search of the national offender databases revealed a match between the DNA profile found on and in Laura and her clothing and the DNA profile of Jorge Torrez, a former Zion resident and a friend of Krystal's brother. Torrez's profile was on the national offender databases because he had been arrested and charged with sex offenses in the Commonwealth of Virginia. Torrez was subsequently convicted of the Virginia offenses. The brutal attempted murder of one woman and rape of another would never have happened but for the wrongdoing of the Defendants in delaying the DNA testing.

145. Finally on August 4, 2010, based on this match, the Lake County State's Attorney nolle prossed the charges against Jerry Hobbs, and he was released from

custody.  At the time of his release Jerry had spent 1912 days unjustly confined in the Lake County jail.

### Defamation of Jerry Hobbs

146.    Throughout the course of Jerry's wrongful arrest and malicious prosecution, defamatory statements were made about him by the Lake County State's Attorney's Office. Defendant Pavletic stated on July 7, 2010, "it's not unusual to have some unrelated DNA evidence in a case like this.  It is not necessarily a case breaker."

147.    After the charges were dismissed and Jerry was released from jail, and the prosecution had terminated, the Lake County State's Attorney's Office continued its defamation of Jerry's character.

148.    Defendant Waller, on August 4, 2010, without a shred of evidence, stated "he was not convinced that Hobbs didn't have a role in the killings, but he said "he didn't believe the case could be proved beyond a reasonable doubt." (Chicago Tribune 8/4/10).

149.    Also after the prosecution had terminated, Defendant Waller, without the slightest hint of compassion, defiantly stated, "I have studied this case and I don't believe law enforcement did anything wrong."

150.    Also, subsequent to the termination of the prosecution, Defendant Mermel advised a national news organization that the evidence demonstrated Jerry was guilty. Defendant Pavletic made similar statements subsequent to the termination of the prosecution.

### Jerry Hobbs' Damages

151.    As a direct result of defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions of the Defendants, Jerry sustained injuries and damages including loss of his freedom for over five years, pain and suffering, severe mental anguish, emotional distress, loss of income, inadequate medical care, humiliation, indignities and embarrassment, degradation, permanent loss of natural psychological development, and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and freedom of speech and expression.

152.    Like a prisoner of war, Jerry spent five years in total isolation in his Lake County Jail cell.  He was never given a cell mate or permitted to interact with other inmates.  He had no opportunity to talk to anyone and lived in extreme mental anguish.

### The Defendants Acted Pursuant to a Conspiracy

153.    The defendants, acting jointly and with other unnamed persons, including other police and prosecutorial investigative, supervisory, and command personnel, together, and under color of law, reached an understanding, engaged in a course of conduct, engaged in a joint action, and otherwise conspired among and between themselves to deprive Jerry of his constitutional rights, and did deprive Jerry Hobbs of these rights, including, but not limited to, his rights to be free from unreasonable arrest and seizure, from wrongful confinement and imprisonment and from coercive interrogation.

154.    The defendants also denied Jerry his right to an attorney, his rights of access to the Courts and to a fair and impartial criminal proceeding, and his right to due process as protected by the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution as well as his rights protected by Illinois law and the Illinois constitution.

155.    In furtherance of this conspiracy, during the afternoon of May 9, 2005, as Jerry's coercive interrogation was underway, the defendants, including Schletz, Harris, Cappelluti, Jones, Valko and Unknown Police Officers, met together and reviewed the facts of the case; including the complete lack of any reliable evidence that Jerry had any involvement with the crime. At that time, these defendants agreed and determined that they should continue their aggressive and forceful interrogation of Jerry in an effort to force him to confess to involvement in the murders.

156.    The subsequent coercion of Jerry's false confession was undertaken by these defendants and the other named defendants and unnamed individuals in furtherance of that agreement.

