## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **JERRY HOBBS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 10 C 7649** |
| | ) | |
| **DOMENIC CAPPELLUTI, CHARLES SCHLETZ** | ) | **Honorable Joan Lefkow** |
| **and WILLIAM VALKO, of the Waukegan Police** | ) | |
| **Department; CITY OF WAUKEGAN; ANDREW** | ) | **Magistrate Judge** |
| **JONES, of the Vernon Hills Police Department;** | ) | **Geraldine Soat Brown** |
| **VILLAGE OF VERNON HILLS; KEVIN HARRIS,** | ) | |
| **of the Zion Police Department; CITY OF ZION;** | ) | |
| **Lake County State's Attorney, MICHAEL WALLER;** | ) | |
| **Assistant Lake County State's Attorney, MICHAEL** | ) | |
| **MERMEL; Assistant Lake County State's Attorney** | ) | |
| **JEFF PAVLETIC; Assistant Lake County State's** | ) | |
| **Attorney, COUNTY OF LAKE; Laboratory Director,** | ) | |
| **GARTH GLASSBURG; Analyst, KELLY** | ) | |
| **LAWRENCE; NORTHEASTERN ILLINOIS** | ) | |
| **REGIONAL CRIME LABORATORY and** | ) | |
| **UNKNOWN POLICE OFFICERS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## THIRD AMENDED COMPLAINT

NOW COMES Plaintiff, JERRY HOBBS, by and through his attorneys, Kathleen

T. Zellner & Associates, P.C., and complaining of Defendants, DOMENIC

CAPPELLUTI, CHARLES SCHLETZ, WILLIAM VALKO, CITY OF WAUKEGAN,

ANDREW JONES, VILLAGE OF VERNON HILLS, KEVIN HARRIS, CITY OF

ZION, MICHAEL WALLER, MICHAEL MERMEL, JEFF PAVLETIC, COUNTY OF

LAKE, GARTH GLASSBURG, KELLY LAWRENCE, NORTHEASTERN ILLINOIS

REGIONAL CRIME LABORATORY, and UNKNOWN POLICE OFFICERS, states as

follows:

## Introduction

On May 9, 2005, within hours of discovering the bodies of Laura Hobbs (hereinafter referred to as "Laura") and Krystal Tobias (hereinafter referred to as "Krystal"), the Defendants concluded what can best be described as a botched investigation of the murders. Jerry Hobbs (hereinafter referred to as "Jerry") was easy prey for the Defendants as they interrogated him for over 24 hours in marathon sessions that involved extreme mental and physical abuse. Having just discovered the twisted and butchered bodies of his daughter and her friend, he was in the most fragile mental state imaginable. Probable cause to arrest and prosecute was based exclusively upon Jerry's false confession. The line that separates aggressive law enforcement from impermissible conduct lies several standard deviations removed from the conduct at issue here.

## Factual Summary of Jerry's Alleged Confession

1.      The Defendant officers knew the substance of Jerry's confession was false. No efforts were made to corroborate the confession through any of the national experts or agencies who study and collect data on violent crimes. Less than 10% of child murder cases involving a sexual assault are committed by a parent. In the majority of child murder cases where a parent is the perpetrator, the other parent is murdered, and the motive is not discipline, but revenge.

2.      No efforts were made to determine if Laura had been the victim of past abuse by either parent.

3.      The autopsy made no mention of prior sexual abuse.

4. No inquiries were made to Laura's doctor or teachers about whether she was being abused.

5. The Illinois Department of Children and Family Services found that there was no prior abuse of Laura.

6. Family members, if asked, would have attested to the fact that Laura was very attached to her father and was thrilled that he was living with them.

7. Further investigation would have revealed that Jerry was very indulgent with Laura as he rarely told her no and never disciplined her.

8. On May 12, 2005, Jerry's cellmate in Texas was interviewed. Jerry's cellmate told the interviewer that "Hobbs had four pictures on the wall of his cell of his children and he frequently talked about his family . . . . Hobbs was excited about being released and reunited with his family . . . . Hobbs was a laid back kind of guy and I did not observe any outbursts of temper or rage." Jerry's cellmate reported being "shocked" when he saw the news about the homicides and it did not seem to be Jerry's character or nature to have been involved in such an offense.

9. Jerry spent almost all of his free time with his children.

10. Despite earlier episodes of drinking and drug usage, Jerry did not use drugs and rarely drank after he moved in with his family.

11. Both the crime scene and the autopsy report revealed that neither Laura nor Krystal had defensive wounds signifying that there was no struggle as the confession alleged.

12. A sexual assault should not have been ruled out simply because the girls were dressed, because in at least one-third of sexual homicides, the victim is redressed.

13.     The positioning of Laura's and Krystal's shoes would have been significant to an expert on sexual homicides because it suggests a certain type of sexual predator.

14.     There is also readily available data about the psychological effect on parents of having their child murdered. It is well known by psychologists that parents of murdered children suffer from emotional detachment immediately following the murders.

15.     The vast majority of these parents express prolonged periods of constricted affect and feelings of extreme detachment. Jerry's behavior during the interrogation should not have been used to establish probable cause because he had suffered extraordinary emotional shock when he discovered his butchered daughter.

16.     The Lake County State's Attorney, Michael Waller (hereinafter referred to as "Defendant Waller"), rather than stopping this affront to the Constitution and the laws of Illinois, joined in, mobilizing the full power of the office in an effort to control the prosecution and build a case against an innocent man.

17.     Defendant Waller praised Defendant Commander William Valko (hereinafter referred to as "Defendant Valko") and all members of the task force for their "professionalism" and "extraordinary efforts in resolving this case."

18.     The alleged confession omitted the crucial detail that Laura had been sexually assaulted. Defendant Waller indisputably became aware that the confession was false after DNA testing in 2007 confirmed that Laura had been sexually assaulted by an unknown male, not Jerry.

19.    Jerry's confession was contradicted by the autopsy report and subsequent DNA testing.  The autopsy report verified that neither Laura nor Krystal had defensive wounds, and yet the confession described both girls struggling with Jerry.

20.    The DNA confirmed the motive of the crime was clearly a sexual assault, which was also readily apparent from the injuries, the positioning of the bodies and the placement of the victim's shoes.

21.    As further proof the State's Attorney's Office was acting maliciously, after they had received DNA confirmation of a sexual assault on Laura Hobbs, Defendant Michael G. Mermel (hereinafter referred to as "Defendant Mermel") issued a ridiculous series of statements.

22.    Defendant Mermel stated that the semen found inside of Laura and on her clothes was the result of her playing around the crime scene where couples had sex, and had left semen on the grass and leaves.

23.    A competent forensic scientist would reject Defendant Mermel's statement because environmental DNA has a very short lifespan.  It would be quickly destroyed by ultra-violet rays, condensation and fluctuating temperatures.

24.    It is a forensic fact that the concentration of semen in the environment would have to be in exactly the same concentration and location as the semen that was ultimately found inside Laura.

25.    It is a forensic fact that DNA does not migrate from one location to another in the environment.

26.    If Defendant Mermel's theory was correct, there would have been multiple DNA profiles, not simply one profile at the crime scene.

27.     It is a forensic fact that the presence of semen on Laura's oral, vaginal and rectal swabs meant that she was sexually assaulted.

28.     Defendant Mermel also said that the semen was not in "any significant area of Laura Hobbs' body." The truth is semen was found in every orifice of Laura's body. There was no probable cause for Jerry's arrest, prosecution and incarceration.

29.     Finally, after languishing in a prison cell for over 5 years, 3 full years after the discovery of the exculpatory DNA, Jerry was released in August of 2010.

30.     In one last malicious swipe at Jerry's reputation, Defendant Waller commented that no one from his office would be fired over the case and no apology would be made to Jerry.

31.     On the day of Jerry's release, after the case against Jerry was dismissed, and the prosecution terminated, Defendant Waller, without the slightest hint of remorse, defiantly stated, "I have studied this case and I don't believe law enforcement did anything wrong." Because the DNA exclusion conclusively established the falsity of Jerry's confession, Defendant Waller's statement placed Jerry in a false light.

32.     Defendant Waller also stated, after the case against Jerry was dismissed, that he was "not convinced that Hobbs didn't have a role in the killings" but he "didn't believe the case could be proved beyond a reasonable doubt."

33.     About April 15, 2011, eight and a half months after Jerry's release, Defendant Mermel stated in a taped interview with a national news organization that "Jerry was guilty of murdering his daughter" and the "evidence" according to Defendant Mermel demonstrated this fact. Defendant Mermel also said that the semen in Laura was the result of "another incident."

## Jurisdiction and Venue

34.     This is a civil rights action brought pursuant to 42 U.S.C. §1983 et seq.;

the Judicial Code, 28 U.S.C. §§1331 and 1343(a); and the Constitution of the United

States. This Court also has supplemental jurisdiction over the pendent state law claims as

codified in 28 U.S.C. §1367(a).

35.     This Court has jurisdiction of the action pursuant to 28 U.S.C. §1331.

Venue is proper under 28 U.S.C. §1391(b) because the events giving rise to Plaintiff's

claims occurred in this judicial district and the parties resided, at the time the events took

place, in this judicial district.

36.     This Court also has diversity jurisdiction pursuant to 28 U.S.C.

§1332(a)(1), as Plaintiff is a citizen of the State of Texas, no Defendant is a citizen of the

State of Texas, and the amount in controversy is greater than $75,000.

## The Parties

37.     Plaintiff Jerry Hobbs is at all relevant times a citizen of the State of Texas.

38.     Defendant Domenic Cappelluti (hereinafter referred to as "Defendant

Cappelluti") was at all times relevant herein employed as a police officer in the

Waukegan Police Department and assigned to the Lake County Major Crimes Task Force

at the time of some of the wrongdoing alleged in the Third Amended Complaint.

39.     Defendant Charles Schletz (hereinafter referred to as "Defendant Schletz")

was at all times relevant herein employed as a police officer in the Waukegan Police

Department and assigned to the Lake County Major Crimes Task Force at the time of

some of the wrongdoing alleged in the Third Amended Complaint.

40.     Defendant William Valko was at all relevant times to this action employed as a commander in the Waukegan Police Department. At the time of some or all of the wrongdoing alleged in this complaint, Valko was assigned to the Lake County Major Crimes Task Force. At all times relevant to this action, Defendant Valko was a direct supervisor of several Defendants, including Schletz, Harris and Cappelluti, and supervised these Defendants in the investigation and interrogation of Plaintiff.