157.    Also in furtherance of this conspiracy or conspiracies, the Defendants, together with their named and unnamed co-conspirators, each committed one or more of the overt acts set forth above, including, but not limited to, the wrongful arrest, imprisonment, charging and prosecution of Jerry; the fabrication, manipulation, alteration, and coercion of false and unreliable inculpatory evidence against Jerry, including Jerry's confession; the failure to expose and/or intervene in the malicious prosecution, false imprisonment, and attempted wrongful conviction of Jerry; the misrepresentations to the grand jury and judges, and the presentation of knowingly false

and incomplete evidence to those persons; the giving of false testimony and the filing of

false and incomplete statements and reports; the suppression and destruction of favorable,

exculpatory evidence; the failure to come forward with a truthful account of the events;

and the other acts set forth above.

158.    The conspiracy or conspiracies, joint actions and overt acts continue to

this date, have caused and continue to cause Jerry's constitutional rights to be violated

and the pain, suffering, fear, mental anguish, detention, imprisonment, humiliation,

defamation of character and reputation, loss of freedom and companionship, and other

injuries as set forth above.

159.    Defendant Cappelluti has a history of obtaining false murder confessions.

Ironically, other police departments hire him to teach them his interrogation "methods."

160.    Jorge Torrez has not been charged with or prosecuted for the murders and

sexual assaults of Laura Hobbs and Krystal Tobias. To charge and prosecute Torrez

would be to admit Jerry was framed for a crime he did not commit, his confession was

false and his claims of coercion are true.


## COUNT I

### (42 U.S.C. §1983 – Coerced Confession: Fourteenth Amendment)

161.    Plaintiff re-alleges paragraphs 1-160 of this Complaint as if fully set forth

herein.

162.    In a manner more fully set forth above, one or more of the Defendants

used unjust violence against Jerry Hobbs in an attempt to coerce him to confess to a

crime he did not commit.

163.    Jerry Hobbs was coerced into falsely confessing to the murders of Laura Hobbs and Krystal Tobias and as a direct and proximate result of that coercion has suffered actual and special damages including, *inter alia*, severe emotional distress.

164.    Plaintiff's coerced confession was used against him, in that the confession resulted in charges being initiated against him and the continuation of the charges against him, resulting in his subsequent incarceration at the Lake County Jail for over five years.

165.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others such that the Defendants' actions shock the conscience.

WHEREFORE, Plaintiff, Jerry Hobbs, respectfully requests that this Court enter judgment in his favor and against Defendants, except Defendants Michael Waller, Michael Mermel, Jeff Pavletic, Garth Glassburg, Kelly Lawrence and Northeastern Illinois Regional Crime Laboratory, awarding compensatory damages, costs, and attorney's fees along with punitive damages against each of the Defendants named in this Count as well as any other relief this Court deems just and appropriate.

## COUNT II

### (42 U.S.C. §1983 – Substantive Due Process: Shock the conscience)

166.    Plaintiff re-alleges paragraphs 1-165 of this Complaint as if fully set forth herein.

167.    In a manner more fully set forth above, Defendants, through the use of force and the threat of physical violence, coerced Plaintiff into giving false and fabricated

admissions in a manner shocking to the conscience. Plaintiff has suffered actual and

special damages including, *inter alia*, severe emotional distress as a direct and proximate

result of Defendants' conduct.

168.     The misconduct described in this Count was undertaken with malice,

willfulness, and reckless indifference to the rights of others such that the Defendants'

actions shock the conscience.


WHEREFORE, Plaintiff, Jerry Hobbs, respectfully requests that this Court enter

judgment in his favor and against Defendants, except Defendants Michael Waller,

Michael Mermel, Jeff Pavletic, Garth Glassburg, Kelly Lawrence and Northeastern

Illinois Regional Crime Laboratory, awarding compensatory damages, costs, and

attorney's fees along with punitive damages against each of the Defendants named in this

Count as well as any other relief this Court deems just and appropriate.


## COUNT III

### (42 U.S.C. §1983 – Procedural Due Process: 5th and 14th Amendments)

169.     Plaintiff re-alleges paragraphs 1-168 of this Complaint as if fully set forth

herein.