41.     Defendant City of Waukegan is a duly incorporated municipal corporation and at all relevant times was the employer of Defendants Cappelluti, Schletz and Valko. The City of Waukegan is liable for the wrongful acts of the Defendants Cappelluti, Schletz and Valko while acting within the scope of their employment pursuant to its statutory obligation to indemnify them.

42.     Defendant Andrew Jones (hereinafter referred to as "Defendant Jones") was at all times relevant herein employed as a police officer in the Vernon Hills Police Department and assigned to the Lake County Major Crimes Task Force at the time of some of the wrongdoing alleged in the Third Amended Complaint.

43.     Defendant Village of Vernon Hills is a duly incorporated municipal corporation and at all relevant times was the employer of Defendant Jones. The Village of Vernon Hills is liable for the wrongful acts of Defendant Jones while acting within the scope of his employment pursuant to its statutory obligation to indemnify him.

44.     Defendant Kevin Harris (hereinafter referred to as "Defendant Harris") was at all times relevant herein employed as a police officer in the Zion Police Department and assigned to the Lake County Major Crimes Task Force at the time of some of the wrongdoing alleged in the Third Amended Complaint.

45.     Defendant City of Zion is a duly incorporated municipal corporation and at all relevant times was the employer of Defendant Harris. The City of Zion is liable for the wrongful acts of Defendant Harris while acting within the scope of his employment pursuant to its statutory obligation to indemnify him.

46.     The Lake County Major Crimes Task Force is an organization formed by, *inter alia*, the State's Attorney of Lake County, the Lake County Sheriff, and the police chiefs of several municipal police departments in Lake County, and is involved in investigations of certain major crimes which occur in Lake County.

47.     Defendant Jeff Pavletic (hereinafter referred to as "Defendant Pavletic") is an Assistant State's Attorney in the Lake County State's Attorney Office, and was so employed at all times relevant herein. Defendant Pavletic is a member of the Lake County Major Crimes Task Force. Defendant Pavletic is sued in his individual capacity

48.     Defendant Waller is the acting Lake County State's Attorney, and was the Lake County State's Attorney at all times relevant herein. Defendant Waller is responsible for supervising all prosecutions and is a member of the Lake County Major Crimes Task Force. Defendant Waller is sued in his individual capacity.

49.     Defendant Mermel is an Assistant State's Attorney in the Lake County State's Attorney Office, and was so employed at all times relevant herein. Defendant Mermel is a member of the Lake County Major Crimes Task Force. Defendant Mermel is sued in his individual capacity.

50.     Defendant County of Lake (hereinafter referred to as "Lake County") is a governmental entity within the State of Illinois which consists in part of the Lake County State's Attorney's Office. Defendant Lake County is liable for the wrongful acts of

Defendants Waller, Pavletic, and Mermel pursuant to its statutory obligation to indemnify them.

51. Defendant Lake County is responsible for the policies and practices of the Lake County Major Crimes Task Force and its State's Attorneys Office, through the action of Defendants Waller, Pavletic and Mermel, and other Assistant State's Attorneys and employees.

52. Defendant Garth Glassburg (hereinafter referred to as "Defendant Glassburg") is the Laboratory Director employed by the Northeastern Illinois Regional Crime Lab; Defendant Kelly Lawrence (hereinafter referred to as "Defendant Lawrence") is a forensic analyst employed by the Northeastern Illinois Regional Crime Lab. Both Defendant Glassburg and Defendant Lawrence were so employed at all times relevant herein and are each sued in their individual capacity. The Northeastern Illinois Regional Crime Laboratory is a crime lab that performs forensic testing located in Vernon Hills, Illinois.

53. Defendant Unknown Police Officers were at all times relevant herein assigned to the Lake County Major Crimes Task Force and their names are unknown to Plaintiff at this time.

54. Each of the individual police officer Defendants named above engaged in the conduct complained of under color of state law and in the course and scope of his employment with the municipal police department with which he is affiliated and the Lake County Major Crimes Task Force.

55. Each of the individual police officer Defendant is sued in his individual capacity.

## Allegations of Fact

### The Murders of Laura Hobbs and Krystal Tobias

56.     On Sunday, May 8, 2005, Mother's Day, Jerry lived at 2015 Gilboa, Zion, Illinois, with Sheila Hollabaugh (hereinafter referred to as "Sheila"). Three children born to the couple also lived at the address: Laura, 8 years of age; Jerry Hobbs, Jr. (hereinafter referred to as "Jerry Jr."), 10 years of age; and Jeremy Hobbs (hereinafter referred to as "Jeremy"), 6 years of age. Another child of Sheila's, Meagan Smith (hereinafter referred to as "Meagan"), 13 years of age, also lived with the family.

57.     This close knit family spent part of the day together flying kites at Illinois Beach State Park and then returned home. Jerry, Jerry Jr., Jeremy and Sheila stayed indoors and watched the Lord of the Rings Trilogy. Laura went outside to play, riding her bicycle.

58.     Laura was supposed to return by dark, at approximately 7:00 p.m., and when she did not, Jerry and Jerry Jr. began to search for her. They soon learned that Laura's best friend, Krystal, 9 years of age, was also missing.

59.     During the evening, Jerry, Sheila, Meagan, Jerry Jr., Sheila's father Arthur and Arthur's wife, Emily, searched the neighborhood for Laura, including nearby Beulah Park, where children often played. The search was unsuccessful, and Jerry and Sheila contacted the local police to report that their daughter was missing.

60.     Jerry searched most of the night for Laura, but it was difficult to search in Beulah Park because parts of it were heavily wooded and unlit. The police also searched the park and surrounding neighborhood throughout the evening.

61.     After a sleepless night, Jerry and Arthur resumed their search and returned to the park at daybreak.

62.     Because Jerry was a skilled outdoorsman, he discovered the bodies of his daughter and her friend Krystal. The two bodies were lying face up, two to three feet apart, in a grassy, open area. Both girls had been repeatedly stabbed and beaten about the face and head.

63.     Eight year old Laura, who weighed sixty pounds, and was four feet four inches tall, was stabbed twenty times, in the neck, back, abdomen, left and right flanks and both eyes. Her face had deep purple bruising, she had multiple linear abrasions on her arms, thighs, lower legs and her back.

64.     Significantly, Laura had no defensive wounds, showing there was not a struggle. Obviously, she was caught by surprise. This is a blatant contradiction to the confession that Jerry was forced to sign, in which it stated that both girls fought with him and he physically overpowered them.

65.     The pathologist, Nancy Jones, M.D., who performed the autopsies, did not rule out a sexual assault. No such opinion was offered because it would have been impossible to know this without DNA testing. The vaginal, rectal and oral swab DNA testing was not done until August 29, 2007. These tests confirmed a sexual assault of Laura.

66.     Nine year old Krystal, who weighed sixty four pounds, and was four feet three inches tall, had eleven stab wounds to her neck, right axilla, left upper abdomen, left lower abdomen, mid abdomen, liver, hemothorax, and hemoperitoneum. She had multiple abrasions, bruises, hemorrhages, both subgaleal and petechial, and cerebral

edema. Again, no defensive wounds were noted, demonstrating there was not a struggle, in contradiction to the confession Jerry was forced to sign. The existence of a sexual assault was not determined until DNA testing was completed on August 29, 2007. There were no autopsy findings that either girl had ever been physically or sexually abused prior to May 8, 2005.

67.     Upon discovering Krystal and Laura, Jerry, an innocent father, collapsed on the spot, sobbing and moaning uncontrollably. He and Laura had been very close. He never abused her, was very indulgent with her, and never disciplined her. Laura was very attached to Jerry and very happy that he was now living with her mother.

68.     The Lake County Major Crimes Task Force (hereinafter referred to as "the Task Force") included officers from the Lake County Sheriff's Department, City of Waukegan, City of Zion, and Village of Vernon Hills, as well as members of the Lake County State's Attorney's Office. The murder was intensively covered in the Chicago and Lake County media, and Defendants believed they were under enormous pressure to make an arrest, prosecute someone and obtain a conviction. Sadly, not only did they frame an innocent man, but they let the real killer escape and continue to murder and sexually assault other females.

69.     No forensic evidence at the crime scene, or any other reliable evidence, pointed to even a remote possibility that Jerry had murdered or sexually assaulted Laura, or murdered Krystal. Any qualified violent crime expert would have instantly classified this as a sexual homicide. No experienced and competent police officer or prosecutor would conclude that because a victim was clothed and there was no visible evidence of sexual trauma that there had been no sexual assault.

### Jerry Hobbs' Interrogation and Coerced Confession

70.     The final product of the interrogation described herein was a one page fabricated document, created and typed by the police and signed by Jerry, which the police allege contains Jerry's confession to these horrific murders. Jerry disputes the veracity of the alleged statement and claims that his signature on that document is the result of physical and mental coercion over a lengthy period of time. The alleged statement that came out of this interrogation constituted the State's only evidence against Jerry. There is no physical or forensic evidence linking Jerry to the murders, only the alleged "gut feelings" of the Defendants who rushed to falsely arrest, charge and prosecute him.

71.     Jerry's formal education ended after the seventh grade. His vocabulary and understanding of the meaning of words was at the seventh grade level.

72.     The Defendants instantly created a theory that was completely refuted by the autopsy and forensic evidence. The theory was that these murders were motivated by a parent who lost control when disciplining his child and brutally killed her and her friend. No search of any of the national data banks for violent crimes contains such a case. The theory was unprecedented and bizarre from the outset.

73.     Shortly after Jerry found the bodies, he was taken to the Zion police station. Jerry had no transportation to leave the police department. He was never told that he was under arrest or that he was free to leave. He was kept confined in two rooms for the next 24 hours, and he was interrogated approximately ten times, usually in a tag team approach. This style has been severely criticized by police interrogation experts throughout the world.

74.     After an initial interview at the Zion police station, Defendants Schletz and Harris informed Jerry that he needed to come with them to another location so that they could question him further.  At around 10:00 a.m. on May 9, 2005, Jerry was transported to the Waukegan Police Department, located at 13 N. Genesee Street.

75.     Despite an absence of evidence indicating Jerry's involvement, Jerry was the only one on whom a LEADS check was run.  Jerry was the only one Mirandized or transferred to the Task Force.  Jerry was the only one not given a ride home.  Moreover, Jerry could not get home because he was also the only one from whom shoes and clothes were taken.