170.     In a manner more fully set forth above, one or more of the Defendants

used unjustified violence against Jerry Hobbs in an attempt to coerce him to confess to a

crime he did not commit.

171.     Jerry Hobbs, who was not provided any *Miranda* warnings, was denied

access to legal counsel for the duration of his interrogation, notwithstanding requests for

the same. As a result of this and the other misconduct described in this Complaint, Plaintiff was forced to incriminate himself falsely against his will.

172.    Plaintiff's coerced false statements were used against Plaintiff in a criminal case to his detriment.

173.    As a result of Defendants' misconduct, Plaintiff suffered great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other consequential damages, as well as loss of liberty.

174.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others such that the Defendants' actions shock the conscience.


WHEREFORE, Plaintiff, Jerry Hobbs, respectfully requests that this Court enter judgment in his favor and against Defendants, except Defendants Michael Waller, Michael Mermel, Jeff Pavletic, Garth Glassburg, Kelly Lawrence and Northeastern Illinois Regional Crime Laboratory, awarding compensatory damages, costs, and attorney's fees along with punitive damages against each of the Defendants named in this Count as well as any other relief this Court deems just and appropriate.


## COUNT IV

### (42 U.S.C. §1983 – Failure to Intervene)

175.    Plaintiff re-alleges paragraphs 1-174 of this Complaint as if fully set forth herein.

176.    In the manner described above, during the constitutional violations described above, one or more of the Defendants stood by without intervening to prevent the misconduct.

177.    As a result of the Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered pain and injury, as well as emotional distress. These Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

178.    The misconduct described in this Court was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.


WHEREFORE, Plaintiff, Jerry Hobbs, respectfully requests that this Court enter judgment in his favor and against Defendants, awarding compensatory damages, costs, and attorney's fees along with punitive damages against each of the Defendants named in this Count as well as any other relief this Court deems just and appropriate.


## COUNT V

### (42 U.S.C. §1985 - Conspiracy)

179.    Plaintiff re-alleges paragraphs 1-178 of this Complaint as if fully set forth herein.

180.    In a manner more fully set forth above, Defendants together reached an understanding, engaged in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves for the purpose of depriving Plaintiff of his Constitutional rights and accomplish an unlawful purpose by an unlawful means.

181.    In furtherance of this conspiracy or conspiracies, Defendants, acting in concert with other co-conspirators, committed the overt acts as set forth above including, but not limited to, the arrest of Plaintiff without probable cause, the coercion of Plaintiff's confession, the manipulation and falsification of police reports, and the knowing presentation of fabricated evidence to initiate proceedings against Plaintiff maliciously.

182.    Said conspiracy or conspiracies and overt acts were continued from on or about May 9, 2005, through to the present.

183.    This conspiracy proximately caused the injuries to Plaintiff as set forth above.

184.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

WHEREFORE, Plaintiff, Jerry Hobbs, respectfully requests that this Court enter judgment in his favor and against Defendants, awarding compensatory damages, costs, and attorney's fees along with punitive damages against each of the Defendants named in this Count as well as any other relief this Court deems just and appropriate.

## COUNT VI

### (Malicious Prosecution – State Law Claim)

185.    Plaintiff re-alleges paragraphs 1-184 of this Complaint as if fully set forth herein.

186.    Defendants initiated and/or continued a malicious prosecution against Jerry Hobbs, all without probable cause.  Defendants were each instrumental in the

initiation and perpetuation of the prosecution of Jerry Hobbs. These Defendants each acted with malice.

187.   This prosecution was terminated in Plaintiff's favor on August 4, 2010 when all charges were dropped.

188.   Defendants are liable for the prosecution because it was proximately caused by their unlawful actions as set forth above.

189.   These actions directly and proximately caused the injuries and damages to Plaintiff as claimed above, and constitute the tort of malicious prosecution under Illinois law.