76.     At that location, Jerry was kept in a small windowless room with no clock. For the next 24 hours, Jerry remained at 13 N. Genesee Street where he was psychologically and physically terrorized until he broke down and signed a one page typed confession created and forced upon him by several of the Defendants.  Prior to his incarceration on May 10, 2005, Jerry had not had a chance to sleep for more than 48 hours.

### Violation of *Miranda* Rights

77.     Prior to his arrest, Jerry was not fully informed of his *Miranda* rights.

78.     The facility at 13 N. Genesee Street was equipped with recording equipment that would have made it possible to videotape the entire interrogation of Jerry. For obvious reasons, all Defendants involved in the interrogation elected not to use that equipment to record their illegal actions during the next 24 hours.

15

Police Interview: Schletz and Harris

79.     Defendant Schletz came into the room and sat immediately next to Jerry. Schletz told Jerry that he would like him to sign a form that "just said Jerry was agreeing to let them ask questions." He told Jerry the form was "nothing really" and it was to help Jerry help the police. Jerry did not read the form and Defendant Schletz did not read it to him. Upon information and belief, this form was a *Miranda* waiver form that Jerry was tricked into signing.

80.     Defendants Schletz and Harris began to question Jerry about Laura and Krystal and how he had discovered the bodies.

81.     Defendants knew that Jerry was exhausted at the time the interrogation commenced, and that he had not slept the preceding 24 hours. When Jerry's interrogation was finally complete, he had been without sleep for 48 hours. In addition to sleep deprivation, Jerry was in complete shock about the murders of Laura and Krystal. He was completely traumatized upon finding the two mutilated bodies. He repeatedly broke down crying over the course of the interrogation. Clearly, Jerry should have immediately received medical care for his own mental health and physical well being.

First Interrogation: Schletz and Harris

82.     This first interrogation lasted approximately an hour and fifty-five minutes. Upon their return, Defendants Schletz and Harris resumed their interrogation of Jerry. They asked Jerry about how the bodies were laying, how far he was from the bodies and why he hadn't gone up to the bodies to check if the girls were still alive. They

told Jerry his timeline did not match up with theirs and they wanted him to tell the story again.

83. Defendant Schletz told Jerry that the girls' shoes were off. Defendant Schletz showed Jerry pictures of the girls' bodies, so that Jerry knew Krystal's eyes were open. Defendant Schletz told Jerry how many times the bodies had been stabbed. Providing crime scene photographs and crime scene details known only to the killer to a potential suspect violates every proper interrogation method used by law enforcement in Illinois and the United States.

84. Jerry demonstrated how far he was from the bodies by pointing from himself to the wall. This was approximately five feet but Schletz insisted that Jerry said it was twenty feet. If it were twenty feet, the Defendants could claim Jerry was lying because he would not have been able to describe the injuries in such detail. Defendants Schletz and Harris left the room again.

85. As the interrogation progressed, Jerry became increasingly emotionally and physically exhausted. Each time Defendant police officers left the interrogation room to take breaks, Jerry attempted to get some rest by lying on the floor. When the officers returned, they resumed their interrogation of Jerry without ever asking whether he needed a break because of his emotional and physical exhaustion. Conversely, the Defendant officers took numerous breaks over the course of the interrogation.

86. Defendants Schletz and Harris returned and Jerry got up off the floor. Defendant Schletz asked Jerry how he was able to find the bike and girls so quickly that morning. Jerry responded that he just stumbled across the bike. He had been following deer tracks.

87.     Jerry began crying and told Defendants Schletz and Harris that he didn't ask to find the girls, he just did. Jerry had gone down that trail because it was the only one he saw. Defendant Schletz then got a map and asked Jerry to show everywhere he had searched.

88.     Jerry explained the path he had taken. Defendants Schletz and Harris left and Jerry lay down on the floor again due to his emotional and physical exhaustion.

89.     After a short break, Defendants Schletz and Harris came in and again Jerry got off the floor. Defendant Schletz asked Jerry what happened to Laura and Krystal and accused Jerry of killing them. Jerry adamantly denied having anything to do with the murders and told Defendants Schletz and Harris they were looking at the wrong man.

90.     Defendant Schletz told Jerry there would be physical evidence linking him to the crime scene. Jerry repeatedly said no and provided his alibi. Defendants Schletz and Harris told him that his alibi wasn't verified because Sheila was sleeping from 5:00-7:00 p.m. and Jerry Jr. said he didn't see Jerry in the house at that time. Jerry Jr. was subjected to extreme coercion and manipulation in an effort to get him to implicate his father.

91.     Defendant Schletz then had Jerry sign a consent to search form for the search of his house. Defendant Schletz told Jerry there would be physical evidence that would link him to the crime. Of course no physical evidence ever developed against him because Jerry did not commit the crime.

92.     Defendants Schletz and Harris left the room and Jerry smoked a cigarette.

93.     Jerry stayed in the room, took off his shoes, pulled off his jacket to put under his head as a pillow, and closed his eyes. Clearly, he was totally exhausted.

Second Interrogation: Schletz and Harris

94.    The more Jerry resisted, the more verbally and physically abusive the officers got. He was emotionally, mentally and physically distraught and exhausted.

95.    Defendant Schletz asked Jerry what the spots on his jacket were and pulled the jacket away from Jerry, handing it to Defendant Harris.

96.    Defendant Schletz repeatedly asked Jerry the same questions and continuously accused him of killing Laura and Krystal. He asked Jerry to describe how the girls looked. Jerry persisted in his denials.

97.    Defendant Schletz then asked Defendant Harris for the crime scene photographs and started laying them out on the table. Jerry would not look at the photos and looked at the wall. He began crying and saying he did not kill his little girl.

98.    Defendants Schletz and Harris produced graphic photographs of the girls' dead bodies showing their multiple wounds and blood-soaked clothing. The Defendants forced Jerry to look at the pictures. When Jerry was unable to look at the mutilated body of his daughter, Defendant Schletz grabbed his head and forced him to face the photograph. As he did so, Defendant Schletz knocked Jerry to the ground. Defendant Schletz then shoved a picture of Laura's battered and stabbed face in Jerry's face and Jerry turned away. Defendant Schletz asked what the photo looked like and Jerry said Laura "didn't have a face" because it had been so mutilated.

99.    Defendant Schletz tried to show another crime scene photograph of Laura and Krystal. When Jerry would not look, Defendant Schletz put his hand around the back of Jerry's neck to turn his head and force him to look. Jerry stiffened his body and Defendant Schletz yanked him out of the chair, throwing him to the floor. Defendants

Schletz and Harris stood over him and told him that he had to tell them why he killed the girls because they knew he had done it.

100.     Jerry then asked for a lawyer, but his requests were ignored.  Defendant Schletz took another horrific crime scene photograph of Laura and showed it to Jerry. Defendant Schletz kept repeating that Jerry killed Laura and Krystal.

101.     Defendants Schletz and Harris told Jerry that he would be allowed to go home if he took and passed a Voice Stress Analysis (VSA) test, which they falsely represented as a technology that could determine whether someone was lying. The VSA test is in fact widely discredited, and the United States Department of Justice has concluded that it is no better in determining deception among arrestees than flipping a coin.

102.     Defendants Schletz and Harris left the room while an officer purported to administer a VSA test to Jerry on four separate occasions.  After completing the purported tests, Jerry was falsely informed that he had failed and that the tests had conclusively showed Jerry was lying.

103.     Defendants Schletz and Harris walked in the room.  Defendant Schletz was carrying papers rolled up in his hand.  Defendants Schletz told Jerry that he needed to tell them what he had done to Laura and Krystal.  They told Jerry that Jerry needed to tell him the truth about what happened in the woods with the girls.  Jerry told him he didn't know and that he did not kill the girls.  Defendant Schletz said that the test results had told him otherwise.  Defendant Schletz hit Jerry across the head with the papers and said the test didn't lie.

104.    Again, Jerry asked for a lawyer. Defendant Schletz told him that he had "gotten all the lawyers he was getting." No lawyer was ever contacted for Jerry by the Defendants. Jerry put his hand over his eyes and looked to the wall and stopped talking. Jerry's efforts to invoke his Fifth Amendment right to silence were held against him by the Defendants, who later testified this was another indicia of his guilt.

105.    Defendant Schletz repeatedly taunted Jerry, at one point making obscene suggestions about the girls' genitalia and underwear. Defendant Schletz began telling Jerry things like: "How did their neck feel when you cut it?", "Did you see their panties?", and "Did you stab them in the pussy?" Defendant Schletz then lied and said Jerry could go home shortly, but if they found any evidence connecting Jerry to the crime, Jerry was going to wish he had never come to Zion.

106.    Defendant Schletz then suggested that Jerry might like to seize his gun and if he did Defendant Schletz would have justification for killing him. When Jerry, disgusted by Defendant Schletz's suggestions, would not look at Defendant Schletz and placed his hand over his face, Defendant Schletz grabbed his hand and forcefully moved it away.

Third Interrogation: Schletz and Cappelluti

107.    Defendant Cappelluti said that the way Jerry went and found the girls in the woods was like winning the lottery. He told Jerry it was like a miracle and asked whether he had a special gift. Defendant Cappelluti asked Jerry if he believed in God. When Jerry said yes, Defendant Cappelluti said he would pray for Laura. Jerry began crying. Defendant Cappelluti's opinion that Jerry must have committed the murder

because he found the girls is preposterous in light of the fact that the real killer, Jorge Torrez, was nowhere near the scene.

108.    Defendant Cappelluti told Jerry to move his hands from his face and to start telling the truth. Jerry told Defendant Cappelluti he had been telling the truth but that they didn't want to hear what he was saying.

109.    Defendant Schletz lied and told Jerry that Arthur thought it was "odd" Jerry went straight to the trail. Defendant Schletz also told Jerry that Sheila was sleeping for two hours and Jerry Jr. said he didn't see Jerry in the house at that time.

110.    Defendant Cappelluti lied and said there was an eyewitness who said they had seen Jerry in the woods on a mountain bike. Schletz said they found a baseball cap under one of the girls and that it must be Jerry's cap. Defendant Cappelluti said the evidence technicians would discover blood on Jerry's clothes. Of course, there was no blood on Jerry's clothes.