WHEREFORE, Plaintiff, Jerry Hobbs, respectfully requests that this Court enter judgment in his favor and against Defendants, awarding compensatory damages, costs, and attorney's fees along with punitive damages against each of the Defendants named in this Count as well as any other relief this Court deems just and appropriate.


## COUNT VII

### (Intentional Infliction of Emotional Distress – State Law Claim)

190.   Plaintiff re-alleges paragraphs 1-189 of this Complaint as if fully set forth herein.

191.   In a manner more fully set forth above, the acts and conduct of Defendants were extreme and outrageous. Defendants intended to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff.

192.     Said actions were undertaken with malice, willfulness, and with reckless indifference to the rights of Plaintiff.

193.     As a direct and proximately result of Defendants' wrongful acts, Plaintiff suffered damages, including severe emotional distress and anguish.

WHEREFORE, Plaintiff, Jerry Hobbs, respectfully requests that this Court enter judgment in his favor and against Defendants, awarding compensatory damages, costs, and attorney's fees along with punitive damages against each of the Defendants named in this Count as well as any other relief this Court deems just and appropriate.

## COUNT VIII

### (Conspiracy – State Law)

194.     Plaintiff re-alleges paragraphs 1-193 of this Complaint as if fully set forth herein.

195.     In a manner more fully set forth above, Defendants together reached an understanding, engaged in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves to maliciously prosecute Plaintiff without probable cause, and to intentionally inflict severe emotional distress.

196.     In furtherance of this conspiracy or conspiracies, Defendants committed the overt acts as set forth above including, but not limited to, the arrest of Plaintiff without probable cause, the coercion of Plaintiff's confession, the manipulation and falsification of police reports, the knowing presentation of fabricated evidence to initiate

and continue proceedings against Plaintiff maliciously, and the prolonging of Plaintiff's incarceration despite exclusionary DNA.

197.    Said conspiracy or conspiracies and overt acts were continued from on or about May 9, 2005, through to the present.

198.    This conspiracy proximately caused the injuries to Plaintiff as set forth above.

WHEREFORE, Plaintiff, Jerry Hobbs, respectfully requests that this Court enter judgment in his favor and against Defendants, awarding compensatory damages, costs, and attorney's fees along with punitive damages against each of the Defendants named in this Count as well as any other relief this Court deems just and appropriate.

## COUNT IX

### (Defamation – State Law Claim)

199.    Plaintiff re-alleges paragraphs 1-198 of this Complaint as if fully set forth herein.

200.    In a manner more fully set forth above, Defendants Waller, Pavletic and Mermel made false statements about Plaintiff, Jerry Hobbs.

201.    Defendants Waller, Pavletic and Mermel caused these statements to be widely published in the media.

202.    Defendants Waller, Pavletic and Mermel made the aforesaid statements with malice, knowing they were false.

203.     The actions of Defendants Waller, Pavletic and Mermel in making false statements about Plaintiff and in publishing said statements were a direct and proximate cause of Plaintiff's injuries and damages as set forth above.

WHEREFORE, Plaintiff, Jerry Hobbs, respectfully requests that this Court enter judgment in his favor and against Defendants, Michael Waller, Jeff Pavletic and Michael Mermel, awarding compensatory damages, costs, and attorney's fees along with punitive damages against each of the Defendants named in this Count as well as any other relief this Court deems just and appropriate.

## COUNT X

**(Fraudulent Concealment: State Law Claim: 735 ILCS 5/13-215)**

204.     Plaintiff re-alleges paragraphs 1-203 of this Complaint as if fully set forth herein.

205.     By obstructing the DNA testing, Defendants knew the evidence proving Jerry's confession was coerced would be concealed.  These affirmative acts by Defendants, as described more fully above, were designed to prevent, and, in fact, did prevent, Plaintiff from discovering his claim.

206.     The defendants knew the acts and/or misrepresentations were false and made with the intent to deceive him.  Plaintiff detrimentally relied on them such that he was lulled or induced to delay filing suit until after the statute of limitations expired.