111.    Defendant Schletz left the room and Defendant Cappelluti prayed with Jerry, holding his hand.


Fourth Interrogation: Schletz, Harris, and Valko

112.    Defendants Schletz and Harris took Jerry into a big room with a camera. An officer stood by the camera with Defendant Valko behind him. Jerry was told how the camera worked and was advised that this was his chance to tell them what happened. Jerry said he didn't kill his little girl and in response was called a liar and told that it was known he did it and a test would be performed with a light that would show evidence all over Jerry.

113.    Jerry told them there was nothing on his clothes. The lights were turned out and shined on Jerry's clothes. There was a mark on Jerry's pant leg and Jerry said he wiped his nose there when he was crying. They told him to hold his hands out and asked where he got bruises. Jerry said those weren't bruises, they were scars from work. They then asked Jerry about scratches and Jerry said those were probably from his search in the woods. Defendant Schletz told him to stop lying.

114.    Defendants Schletz, Harris and Unknown Police Officers all confronted Jerry and interrogated him as a group. Jerry was advised that they possessed a special camera that would reveal evidence on Jerry's clothing revealing that Jerry was guilty.

115.    Officers took Jerry's clothes, and Jerry was forced by Defendants Schletz, Harris, and other officers to take off all of his clothes. Defendant Harris came back into the room with a see-through paper suit which he instructed Jerry to put on. At this time, Jerry broke down crying and an officer told the other officers to "get this piece of shit out of here."

116.    An officer said he was going to take pictures of the blood on Jerry's clothes so the jury could see what kind of a liar he was because they all knew Jerry killed those two little girls. Jerry was put back into the interrogation room.

117.    Defendants Schletz and Harris, with the active advice and encouragement of their commander, Defendant Valko, continued to aggressively and forcefully question and accuse Jerry of having been involved in the murders.

Fifth Interrogation: Schletz and Cappelluti

118.   Defendant Cappelluti told Jerry that everybody knew he killed the girls, but they wanted to know why. Defendant Cappelluti told Jerry if he told them why Defendant Cappelluti would make sure Jerry was taken straight to the hospital and get treatment for his mental and physical exhaustion. Jerry again denied killing Krystal and Laura. Defendant Schletz stated, "bullshit Jerry you just show up in town and now your little girl and her friend are dead and everybody we talked to, including your family, thinks you did it." Jerry was told his family had not even called about him and had abandoned him.

119.   Defendant Cappelluti advised Jerry that he had a fellow officer who was outside the room who was not happy about what happened to the girls, and that Jerry would not want him to come into the room. Jerry continued to maintain his innocence and refused to confess. As Defendants Cappelluti and Schletz left the room, Defendant Cappelluti said, "I warned you."

120.   The repeated threats of death and use of physical violence by the Defendant officers terrorized and intimidated Jerry throughout his 5 year incarceration.


Sixth Interrogation: Jones

121.   Defendant Jones, an extremely large man, then entered the room, alone, and began to interrogate Jerry, threatening that God would punish him for killing the girls. When Jerry responded that he did not kill the girls, Defendant Jones punched him in the side of his head, slamming his head into the wall. Defendant Jones then threatened that if Jerry responded to being hit, he would kill him and make up a story that Jerry had

attempted to seize his gun. As Jones turned to leave he threatened, "Don't make me have to come back in here." Jerry was too afraid to file a lawsuit until he was away from the Defendants and back home in Texas.

Seventh Interrogation: Schletz and Cappelluti

122. Following the physical and psychological abuse at the hands of Defendant Jones, Defendants Schletz and Cappelluti resumed the interrogation of Jerry and demanded that Jerry confess to the murders.

123. Again, the tag team continued with Defendants Schletz and Cappelluti asking Jerry what happened to the girls. Jerry responded by asking whether they wanted him to say he killed his little girl and that they did not want to hear the truth. Schletz said, "Well then tell us some lies Jerry."

124. At this point, Jerry had been in police custody for at least 24 hours, had not slept for 48 hours, had not been allowed to leave the police station, had been detained in rooms with no windows so that he was unable to determine whether it was day or night, was unable to determine what time it was, had been stripped of his clothes and forced to wear a see-through paper outfit so that he was practically naked, had been subjected to intense and relentless interrogation by the Defendants who had repeatedly and continually accused him of killing his daughter, had been physically forced to examine gruesome photographs of the mutilated bodies of his daughter and her friend, and had been denied access to a lawyer even though he had requested one, had been beaten and threatened with further violence, and all of this after enduring the most traumatic experience that a father could have: finding his daughter's body, lifeless and

bloodied. As a result of all of these factors, among others, Jerry's will was overborne. Jerry told the Defendant police officers that he would say he did it and they should take him to a judge. Jerry believed a judge would see the Defendants forced him to confess.

125. Defendants Schletz and Cappelluti then concocted a ridiculous story about Jerry looking for the girls, finding them, and trying to get Laura to go home. According to the Defendants' story, Krystal attacked him and he flipped out and stabbed them a total of 31 times. Jerry would not agree to write out this story so they did it for him.

126. Defendants Schletz told Jerry that Jerry hit Laura so hard she fell on the ground and didn't get back up. Defendant Schletz asked where the knife came in. Jerry, in a desperate state of mind, interjected that Krystal came after him with a potato peeler. Jerry thought a judge would toss out the case because a potato peeler could not have inflicted those wounds.

127. After Jerry repeatedly resisted Defendant Schletz's and Defendant Cappelluti's attempt to force Jerry to give this false inclulpatory statements, Defendant Cappelluti left the room and Defendant Jones entered.

Eighth Interrogation: Schletz, Jones, and Cappelluti

128. Defendant Jones sat down next to Jerry, crowding him into the corner in a manner that led Jerry to believe that Defendant Jones would punch him again if Jerry did not come up with a story that was satisfactory to the Defendants.

129. Jerry persisted in his denials.

130.    Defendant Schletz said they were going to bring some paper in for Jerry to write everything down and for Jerry to write an apology letter to Sheila and Krystal's mother.

131.    Defendant Harris brought in paper and a pen and told Jerry to start writing out the concocted story.

132.    Jerry refused to write anything down. Defendant Schletz walked into the room and said that he would just type it up because Jerry told him he was not going to "write those lies down."

133.    Defendant Cappelluti walked in and asked Jerry whether he was going to write and tell the families that he was sorry for what he had done. Jerry told Defendant Cappelluti that he would not write out the concocted story.

134.    Defendant Cappelluti responded by threatening to have Defendants Jones and Schletz return to the room and then left the room carrying the paper.

135.    Defendant's Schletz and Jones entered the room, looming over Jerry. Defendant Schletz slid the statement he had typed up in front of Jerry and ordered him to sign it. Jerry did not want to sign these lies. However, he knew Defendant Jones was going to punch him until he did what they demanded, so he signed it.


Ninth Interrogation: Harris, Schletz, Jones, Cappelluti and Unknown Police Officers

136.    Defendant Harris came in with County jail clothes/uniform and took the paper suit away. Defendants Schletz and Harris handcuffed Jerry. They walked him downstairs to the car where Defendants Jones and Cappelluti were standing. Defendant Schletz put Jerry in the backseat and Defendants Schletz and Jones sat on either side of

him. Defendant Schletz told Jerry everybody was "happy." They said Jerry was going to show them where the knife was. Jerry was afraid if he said anything he would be physically attacked by Defendants Jones and Schletz. Jerry figured at the park he could get some help. He walked down the trail and showed them where he found the girls. There were three other officers at the scene on the other side of the creek.

137. The above named Defendant officers kept telling Jerry to tell where the knife was and he said that there was no knife and that he did not kill the girls. He again stated that he did not do it. The Defendants had Defendant Jones take Jerry back to the car where Defendant Jones began punching him in his side.


Tenth Interrogation: Waller, Pavletic, Cappelluti, Harris, Schletz, and Jones

138. Defendants Waller and Pavletic met with the Defendant officers at 8:40 a.m. on May 10, 2005. Defendants Waller and Pavletic met with members of the Task Force to review the facts of the case. Defendants Waller and Pavletic received all the details of Jerry's interrogation. Upon information and belief, Defendant officers admitted to Defendants Waller and Pavletic that they did not have any notes, audiotape, or videotape of Jerry's confession. Because Jerry had refused to write down the Defendant officers' concocted "confession," Defendants Waller and Pavletic needed to obtain evidence the confession was "voluntary." Upon information and belief, Defendants Waller and Pavletic knew the written story had been coerced. Over the next few hours they coached and prepared the Defendant officers to obtain the videotaped confession by threatening to charge Sheila.

139.   The Defendant Officers took Jerry into a larger interrogation room. Defendant Schletz put Jerry in front of a camera and ordered him to read the typed statement. Jerry told Defendant Schletz it was a "bunch of lies," and Defendant Jones again punched him in the head. Defendant Jones told Defendant Harris to go get Sheila because they were now going to charge her as well. The threat of Sheila being charges was more than Jerry could stand. Jerry agreed to read their fabricated statement to save Sheila. He feared what would happen to their surviving children if they lost their mother and father.

140.   In the first videotape, Jerry said the typed statement was a "bunch of lies." The videotape machine was re-set to erase Jerry's comment. The Defendant police officers and Defendant prosecutors did not disclose the first video to Jerry's defense counsel at any point during his prosecution. The first video has never been viewed by anyone except the Defendants. Upon information and belief, the Plaintiff believes this videotape was destroyed. After Jerry read the fabricated statement for the second time, he told Defendant Schletz that they made him "say them lies." Defendant Schletz responded by asking Jerry who Jerry thought people would believe. Defendant Schletz said, "You don't know how big this thing is, they're going to give you the death penalty for sure."

141.   Notwithstanding Jerry's obviously fragile state, the Defendant police officers conducted a 24 hour physically and psychologically abusive interrogation that culminated in Jerry signing a typed confession, fabricated by the Defendants, to the murders of Laura and Krystal. Jerry read that false confession in front of a video camera.

142.    On information and belief, Defendants Waller and Pavletic watched and listened to the two videotaped statements of Jerry. Both Defendants were aware that Jerry was threatened and punched during the first videotape.

143.    At the time the Defendants commenced their interrogation of Jerry, there was no evidence linking Jerry in any way to the murders. The Defendants lacked probable cause to arrest Jerry after they coerced him into videotaping the statement they had fabricated.