207. Defendants concealed the cause of action by trickery, and/or contrivance and/or some other affirmative action intended to exclude suspicion, prevent inquiry or induce plaintiff to delay filing.


WHEREFORE, Plaintiff, Jerry Hobbs, respectfully requests that this Court enter judgment in his favor and against Defendants, awarding compensatory damages, costs, and attorney's fees along with punitive damages against each of the Defendants named in this Count as well as any other relief this Court deems just and appropriate.


## COUNT XI

### (745 ILCS 10/9-102 – Indemnification)

208. Plaintiff re-alleges paragraphs 1-207 of this Complaint as if fully set forth herein.

209. Defendants City of Waukegan, City of Zion, Village of Buffalo Grove, and Village of Vernon Hills were the respective employers of each of the Defendant Police Officers at all times relevant to this Complaint, as set forth above.

210. Defendant Lake County employed Defendants Waller, Mermel and Pavletic at all times relevant to this Complaint, as set forth above.

211. Defendant Northeastern Illinois Regional Crime Laboratory employed Defendants Glassburg and Lawrence at all times relevant to this Complaint, as set forth above.

212. All of the individually named police officer Defendants were at all relevant times acting within the course and scope of their employment.

213.    Pursuant to 745 ILCS 10/9-102, each governmental entity set forth above is liable to pay all judgments and settlements entered against any of its employees for the claims of conspiracy to commit malicious prosecution, malicious prosecution, conspiracy to commit intentional infliction of emotional distress, intentional infliction of emotional distress, and defamation.

WHEREFORE, pursuant to 745 ILCS 10/9-102, Plaintiff, Jerry Hobbs, demands judgment against Defendants City of Waukegan, City of Zion, Village of Buffalo Grove, Village of Vernon Hills, Lake County and the Northeastern Illinois Regional Crime Laboratory, in the amounts awarded to Plaintiff against the individual Defendants by way of judgment or settlement, including any and all amounts awarded for damages, costs and attorney's fees.

## COUNT XII

### (Respondeat Superior)

214.    Plaintiff re-alleges paragraphs 1-213 of this Complaint as if fully set forth herein.

215.    At all times relevant to this complaint Defendants Schletz, Valko and Cappelluti acted as agents of, and in the scope of their employment with, Defendant City of Waukegan.

216.    At all times relevant to this complaint defendant Harris acted as an agent of, and in the scope of his employment with, Defendant City of Zion.

217.    At all times relevant to this complaint defendant Jones acted as an agent of, and in the scope of his employment with, defendant Village of Vernon Hills.

218.    At all times relevant to this complaint defendant Derken acted as an agent of, and in the scope of his employment with, defendant Village of Buffalo Grove.

219.    At all times relevant to this complaint defendants Waller, Mermel and Pavletic acted as agents of, defendant Lake County and the Lake County State's Attorney's Office.

220.    At all times relevant to this complaint Defendants Glassburg and Lawrence Jones acted as agents of, and in the scope of their employment with, the Northeastern Illinois Regional Crime Laboratory.

221.    The defendant municipalities and entities are liable for the torts of their respective agents which violated state law under the doctrine of *Respondeat superior.*

WHEREFORE, Plaintiff, Jerry Hobbs, demands judgment against Defendants City of Waukegan, City of Zion, Village of Buffalo Grove, Village of Vernon Hills, Lake County and the Northeastern Illinois Regional Crime Laboratory, for compensatory damages, plus the costs of this action and such other relief as this Court deems equitable and just.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil

Procedure 38(b) on all issues so triable.

Respectfully Submitted,

/s/ Kathleen T. Zellner
Kathleen T. Zellner

Kathleen Zellner & Assoc. P.C.
Esplanade IV
1901 Butterfield Road
Suite 650
Downers Grove, Illinois 60515
(630) 955-1212
Atty No: 6184574