144.    A few hours after the videotaping, one of the jail guards took Jerry out of his cell to where Defendant Schletz was standing. Defendant Schletz told Jerry that they hadn't found the knife and Jerry responded, "I did not kill the girls and I can't show you a knife that does not exist and all that stuff is lies you made up." A guard overheard this and wrote a report stating that Jerry "said that officers told him to lie so he lied to them about what had taken place."

145.    Defendant Schletz then told Jerry, "You killed those girls and I know you did it. And you know what, when they give you the death penalty I'm going to be right there when they shoot you up. And I'm going to have a big smile on my face."

146.    The arrest card indicates that Jerry's arrest was made on May 10, 2005, and that Jerry was not read his *Miranda* rights until after he had given his coerced confession.

147.    The Zion Police Department Arrest Report indicates that Jerry was arrested at 4:30 p.m. on May 10, 2005. Jerry was not arrested until after he had read the fabricated confession on camera on two occasions.

148.    Defendant Valko was present at 13 N. Genesee during the interrogation of Jerry. Defendant Valko was present for and participated in meetings among and between the Defendant officers; he knew about, approved of and ratified the physical and psychological coercion of Jerry performed by Defendants Schletz, Harris, Cappelluti, Jones and Unknown Police Officers.

## Malicious Prosecution

149.    Based upon the false inculpatory statement that the Defendants had obtained by coercing him and engaging in actions that "shocked the conscience," Jerry was charged with the murders of Laura and Krystal. A bond hearing was held on May 11, 2005, which laid out the prosecution's theory.

150.    Because he was framed for the murders and incarcerated, Jerry was not allowed to attend his daughter's funeral; Jerry was never mentioned in Laura's obituary. In another crushing blow to his emotional state, Jerry learned later that Jorge Torrez, his daughter's killer, did attend her funeral.

151.    Based upon the false inculpatory statements concocted by certain Defendants, Jerry was thereafter denied bond at a bond hearing and was detained in the Lake County Jail.

152.    Based upon the false inculpatory statement and the heinous nature of the crime, the Lake County State's Attorney gave notice that the State of Illinois would seek the death penalty against Jerry. No other evidence but Jerry's "false confession" implicated him in the crime.

153.    Defendants Schletz, Cappelluti, Jones, Valko, Harris, and Unknown Police Officers, working individually and together, prepared false reports in which they falsely stated that Jerry's inculpatory statement was voluntary. The above named Defendants failed to record their physical and psychological coercion and "conscience-shocking" actions toward Jerry and that his inculpatory statement had been concocted by them and was false. Some of their notes from the investigation and their interrogation of Jerry were destroyed, in violation of 725 ILCS 5-114/13.

154.    There was no physical evidence connecting Jerry to the two murders. The failure of the Defendant prosecutors to dismiss the charges against Jerry after receiving the DNA exclusion of him demonstrates their complicity in framing an innocent man.

### Grand Jury

155.    The Defendants' pattern of deception of the courts and public continued with the presentation to the Grand Jury. Assistant Commander Meadie falsely testified to the Grand Jury that Jerry's clothes had blood on them. He also lied to the Grand Jury by testifying there was one interview that was videotaped after the typed statement was prepared when in fact there were two videotapes made and one was destroyed because Jerry refused to read the statement on the first tape. The grand jurors were never told how long Jerry was interrogated for or what took place over the course of the interrogation, nor were they shown the first videotape. Meadie also falsely told the Grand Jury that Jerry described "in detail" knives that were found at his home. Meadie also falsely represented that knives taken from the home matched the description of the knife that the police claimed Jerry provided.

## Motion to Suppress

156.    In late August of 2006, at a hearing on Jerry's motion to suppress his confession, Defendants Schletz, Harris and Cappelluti all testified falsely that the confession was given voluntarily and without coercion, and that Jerry never requested a lawyer.

157.    Jerry was too afraid and intimidated by Defendant Jones's threat to kill him during the interrogation to testify at the suppression hearing. Jerry's counsel, Keith Grant, was intimidated by Defendant Mermel. Grant told Jerry, "it is not safe for you to testify at the suppression hearing."

## Delays of DNA Testing and Acting on Results

158.    During the autopsies of Laura and Krystal, the medical examiner, Nancy Jones, M.D., took vaginal, rectal and oral swabs to preserve potential DNA evidence.

159.    The prosecution made misrepresentations to the court regarding the defense's request to have their own forensic expert present for testing at the Defendant Northeastern Illinois Regional Crime Laboratory, telling Judge Fred Foreman that the lab would have to shut down and no other testing could occur because of confidentiality and contamination issues. This assertion has no basis in fact or in science.

160.    Defendant Northeastern Illinois Regional Crime Laboratory took direction from the Lake County State's Attorney's Office and Defendant Officers. The lab technicians were told which, if any, tests to perform for the purpose of corroboration and which tests not to perform. Defendant prosecutors controlled Defendant Northeastern Illinois Regional Crime Laboratory by directing the method of the tests performed, the

individuals who could be present when the tests were performed and the release date of the test results to the defense attorneys.

161. On December 13, 2005, Jerry's attorney, David Brodsky, wrote a letter to the crime lab addressing the issue that someone from the State's Attorney's Office had told the crime lab not to speak with Brodsky's office regarding this case. Brodsky stated, "there was an improper aura of secrecy surrounding the evidence."

162. In that same letter, Attorney Brodsky further wrote:

> I was surprised when you informed me that you had been directed not to speak to me any more regarding your work on this case (that you were told to direct all of my inquires to the State's Attorney's Office). The state of the physical evidence and the lack of any forensic or physical evidence linking Mr. Hobbs to this crime are of paramount importance to the defense. Transparency in testing and interpretation of the forensic and physical evidence is essential to a fair and honest determination. I am at a loss as to what can be gained from such secrecy except to favor one side over the other. I hope that is not the case, but I do not know what other conclusion to draw. I urge you to revisit that policy with those who directed you, and join me in adopting procedures that will favor an open and honest interpretation as to the meaning of the evidence.

163. Significantly, no DNA testing was requested by the prosecutors or Defendant officers on behalf of the Defendant prosecutors on the vaginal, oral and rectal swabs. The only examination done on these items by Defendant Northeastern Illinois Regional Crime Laboratory was a microscopic one which did not reveal the presence of spermatozoa. Laura's vaginal, rectal and oral swabs had a complete DNA nuclear profile of her killer Jorge Torrez. Sperm was present on each of these swabs.

164. Upon information and belief, Defendant Lawrence will testify that when evidence is submitted to Defendant Northeastern Illinois Regional Crime Laboratory it is sent by a law enforcement agency; typically they need some background on a case before they do any testing because they do not want to compromise evidence; normally,

the law enforcement agency (i.e., the sheriff or the police) provides the lab the

background and instructs in the testing; Defendant Northeastern Illinois Regional Crime

Laboratory also performs testing at the direction of the Lake County State's Attorney's

Office when that office wishes to corroborate a theory after initial testing has been

completed. She is often in contact with prosecutors.

### The Physical Evidence Proves Jerry Hobbs' Innocence

165.    On May 9, 2005, forensic pathologist Nancy Jones, M.D., performed

autopsies on each of the victims, taking vaginal, rectal and oral swabs from each girl, as

well as swabs of foreign bodies and samples from the victims' hands.

166.    Subsequently, at the request of Jerry's criminal defense lawyers and

pursuant to court order, these swabs and other evidence were delivered for testing to

Serological Research Institute (SERI), a laboratory which is certified to do forensic

testing, including testing of evidence for the presence of biological materials and DNA.

167.    On August 29, 2007, SERI issued a report which stated that there was

spermatozoa and semen from an unknown male on a vaginal swab taken from Laura at

her autopsy in 2005; spermatozoa and semen from an unknown male on a rectal swab

taken from Laura; spermatozoa and semen from an unknown male on an oral swab taken

from Laura; spermatozoa and semen on the blue jean skirt which Laura had been wearing

at the time of her murder; and biological material from an unknown male on swabs taken

from Laura's right and left hands.

168.    The report further stated that DNA testing established that Jerry was

excluded as the source of any of the semen, spermatozoa or biological material, and that a

single male was the source of all of that material. The report further stated that the DNA profile was suitable for entry into local, state and national databases in order to identify the actual perpetrator.

169.   As soon as this report was received, Jerry should have been released. The DNA findings clearly demonstrate that Jerry's confession was false. At this point, even the alleged probable cause to prosecute Jerry dissipated. Rather than releasing Jerry, he was kept incarcerated for three more years.

170.   Illinois Rule of Professional Conduct 3.3(a)(1) states that "a lawyer shall not knowingly make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." Defendant Mermel repeatedly violated this rule throughout Jerry's prosecution.

171.   The prosecution made false and malicious representations to the Court regarding the DNA. For example, Defendant Mermel stated in open court that the defense reports showed "one errant sperm which is impossible to deposit by the offender." This is false. He also stated to the Chicago Tribune, "none of the sperm they found was in significant place." This is also false. Spermatozoa (plural) were found on oral, vaginal and anal swabs taken from Laura Hobbs and the quantity was sufficient enough to create a full nuclear DNA profile.

172.   Defendant Mermel also stated in open court that, "It doesn't have the underlying P30 base substrate that would be left with an offender, a killer, leaving his sperm on her." This is scientifically and factually false. All of the items (vaginal swabs, anal swabs and material from Laura's skirt) showed positive results when tested for the P30 substrate (which is found in seminal fluid).

173.    At no time following the revelation of this exonerating evidence did the Defendant police officers take any steps to reveal that Jerry's confession-the sole remaining "evidence" that he was guilty of the murders–was, in fact, involuntary and the product of physical and psychological coercion of Jerry.

174.    On November 12, 2008, Jerry's criminal defense attorneys moved for a review of his bond on the basis of the DNA findings described in the preceding paragraphs. The attorneys also requested a search of the DNA profile in state and national databases in order to identify the real perpetrator.

175.    On December 2, 2008, the Circuit Court of Lake County conducted a hearing on Jerry's motion for review of his bond in light of the new DNA evidence. At that time, based on the false inculpatory statement which the Defendant police officers had coerced from Jerry, and the misrepresentations made by Defendant Mermel, the circuit court denied the motion. Jerry remained in the Lake County Jail.

176.    At the time of the exclusionary DNA results, Defendants Waller and Mermel no longer had jurisdiction to continue the prosecution of Jerry. There was absolutely no chance Jerry could have been found guilty beyond a reasonable doubt and it was apparent his "confession" was false.

**Jerry Hobbs's Release**

177.    On June 24, 2010, a search of the national offender databases revealed a match between the DNA profile found on and in Laura and her clothing and the DNA profile of Jorge Torrez, a former Zion resident and a friend of Krystal's brother. Torrez's profile was on the national offender databases because he had been arrested and charged

with sex offenses in the Commonwealth of Virginia. Torrez was subsequently convicted of the Virginia offenses. The brutal attempted murder of one woman and rape of another would never have happened but for the wrongdoing of the Defendants in delaying the DNA testing. In 2011, Torrez was charged with the murder of 20 year old Amanda Snell. Snell was murdered by Torrez on July 13, 2009.

178.    Finally on August 4, 2010, based on this match, the Lake County State's Attorney *nolle prossed* the charges against Jerry Hobbs, and he was released from custody. At the time of his release Jerry had spent 1912 days unjustly confined in the Lake County Jail. Defendant State's Attorney Waller stated that the DNA profile discovered in Laura belonged to Torrez and the State no longer had probable cause to prosecute Jerry. Nothing changed with the DNA evidence from 2007 to 2010.

## False Light and Defamation Of Jerry Hobbs

179.    Defendant Waller, on August 4, 2010, without a shred of evidence, stated "he was not convinced that Hobbs didn't have a role in the killings," but he said "he didn't believe the case could be proved beyond a reasonable doubt." (Chicago Tribune 8/4/10).

180.    After the prosecution had terminated, Defendant Waller, without the slightest hint of compassion, defiantly stated, "I have studied this case and I don't believe law enforcement did anything wrong."

181.    Approximately eight months after the termination of the prosecution, on about April 15, 2011, Defendant Mermel advised a national news organization that the

evidence demonstrated that "Hobbs did it" and the sperm got on Laura "some other way." Accusing Jerry of murdering the girls is defamatory and places him in a false light.

182.    Defendant Mermel displayed his knowledge of defamation law in an interview on July 6, 2011, when he said; "[t]here are libel and slander law in this county, and the state is asking for a protective order in the event he is publicly lambasted in the media when he is not charged with anything."

### Jerry Hobbs' Damages

183.    As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Jerry sustained injuries and damages including loss of his freedom for over five years, pain and suffering, severe mental anguish, emotional distress, loss of income, inadequate medical care, humiliation, indignities and embarrassment, degradation, permanent loss of natural psychological development, and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and freedom of speech and expression.

184.    Like a prisoner of war, Jerry spent four and a half years in total isolation in his Lake County Jail cell.  He was never given a cell mate or permitted to interact with other inmates.  Reflecting an internal jail memo on May 18, 2005, the police officers told Jerry they were keeping him in isolation, "due to the high publicity of your case and the seriousness of the allegations against you."  A further reason for keeping Jerry in isolation was to "keep him away from lawyers."

185.    Jerry was too intimidated to file a civil lawsuit against the Defendants because his life had been threatened during the interrogation and throughout the prosecution.  Further, law enforcement continued to intimidate Jerry through his attorney, Keith Grant, to such an extent that he did not believe it was safe to file a lawsuit while he was incarcerated in Lake County or that he would ever be released if he filed a lawsuit.

### The Defendant Officers Acted Pursuant to a Conspiracy

186.    The Defendants, acting jointly and with other unnamed persons, including other police investigative, supervisory, and command personnel, together, and under color of law, reached an understanding, engaged in a course of conduct, engaged in a joint action, and otherwise conspired among and between themselves to deprive Jerry of his constitutional rights, and did deprive Jerry of these rights, including, but not limited to, his rights to be free from deprivation of his constitutional rights.

187.    The Defendants also denied Jerry his right to an attorney, his rights of access to the Courts and to a fair and impartial criminal proceeding, and his right to due process as protected by the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution as well as his rights protected by Illinois law and the Illinois Constitution.

188.    In furtherance of this conspiracy, during the afternoon of May 9, 2005, as Jerry's coercive interrogation was underway, the Defendants, including Schletz, Harris, Cappelluti, Jones, Valko and Unknown Police Officers, met together and reviewed the facts of the case, including the complete lack of any reliable evidence that Jerry had any involvement with the crime.  At that time, these Defendants agreed and determined that

they should continue their aggressive and forceful interrogation of Jerry in an effort to force him to confess to involvement in the murders.

189.   The subsequent coercion of Jerry's false confession was undertaken by these Defendants, the other named Defendants and unnamed individuals in furtherance of that agreement.

190.   Also in furtherance of this conspiracy or conspiracies, the Defendant officers, together with their named and unnamed co-conspirators, each committed one or more of the overt acts set forth above, including, but not limited to: the wrongful arrest, imprisonment, charging and prosecution of Jerry; the fabrication, manipulation, alteration, and coercion of false and unreliable inculpatory evidence against Jerry, including Jerry's confession; the failure to expose and/or intervene in the malicious prosecution, false imprisonment, and attempted wrongful conviction of Jerry; the misrepresentations to the grand jury and judges, by, *inter alia*, and the presentation of knowingly false and incomplete evidence to those persons; the giving of false testimony and the filing of false and incomplete statements and reports; the suppression and destruction of favorable, exculpatory evidence; the failure to come forward with a truthful account of the events; and the other acts set forth above.

191.   The conspiracy or conspiracies, joint actions and overt acts continue to this date, have caused and continue to cause Jerry's constitutional rights to be violated and have caused and continue to cause pain, suffering, fear, mental anguish, detention, imprisonment, humiliation, defamation of character and reputation, loss of freedom and companionship, and other injuries as set forth above.

192.    Defendant Cappelluti has a history of obtaining false murder confessions. Ironically, other police departments hire him to teach them his interrogation "methods."

193.    Jorge Torrez has not been charged with or prosecuted for the murders and sexual assaults of Laura Hobbs and Krystal Tobias. To charge and prosecute Torrez would be to admit Jerry was framed for a crime he did not commit and his confession was false and his claims of coercion are true.

## COUNT I

### (42 U.S.C. §1983 – Coerced Confession: Fourteenth Amendment)

### (Defendants Waller, Pavletic, Jones, Cappelluti, Harris, Valko, and Schletz)

194.    Plaintiff re-alleges paragraphs 1-193 of this Complaint as if fully set forth herein.

195.    In a manner more fully set forth above, one or more of the Defendants used unjust violence against Plaintiff in an attempt to coerce him to confess to a crime he did not commit.

196.    Plaintiff was coerced into falsely confessing to the murders of Laura Hobbs and Krystal Tobias and as a direct and proximate result of that coercion has suffered actual and special damages including, *inter alia*, severe emotional distress.

197.    Plaintiff's coerced confession was used against him, in that the confession resulted in charges being initiated against him and the continuation of the charges against him, resulting in his subsequent incarceration at the Lake County Jail for over five years.

198.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of the Plaintiff.

WHEREFORE, Plaintiff, Jerry Hobbs, respectfully requests that this Court enter judgment in his favor and against above named Defendants, awarding compensatory damages, costs, and attorney's fees along with punitive damages against each of the Defendants named in this Count as well as any other relief this Court deems just and appropriate.

## COUNT II

### (42 U.S.C. §1983 – Substantive Due Process: Shock the conscience)

### (Defendants Jones, Cappelluti, Harris, Valko, and Schletz)

199. Plaintiff re-alleges paragraphs 1-198, with specific emphasis toward paragraphs 81, 85, 97, 98, 99, 105, 106, 118, 121, 124, and 139 of this Complaint as if fully set forth herein.

200. In a manner more fully set forth above, Defendants, through the use of force and the threat of physical violence, coerced Plaintiff into giving false and fabricated admissions in a manner shocking to the conscience. Plaintiff has suffered actual and special damages including, *inter alia*, severe emotional distress as a direct and proximate result of Defendants' conduct.

201. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others such that the Defendants' actions shock the conscience.

WHEREFORE, Plaintiff, Jerry Hobbs, respectfully requests that this Court enter judgment in his favor and against above named Defendants, awarding compensatory damages, costs, and attorney's fees along with punitive damages against each of the Defendants named in this Count as well as any other relief this Court deems just and appropriate.

## COUNT III

**(42 U.S.C. §1983 – Procedural Due Process: 5th and 14th Amendments)**

**(Defendants Mermel, Waller, Pavletic, Jones, Cappelluti, Harris, Valko, and Schletz)**

202.    Plaintiff re-alleges paragraphs 1-201 of this Complaint as if fully set forth herein.

203.    In a manner more fully set forth above, one or more of the Defendants used unjustified violence against Plaintiff in an attempt to coerce him to confess to a crime he did not commit.

204.    Plaintiff, who was not provided any *Miranda* warnings, was denied access to legal counsel for the duration of his interrogation, notwithstanding requests for the same.  As a result of this and the other misconduct described in this Complaint, Plaintiff was forced to incriminate himself falsely against his will.

205.    Plaintiff's coerced false statements were used against Plaintiff in a criminal case to his detriment.

206.    As a result of Defendants' misconduct, Plaintiff suffered great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other consequential damages, as well as loss of liberty.

207.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of the Plaintiff.

WHEREFORE, Plaintiff, Jerry Hobbs, respectfully requests that this Court enter judgment in his favor and against above named Defendants, awarding compensatory damages, costs, and attorney's fees along with punitive damages against each of the Defendants named in this Count as well as any other relief this Court deems just and appropriate.

## COUNT IV

### (42 U.S.C. §1983 – Failure to Intervene)

### (Defendants Mermel, Waller, Pavletic, Jones, Cappelluti, Harris, Valko, and Schletz)

208.    Plaintiff re-alleges paragraphs 1-207 of this Complaint as if fully set forth herein.

209.    In the manner described above, during the constitutional violations described above, one or more of the Defendant officers stood by without intervening to prevent the misconduct.

210.    As a result of the Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered pain and injury, as well as emotional

distress. These Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

211.    The misconduct described in this Complaint was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.


WHEREFORE, Plaintiff, Jerry Hobbs, respectfully requests that this Court enter judgment in his favor and against above named Defendants, awarding compensatory damages, costs, and attorney's fees along with punitive damages against each of the Defendants named in this Count as well as any other relief this Court deems just and appropriate.


## COUNT V

**(42 U.S.C. §1985 - Conspiracy)**

**(Defendants Mermel, Waller, Pavletic, Jones, Cappelluti, Harris, Valko, Schletz Northeastern Illinois Regional Crime Laboratory, Glassburg, and Lawrence)**

212.    Plaintiff re-alleges paragraphs 1-211 of this Complaint as if fully set forth herein.

213.    In a manner more fully set forth above, Defendant officers together reached an understanding, engaged in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves for the purpose of depriving Plaintiff of his Constitutional rights and accomplish an unlawful purpose by unlawful means.

214.    In furtherance of this conspiracy or conspiracies, Defendants, acting in concert with other co-conspirators, committed the overt acts as set forth above including, but not limited to, the arrest of Plaintiff without probable cause, the coercion of Plaintiff's confession, the manipulation and falsification of police reports, and the knowing presentation of fabricated evidence to initiate proceedings against Plaintiff maliciously.

215.    Said conspiracy or conspiracies and overt acts were continued from on or about May 9, 2005, through to the present.

216.    This conspiracy proximately caused the injuries to Plaintiff as set forth above.

217.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of the Plaintiff.

WHEREFORE, Plaintiff, Jerry Hobbs, respectfully requests that this Court enter judgment in his favor and against above named Defendants, awarding compensatory damages, costs, and attorney's fees along with punitive damages against each of the Defendants named in this Count as well as any other relief this Court deems just and appropriate.

## COUNT VI

### (42 U.S.C. § 1983 -- 4th and 14th Amendment Claim for Malicious Prosecution)[1]

### (Defendants Mermel, Waller, Pavletic, Jones, Cappelluti, Harris, Valko, and Schletz)

218.     Plaintiff re-alleges paragraphs 1-217 of this Complaint as if fully set forth herein.

219.     Defendants Harris, Cappelluti, Schletz, Valko, Jones, and Unknown Police Officers, despite knowing that probable cause did not exist to arrest and prosecute Plaintiff to be arrested and prosecuted for that crime, thereby violating Plaintiff's right pursuant to the Fourth and Fourteenth Amendments of the United States Constitution to be free from unreasonable searches and seizures and to due process.

220.     Specifically, despite the fact that the Defendants were aware of information that probable cause did not exist to arrest Plaintiff, the Defendants intentionally caused Plaintiff to be arrested and prosecuted for the murders of Laura and Krystal. Furthermore, the Defendants intentionally withheld from and misrepresented to prosecutors, judges and the grand jury facts that further vitiated probable cause against Plaintiff as set forth above, and failed to investigate evidence which would have led to the actual assailant. The Defendants performed the above-described acts deliberately, with reckless disregard for the truth, and with malice.

---

[1] Plaintiff recognizes that the Seventh Circuit Court of Appeals has held that there is no cause of action for malicious prosecution under 42 U.S.C. § 1983, under either a Fourth or a Fourteenth Amendment theory. This issue has not yet been determined by the United States Supreme Court and Plaintiff is pleading this count in order to preserve this issue for potential review by the United States Supreme Court and for potential reconsideration by the Seventh Circuit.

221.    As a direct and proximate result of the Defendants' actions, Plaintiff was wrongly charged and imprisoned and was deprived of his freedom for more than five years, and suffered the other grievous and continuing injuries and damages as set forth above.

WHEREFORE, Plaintiff, Jerry Hobbs, respectfully requests that this Court enter judgment in his favor and against above named Defendants, awarding compensatory damages, costs, and attorney's fees along with punitive damages against each of the Defendants named in this Count as well as any other relief this Court deems just and appropriate.

## COUNT VII

**(42 U.S.C. § 1983 -- *Monell* Policy Claim Against the City of Waukegan)**

222.    Plaintiff re-alleges paragraphs 1-221 of this Complaint as if fully set forth herein.

223.    Upon information and belief, the actions of Defendants Schletz, Cappelluti, and Valko as alleged above, were done pursuant to one or more interrelated *de facto* policies, practices and/or customs of the Defendant City of Waukegan, its Police Department, Police Board, and/or City Council.

224.    Upon information and belief, at all times material to this complaint, the City of Waukegan and its Police Department had interrelated *de facto* policies, practices, and customs which included, *inter alia*:

a) filing false reports and giving false statements pursuing and obtaining wrongful prosecutions and false imprisonments on the basis of such reports and statements;

b) failing to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control police officers, particularly those who were repeatedly accused of wrongful imprisonments, malicious prosecutions and wrongful convictions and of making false reports and statements;

c) maintaining a police code of silence, pursuant to which police officers refused to report or otherwise covered up instances of police misconduct, and/or the fabrication, suppression and destruction of evidence of which they were aware, despite their obligation under the law and police regulations not to do so;

d) covering up, suppressing and withholding exonerating, exculpatory, and/or other evidence favorable to criminal Defendants;

e) engaging in abusive interrogations which were designed to coerce confessions.

225. These interrelated policies, practices and customs, as set forth above, both individually and together, were maintained and implemented with deliberate indifference; encouraged, *inter alia*, the fabrication, manipulation, and alteration of evidence, the making of false statements and reports, the giving of false testimony, and the pursuit and continuation of wrongful convictions and false arrests and imprisonments; and were, separately and together, a direct and proximate cause of the unconstitutional acts committed by the named Defendants and their co-conspirators, and the injuries suffered by Plaintiff.

226.    Additionally, the failure to properly train, discipline, monitor, control, assign, transfer, supervise, and counsel the police Defendants was done with deliberate indifference and acted as a direct and proximate cause of the injuries to the Plaintiff.

WHEREFORE, Plaintiff, Jerry Hobbs, respectfully requests that this Court enter judgment in his favor and against above named Defendants, awarding compensatory damages, costs, and attorney's fees along with punitive damages against each of the Defendants named in this Count as well as any other relief this Court deems just and appropriate.

## COUNT VIII

### (42 U.S.C. § 1983 -- *Monell* Policy Claim Against the City of Zion)

227.    Plaintiff re-alleges paragraphs 1-226 of this Complaint as if fully set forth herein.

228.    Upon information and belief, the actions of Defendant Harris as alleged above, were done pursuant to one or more interrelated *de facto* policies, practices and/or customs of the Defendant City of Zion, its Police Department, Police Board, and/or City Council.

229.    Upon information and belief, at all times material to this complaint, the City of Zion and its Police Department had interrelated *de facto* policies, practices, and customs which included, *inter alia*:

      a)      filing false reports and giving false statements pursuing and obtaining wrongful prosecutions and false imprisonments on the basis of such reports and statements;

      b)      failing to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control police officers, particularly those who were repeatedly accused of wrongful imprisonments, malicious prosecutions and wrongful convictions and of making false reports and statements;

      c)      maintaining a police code of silence, pursuant to which police officers refused to report or otherwise covered up instances of police misconduct, and/or the fabrication, suppression and destruction of evidence of which they were aware, despite their obligation under the law and police regulations not to do so;

      d)      covering up, suppressing and withholding exonerating, exculpatory, and/or other evidence favorable to criminal Defendants;

      e)      engaging in abusive interrogations which were designed to coerce confessions.

230.    These interrelated policies, practices and customs, as set forth above, both individually and together, were maintained and implemented with deliberate indifference; encouraged, *inter alia*, the fabrication, manipulation, and alteration of evidence, the making of false statements and reports, the giving of false testimony, and the pursuit and continuation of wrongful convictions and false arrests and imprisonments; and were, separately and together, a direct and proximate cause of the unconstitutional acts committed by the named Defendants and their co-conspirators, and the injuries suffered by Plaintiff.

231.    Additionally, the failure to properly train, discipline, monitor, control, assign, transfer, supervise, and counsel the police Defendants was done with deliberate indifference and acted as a direct and proximate cause of the injuries to the Plaintiff.

WHEREFORE, Plaintiff, Jerry Hobbs, respectfully requests that this Court enter judgment in his favor and against above named Defendants, awarding compensatory damages, costs, and attorney's fees along with punitive damages against each of the Defendants named in this Count as well as any other relief this Court deems just and appropriate.

## COUNT IX

**(42 U.S.C. § 1983 -- *Monell* Policy Claim Against the Village of Vernon Hills)**

232.    Plaintiff re-alleges paragraphs 1-231 of this Complaint as if fully set forth herein.

233.    Upon information and belief, the actions of Defendant Jones as alleged above, were done pursuant to one or more interrelated *de facto* policies, practices and/or customs of the Defendant Village of Vernon Hills, its Police Department, Police Board, and/or City Council.

234.    Upon information and belief, at all times material to this complaint, the Village of Vernon Hills and its Police Department had interrelated *de facto* policies, practices, and customs which included, *inter alia*:

a)     filing false reports and giving false statements pursuing and obtaining wrongful prosecutions and false imprisonments on the basis of such reports and statements;

b)     failing to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control police officers, particularly those who were repeatedly accused of wrongful imprisonments, malicious prosecutions and wrongful convictions and of making false reports and statements;

c)     maintaining a police code of silence, pursuant to which police officers refused to report or otherwise covered up instances of police misconduct, and/or the fabrication, suppression and destruction of evidence of which they were aware, despite their obligation under the law and police regulations not to do so;

d)     covering up, suppressing and withholding exonerating, exculpatory, and/or other evidence favorable to criminal Defendants;

e)     engaging in abusive interrogations which were designed to coerce confessions.

235.    These interrelated policies, practices and customs, as set forth above, both individually and together, were maintained and implemented with deliberate indifference; encouraged, *inter alia*, the fabrication, manipulation, and alteration of evidence, the making of false statements and reports, the giving of false testimony, and the pursuit and continuation of wrongful convictions and false arrests and imprisonments; and were, separately and together, a direct and proximate cause of the unconstitutional acts committed by the named Defendants and their co-conspirators, and the injuries suffered by Plaintiff.

236.    Additionally, the failure to properly train, discipline, monitor, control, assign, transfer, supervise, and counsel the police Defendants was done with deliberate indifference and acted as a direct and proximate cause of the injuries to the Plaintiff.

WHEREFORE, Plaintiff, Jerry Hobbs, respectfully requests that this Court enter judgment in his favor and against above named Defendants, awarding compensatory damages, costs, and attorney's fees along with punitive damages against each of the Defendants named in this Count as well as any other relief this Court deems just and appropriate.

## COUNT X

**(42 U.S.C. § 1983 – Deprivation of Access To Courts)**

**(Defendants Mermel, Waller, Pavletic, Jones, Cappelluti, Harris, Valko, and Schletz)**

237.    Plaintiff re-alleges paragraphs 1-236 of this Complaint as if fully set forth herein.

238.    Plaintiff was isolated and separated while held in Lake County Jail.

239.    During that time, each of the Defendants, all the while acting individually, jointly, and in conspiracy, denied Plaintiff access to courts by denying him access to the law library, legal material and/or legal counsel such that his ability to bring a lawsuit on Claims I-IX of this Complaint was deprived or diminished.

240.    The misconduct described in the Count was undertaken with malice, willfulness, and in reckless indifference to the rights of others.

241.    The deprivation of Plaintiff's access to the courts proximately caused the injury as described in this Complaint.

242.    Additionally, certain misconduct described in this Count was undertaken pursuant to the policy and practice of Defendant municipalities in the manner described more fully in paragraphs of this Complaint.

WHEREFORE, Plaintiff, Jerry Hobbs, respectfully requests that this Court enter judgment in his favor and against above named Defendants, awarding compensatory damages, costs, and attorney's fees along with punitive damages against each of the Defendants named in this Count as well as any other relief this Court deems just and appropriate.

## COUNT XI

### (Malicious Prosecution – State Law Claim)

### (Defendants Mermel, Waller, Pavletic, Jones, Cappelluti, Harris, Valko, Schletz Northeastern Illinois Regional Crime Laboratory, Glassburg, and Lawrence)

243.    Plaintiff re-alleges paragraphs 1-242 of this Complaint as if fully set forth herein.

244.    Defendants initiated and/or continued a malicious prosecution against Jerry Hobbs, all without probable cause. Defendants were each instrumental in the initiation and perpetuation of the prosecution of Jerry Hobbs. These Defendants each acted with malice.

245.    This prosecution was terminated in Plaintiff's favor on August 4, 2010 when all charges were *nolle prosequi*.

246.    Defendants are liable for the prosecution because it was proximately caused by their unlawful actions as set forth above.

247.    These actions directly and proximately caused the injuries and damages to Plaintiff as claimed above, and constitute the tort of malicious prosecution under Illinois law.

WHEREFORE, Plaintiff, Jerry Hobbs, respectfully requests that this Court enter judgment in his favor and against above named defendants Defendants, awarding compensatory damages, costs, and attorney's fees against each of the Defendants named in this Count as well as any other relief this Court deems just and appropriate.

## COUNT XII

**(Intentional Infliction of Emotional Distress – State Law Claim)**

**(Defendants Mermel, Waller, Pavletic, Jones, Cappelluti, Harris, Valko, Schletz Northeastern Illinois Regional Crime Laboratory, Glassburg, and Lawrence)**

248.    Plaintiff re-alleges paragraphs 1-247 of this Complaint as if fully set forth herein.

249.    In a manner more fully set forth above, the acts and conduct of Defendants were extreme and outrageous. Defendants intended to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff.

250.     Said actions were undertaken with malice, willfulness, and with reckless indifference to the rights of Plaintiff.

251.     As a direct and proximate result of Defendants' wrongful acts, Plaintiff suffered damages, including severe emotional distress and anguish.


WHEREFORE, Plaintiff, Jerry Hobbs, respectfully requests that this Court enter judgment in his favor and against above named Defendants, awarding compensatory damages, costs, and attorney's fees against each of the Defendants named in this Count as well as any other relief this Court deems just and appropriate.


## COUNT XIII

### (Conspiracy – State Law)

**(Defendants Mermel, Waller, Pavletic, Jones, Cappelluti, Harris, Valko, Schletz Northeastern Illinois Regional Crime Laboratory, Glassburg, and Lawrence)**

252.     Plaintiff re-alleges paragraphs 1-251 of this Complaint as if fully set forth herein.

253.     In a manner more fully set forth above, Defendants together reached an understanding, engaged in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves to maliciously prosecute Plaintiff without probable cause, and to intentionally inflict severe emotional distress.

254.     In furtherance of this conspiracy or conspiracies, Defendants committed the overt acts as set forth above including, but not limited to, the arrest of Plaintiff without probable cause, the coercion of Plaintiff's confession, the manipulation and

falsification of police reports, the knowing presentation of fabricated evidence to initiate and continue proceedings against Plaintiff maliciously, and the prolonging of Plaintiff's incarceration despite exclusionary DNA.

255.    Said conspiracy or conspiracies and overt acts were continued from on or about May 9, 2005, through to the present.

256.    This conspiracy proximately caused the injuries to Plaintiff as set forth above.


WHEREFORE, Plaintiff, Jerry Hobbs, respectfully requests that this Court enter judgment in his favor and against above named Defendants, awarding compensatory damages, costs, and attorney's fees against each of the Defendants named in this Count as well as any other relief this Court deems just and appropriate.


## COUNT XIV

### (Defamation – State Law Claim)

### (Defendant Mermel)

257.    Plaintiff re-alleges paragraphs 1-256 of this Complaint as if fully set forth herein.

258.    In a manner more fully set forth above, Defendant Mermel made false statements about Plaintiff, Jerry Hobbs.

260.    Defendant Mermel caused these statements to be widely published in the media.

261.    Defendants Mermel made the aforesaid statements, knowing they were false.

262.    The actions of Defendant Mermel in making false statements about Plaintiff and in publishing said statements were a direct and proximate cause of Plaintiff's injuries and damages as set forth above.

WHEREFORE, Plaintiff, Jerry Hobbs, respectfully requests that this Court enter judgment in his favor and against above named Defendant, awarding compensatory damages, costs, and attorney's fees against each of the Defendants named in this Count as well as any other relief this Court deems just and appropriate.

## COUNT XV

### (False Light – State Law Claim)

### (Defendant Waller)

263.    Plaintiff re-alleges paragraphs 1-262 of this Complaint as if fully set forth herein.

264.    On August 4, 2010, Defendant Waller held a press conference. On that date and at that time the charges against Plaintiff had been *nolle prosequi* and Plaintiff had been released from custody. During the course of this press conference, Defendant Waller spoke and then answered numerous questions from the media.

265.    Defendant Waller, acting with reckless disregard, placed Plaintiff before the public in a false light. He represented during this press conference that Plaintiff had taken the police to Beulah Park where he "threw the murder weapon."

266.    Defendant Waller refused to say that Plaintiff is innocent of this horrendous crime despite the existence of the exonerating DNA.

267.    Defendant Waller encouraged everyone to read the court's opinion from the motion to suppress and expressed to the media and the public that the information in the ruling was not positive information about Plaintiff.

268.    Defendant Waller stated that there could have been sexual contact beforehand, thereby raising doubt as to the DNA's exonerating power.

269.    Defendant Waller would not exclude Jerry Hobbs as having a role in it and stated at some point in the future he would be able to answer that question.

270.    Defendant Waller stated that he did not believe law enforcement did anything wrong in this case.

271.    Defendant Waller failed to say that the only reason the testimony at the motion to suppress was undisputed was because Jerry Hobbs did not testify.

272.    Defendant Waller placed Plaintiff before the public in a false light in a manner that was highly offensive to a reasonable person.


WHEREFORE, Plaintiff, Jerry Hobbs, respectfully requests that this Court enter judgment in his favor and against above named Defendant, awarding compensatory damages, costs, and attorney's fees against each of the Defendants named in this Count as well as any other relief this Court deems just and appropriate.

## COUNT XVI

### (745 ILCS 10/9-102 – Indemnification)

### (Defendants City of Waukegan, City of Zion, Village of Vernon Hills, and

### County of Lake)

273.     Plaintiff re-alleges paragraphs 1-272 of this Complaint as if fully set forth herein.

274.     Defendants City of Waukegan, City of Zion, and Village of Vernon Hills were the respective employers of each of the Defendant Police Officers at all times relevant to this Complaint, as set forth above.

275.     Defendant Lake County employed Defendants Mermel, Waller, and Pavletic at all times relevant to this Complaint, as set forth above.

276.     All of the individually named Defendant police officers were at all relevant times acting within the course and scope of their employment.

277.     Pursuant to 745 ILCS 10/9-102, each governmental entity set forth above is liable to pay all judgments and settlements entered against any of its employees for the claims of conspiracy to commit malicious prosecution, malicious prosecution, conspiracy to commit intentional infliction of emotional distress, intentional infliction of emotional distress, and defamation.

WHEREFORE, pursuant to 745 ILCS 10/9-102, Plaintiff, Jerry Hobbs, demands judgment against Defendants City of Waukegan, City of Zion, Village of Vernon Hills, and County of Lake, in the amounts awarded to Plaintiff against the individual

Defendants by way of judgment or settlement, including any and all amounts awarded for damages, costs and attorney's fees.

## COUNT XVII

### (Respondeat Superior)

### (Defendant City of Waukegan, City of Zion, Village of Vernon Hills, and County of Lake)

278.    Plaintiff re-alleges paragraphs 1-277 of this Complaint as if fully set forth herein.

279.    At all times relevant to this Complaint Defendants Schletz, Valko and Cappelluti acted as agents of, and in the scope of their employment with, Defendant City of Waukegan.

280.    At all times relevant to this Complaint Defendant Harris acted as an agent of, and in the scope of his employment with, Defendant City of Zion.

281.    At all times relevant to this Complaint Defendant Jones acted as an agent of, and in the scope of his employment with, Defendant Village of Vernon Hills.

282.    At all times relevant to this Complaint Defendants Waller, Pavletic, and Mermel acted as agents of, Defendant Lake County and the Lake County State's Attorney's Office.

283.    The Defendant municipalities and entities are liable for the torts of their respective agents which violated state law under the doctrine of *respondeat superior.*

WHEREFORE, Plaintiff, Jerry Hobbs, demands judgment against Defendants City of Waukegan, City of Zion, Village of Vernon Hills, and County of Lake, for compensatory damages, plus the costs of this action and such other relief as this Court deems equitable and just.

## JURY DEMAND

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil

Procedure 38(b) on all issues so triable.


Respectfully Submitted,


_____/s/ Kathleen T. Zellner_____
Kathleen T. Zellner


Kathleen Zellner & Assoc.  P.C.
Esplanade IV
1901 Butterfield Road
Suite 650
Downers Grove, Illinois  60515
(630) 955-1212
Atty No: 6184574