**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JERRY HOBBS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **DOMENIC CAPPELLUTI, CHARLES** | ) | |
| **SCHLETZ, and WILLIAM VALKO, of** | ) | |
| **the Waukegan Police Department;** | ) | |
| **CITY OF WAUKEGAN; ANDREW** | ) | **Case No. 10 C 7649** |
| **JONES, of the Vernon Hills Police** | ) | **Judge Joan H. Lefkow** |
| **Department; VILLAGE OF VERNON** | ) | |
| **HILLS; KEVIN HARRIS of the Zion** | ) | |
| **Police Department; CITY OF ZION;** | ) | |
| **Lake County State's Attorney** | ) | |
| **MICHAEL WALLER; Assistant Lake** | ) | |
| **County State's Attorney JEFF** | ) | |
| **PAVLETIC; Assistant Lake County** | ) | |
| **State's Attorney MICHAEL MERMEL;** | ) | |
| **COUNTY OF LAKE and UNKNOWN** | ) | |
| **POLICE OFFICER,** | ) | |
| | ) | |
| **Defendants**. | ) | |

<u>**OPINION AND ORDER**</u>

On May 9, 2005, plaintiff Jerry Hobbs realized every parent's worst nightmare when he

discovered the bodies of his young daughter, Laura, and her friend, Krystal Tobias, in the park

by their house. Laura had been sexually assaulted and both girls had been brutally murdered.

Hobbs's nightmare did not end there, however. Police quickly identified him as a suspect and,

after interrogating him for 24 hours, coerced him into falsely confessing. This confession was

then used to detain him on murder charges for over five years until he was exonerated by DNA

evidence and eventually released.

Shortly thereafter, Hobbs filed the present action under 42 U.S.C. §§ 1983 and 1985 against the police officers who investigated and interrogated him (defendants Domenic Cappelluti, Charles Schletz, William Valko, Kevin Harris and Andrew Jones, (collectively "defendant officers")), the municipalities that employed them (the Cities of Waukegan and Zion and the Village of Vernon Hills), the state's attorneys who prosecuted him (Lake County State's Attorney Michael Waller and Assistant Lake County State's Attorney's Jeff Pavletic and Michael Mermel (collectively "defendant prosecutors," collectively with defendant officers "defendants")),[1] and the county that employed them (Lake County) (collectively with Waukegan, Zion and Vernon Hills "municipal defendants"). In his third amended complaint, Hobbs alleges multiple claims of police and prosecutorial misconduct under both state and federal law. (Dkt. #94.) Presently before the court are motions to dismiss by defendant officers (dkt. #98 #106), defendant prosecutors (dkt. #100) and municipal defendants (dkt. #103, #106, #107, #109, #111). For the reasons set forth herein, these motions will be granted in part and denied in part.[2]

## BACKGROUND[3]

On Sunday, May 8, 2005, eight-year-old Laura Hobbs went missing. At the time, her father Jerry Hobbs ("Hobbs") was living in Zion, Illinois with Laura's mother, Sheila, and their children Jerry, Jr. (age 10), Laura (age 8), and Jeremy (age 6), and Meagan (age 13) (Sheila's

---

[1] Defendant prosecutors are sued in their individual capacity.

[2] The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1332(a)(1) (diversity), and 28 U.S.C. § 1367(a) (supplemental jurisdiction). Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Hobbs's claims occurred here.

[3] In deciding the instant motion, the court assumes the veracity of the well-pleaded allegations in the third amended complaint and construes all reasonable inferences in Hobbs's favor. *See, e.g., Savory* v. *Lyons*, 469 F.3d 667, 670 (7th Cir. 2006).

2

child from a previous relationship). Laura had gone outside to play and was supposed to return by dark. When she did not, Hobbs and several family members began searching for her. They soon learned that Laura's friend, Krystal (age 9), was also missing. Not finding Laura that night, Hobbs continued the search the next morning with the help of his family and the police.

The next day Hobbs resumed his search in nearby Beulah Park where children often played. There, in a grassy, open area, Hobbs discovered the bodies of Laura and Krystal. Both were lying face up about two or three feet apart. Laura had been stabbed twenty times, including in both eyes; Krystal had been stabbed eleven. Four years later, DNA evidence would reveal that Laura had also been sexually assaulted, although this fact was unknown to Hobbs at the time.

**Interrogation**

The murder investigation was handled by the Lake County Major Crimes Task Force (the "task force"), which included officers from the Cities of Waukegan and Zion, the Village of Vernon Hills and members of the Lake County State's Attorney's Office. Defendant officers and defendant prosecutors were all members of the task force. Shortly after discovering the bodies, Hobbs was taken to the Waukegan Police Department and was placed in a small, windowless room with no clock. Over the next 24 hours, he was interrogated approximately ten times. He was never told that he was under arrest or that he was free to leave. Defendant officers proceeded on the theory that Hobbs lost his temper when disciplining Laura and, as a result, murdered both her and Krystal. During his interrogation, Hobbs alleges that defendant officers took the following actions:

- Schletz and Harris entered the room and Schletz told Hobbs to sign a form that he described as "nothing really . . . [it] just said [that Hobbs] was agreeing to let [the

3

officers] ask [him] questions." Hobbs signed the form, a *Miranda* waiver, without reading it, and Schletz did not read it to him.

• Officers Schletz began to interrogate Hobbs about the crime, reviewing each gruesome fact in detail. Schletz forced Hobbs to view pictures of the girls' mutilated bodies. When Hobbs refused Schletz grabbed his head and knocked him to the floor. Schletz taunted Hobbs, making obscene suggestions like "How did their neck feel when you cut it?" Schletz and Harris told Hobbs that his alibi of being at home could not be verified and Schletz sad that physical evidence linked him to the crime.

• Hobbs repeatedly asked for a lawyer but his requests were ignored. Hobbs became so exhausted that each time the officers left the room, he tried to rest by lying on the floor. Schletz and Harris told Hobbs he could go home if he passed a voice stress analysis test, which they falsely said could determine whether Hobbs was lying. After completing the test four times, Hobbs was falsely informed that he had failed and that the tests conclusively showed he was lying. Schletz then suggested that Hobbs grab his gun so Schletz would have a justification for killing him.

• Cappelluti said that the fact that Hobbs discovered the bodies was "like winning the lottery," accusing Hobbs of committing the murders because he had found the victims. Cappelluti asked Hobbs if he believed in God and the two men prayed together for Laura. Hobbs cried. Cappelluti lied and said that there was an eyewitness who placed Hobbs at the crime scene.

• Schletz and Harris took Hobbs into a large room with a camera and told him that a light test would reveal evidence on his person. Officer Valko, the direct supervisor of Schletz, Harris and Cappellutti, was also present. The lights were turned out and shined on Hobbs's clothes revealing a mark on his pant leg. Hobbs responded that he had wiped his nose there when he was crying. Schletz and Harris then made Hobbs remove his clothes and put on a see-through paper suit, which he was forced to wear for part of his interrogation. The officers took Hobbs's clothes, telling him that a special camera would reveal evidence on his clothing that showed he was guilty.

• Back in the interrogation room, Hobbs was told that his family had not inquired about him, and that "everybody [the police] talked to, including [Hobbs's] family, thinks [he] did it." Cappelluti told Hobbs that there was an officer just outside the room who was not happy about what happened to the girls and whom Hobbs would not want to come into the room. When Hobbs again refused to confess, Cappellutti and Schletz left the room and Cappellutti said, "I warned you."

• Officer Jones, an extremely large man, entered the room alone and began interrogating Hobbs. When Hobbs again denied committing the crime, Jones punched him in the side of his head, slamming his head into the wall. Jones threatened that if Hobbs responded to being hit, that Jones would kill him and make up a story that Hobbs had tried to seize his

gun. As Jones turned to leave he threatened, "Don't make me have to come back in here." Officer Valko was present during Hobbs's interrogation and approved these tactics and others used by Schletz, Harris, Cappelluti and Jones.

- After officer Jones left, Schletz and Cappelluti resumed the interrogation and demanded that Hobbs confess. Hobbs replied that they did not want to hear the truth that he did not commit the crimes, to which Schletz replied, "Well then tell us some lies Jerry."

At this point, Hobbs had been in custody for at least 24 hours and had not slept in the last 48 hours. He had no idea what time it was, whether it was day or night, and he had not been allowed to leave the police station or to speak with a lawyer. He had been stripped of his clothes and forced to sit almost naked as defendant officers forced him to examine gruesome photographs of his daughter and her friend, accusing him of their murders. He had been physically assaulted and threatened with additional violence, all after enduring the most traumatic event of his life, discovering his daughter's mutilated body. His will was finally overborne.

### Confession

Hobbs told defendant officers he would confess and that they should take him to a judge, thinking that a judge would see that his confession was forced. Schletz and Cappelluti devised a story that Hobbs went looking for the girls, trying to get Laura to come home, and when he found them Krystal attacked him, causing him to lose control and kill them both. Schletz asked Hobbs about the knife and Hobbs replied that Krystal had attacked him with a potato peeler, thinking a judge would realize that a potato peeler could not have inflicted those types of wounds on the girls.

Jones then reentered the room, sitting close to Hobbs to physically intimidate him. Schletz demanded that Hobbs write the confession on paper. When Hobbs refused, Schletz said

he would type it. Cappellutti told Hobbs to write an apology to his and Krystals' families but Hobbs refused. Cappellutti then threatened to have Jones and Schletz return. Scheltz and Jones entered the room, and Scheltz put the statement he had typed in front of Hobbs, ordering him to sign it. Feeling intimidated by the threat of physical violence from Jones, Hobbs signed the paper.

After signing the confession, Hobbs was given a county jail uniform to wear instead of the paper suit. Scheltz and Harris escorted Hobbs to a car, which transported him and several officers to Beulah Park. Scheltz and Harris told Hobbs to show them where the knife was, and Hobbs walked down the trail to show them where he found the girls. The officers again insisted Hobbs show them where the knife was and Hobbs said that there was no knife and he did not kill the girls. Jones then took Hobbs back to the car and began punching him in the side.

At 8:40 a.m. on May 10, 2005, defendant prosecutors Waller and Pavletic met with members of the task force to review the facts of the case and received all the details of Hobbs's interrogation. Defendant officers told Waller and Pavletic they did not have any notes, audiotape or videotape of Hobbs's confession. Waller and Pavletic needed to obtain evidence that the confession was voluntary, and they knew that the written confession had been coerced. Over the next few hours they coached and prepared defendant officers to obtain a video confession from Hobbs by threatening to charge Sheila, the mother of his children.

Defendant officers then brought Hobbs into a larger room where he was placed in front of a camera and ordered to read his confession. When Hobbs refused, Jones punched him in the head. Jones told Harris to go get Sheila because they were going to charge her as well. Hobbs agreed to read the statement, fearing that Sheila would be arrested if he did not.

6

In the first videotape, Hobbs called the typed statement a "bunch of lies." This video was reset to erase Hobbs's comment. Hobbs then read the statement a second time. After completing the video, Hobbs again told Schletz that the confession was "lies." Schletz responded that Hobbs would surely receive the death penalty. Waller and Pavletic watched and listened to both videotaped statements and knew that Hobbs had been threatened and punched in the first videotape. Defendant prosecutors did not disclose the existence of the first videotape to Hobbs's counsel during his prosecution.

Hobbs was arrested at 4:30 p.m. on May 10, 2005 after reading his videotaped confession. Hobbs was read his *Miranda* rights only after giving his false confessions. Defendant officers worked individually and together to prepare false reports, stating that Hobbs's confession was voluntary. They destroyed notes from their investigation and interrogation of Hobbs. A few hours after the videotaping, a jail guard overheard a conversation between Schletz and Hobbs where Hobbs denied killing the girls and told Schletz that he did not know the location of the knife. The guard later wrote a report stating that Hobbs "said that officers told him to lie so he lied to them about what had taken place."

**Criminal Proceedings**

Hobbs was charged with the murders of Laura and Krystal. A bond hearing took place on May 11, 2005. Based on his confession, Hobbs was denied bond and detained in Lake County Jail. Defendant Waller notified the state of his intent to seek the death penalty. No other evidence except Hobbs's confession implicated him in the crime.

During his incarceration, Hobbs was kept in isolation. He was never given a cell mate or permitted to interact with other inmates. An internal jail memo dated May 18, 2005, instructed

7

officers to keep Hobbs in isolation due to the high profile nature of his case and the desire to

keep him away from lawyers. Hobbs was also prevented from accessing the law library and

other legal material relevant to his case. Additionally, as a result of his incarceration, Hobbs was

unable to attend his daughter's funeral and was not listed in her obituary. He later learned,

however, that the real killer had been allowed to attend.

**Motion to Suppress**

In late August 2006, the court held a hearing on Hobbs's motion to suppress his

confession. Officers Schletz, Harris, and Cappelluti all testified that the confession was

voluntary and that Hobbs never requested a lawyer. Hobbs was too afraid and intimidated by

Jones's threat to kill him during the interrogation that he did not testify at his suppression

hearing. Hobbs's lawyer, Keith Grant, was also intimidated by Assistant State's Attorney

Mermel, and advised Hobbs that it was unsafe for him to testify.

**DNA Evidence**

During the autopsies of Laura and Krystal, the medical examiner took vaginal, rectal and

oral swabs to preserve potential DNA evidence. These swabs were tested at the Northeastern

Illinois Regional Crime Laboratory, which took direction from the Lake County State's

Attorney's Office and defendant officers. The lab technicians were told which, if any, tests to

perform for the purpose of corroboration and which tests not to perform. Hobbs's defense

requested to have its own forensic expert present for the testing, and the prosecution made

misrepresentations to the court, stating that the lab would have to shut down and no other tests

could occur because of confidentiality and contamination concerns. The Lake County State's

Attorney's Office directed the lab not to speak with Hobbs's lawyer, and significantly,

8

defendants did not request any DNA testing on the vaginal, oral and rectal swabs. The only examination done by the lab was a microscopic one, which failed to reveal the presence of spermatozoa.

At some point during Hobbs's detention and upon a motion from his lawyer, the court ordered that the swabs taken from Laura and Krystal be delivered to the Serological Research Institute (SERI) for forensic testing. On August 29, 2007, SERI reported that there were spermatozoa and semen on the vaginal, rectal and oral swabs taken from Laura and spermatozoa on the skirt she was wearing at the time of the murder. There was also biological material from an unknown male on swabs taken from Laura's hands. Hobbs was excluded as the source of the semen, spermatozoa, and biological material and a single male was determined to be the source of all of the material.

### Motion for Review of Bond

On November 12, 2008, Hobbs's attorneys moved for a review of his bond on the basis of the DNA findings. The court conducted a hearing on December 2, 2008, but the court denied the motion. Mermel falsely told the court that the DNA evidence showed "one errant sperm which is impossible to deposit by the offender." He also stated that the biological material "doesn't have the underlying P30 base substrate that would be left with an offender, a killer, leaving his sperm on her." This was false; all of the swabs tested positive for the P30 substrate, which is found in seminal fluid. In addition, Mermel stated to the Chicago Tribune that "none of the sperm they found was in [a] significant place," and at one point said that the semen found inside Laura and on her clothes was the result of her playing around the crime scene, a place where couples go to have sex. At no time did defendant officers take any steps to reveal that

Hobbs's confession, the sole evidence of his guilt, was false. Defendant prosecutors refused to dismiss the charges against Hobbs even though there was no physical evidence linking him to the murders. Despite the fact that the DNA evidence implicated another, Hobbs remained in custody for three more years.

**Hobbs's Release**

On June 24, 2010, a search of the national offender databases revealed a match between the DNA profile found on Laura and the DNA profile of Jorge Torrez, a former resident of Zion and a friend of Krystal's brother. Torrez's profile was on the national offender database because he had been arrested and charged with various sexual offenses in the Commonwealth of Virginia.[4] Based on this match, on August 4, 2010, the Lake County State's Attorney's office *nolle prosequi*[5] the charges against Hobbs and he was released after spending 1,912 days in jail.

After Hobbs's release, Lake County State's Attorney Waller told the press that "he was not convinced that Hobbs didn't have a role in the killings" but that "he didn't believe that the case could be proved beyond a reasonable doubt." He stated that Hobbs had previously taken police to Beulah Park where he "threw the murder weapon" and stated that there could have been sexual contact beforehand, raising doubt as the exonerating power of the DNA evidence. Finally, he stated he had studied the case and "[he didn't] believe that law enforcement did anything wrong." Eight months after the termination of Hobbs's prosecution, Mermel told a

---

[4] Torrez was later convicted of the Virginia offenses which included the attempted murder of one woman and the rape of another. In 2011, Torrez was also charged with the murder of 20 year-old Amanda Snell, who was killed on July 13, 2009.

[5] "A *nolle prosequi* is not a final disposition of a case but is a procedure which restores the matter to the same state which existed before the Government initiated the prosecution." *Washington* v. *Summerville*, 127 F.3d 552, 557 (7th Cir. 1997).

national news organization that the evidence demonstrated that "Hobbs did it" and the sperm got

on Laura "some other way."

On December 1, 2010, Hobbs filed the present lawsuit, alleging the following federal

claims against defendant officers and defendant prosecutors:  coerced confession in violation of

the Fourteenth Amendment (procedural due process) (Count I); coerced confession in violation

of the Fourteenth Amendment (substantive due process) (against defendant officers only) (Count

II);  coerced confession and violation of *Miranda* and in violation of the Fifth and Fourteenth

Amendments (Count III); failure to intervene (Count IV); conspiracy (Count V);[6] and denial of

access to the courts (Count X).[7]  He also alleges the following state law claims against defendant

officers and defendant prosecutors:  malicious prosecution (Count XI); intentional infliction of

emotional distress (Count XII); conspiracy (Count XIII); defamation (against Mermel only)

(Count XIV); and false light (against Waller only) (Count XV).  Finally, Hobbs brings a state

law claim for indemnification (Count XVI) against municipal defendants.

## LEGAL STANDARD

## I.    Federal Rule of Civil Procedure 12(b)(6)

A motion to dismiss under Rule 12(b)(6) challenges a complaint for failure to state a

claim upon which relief may be granted.  Fed. R. Civ. P. 12(b)(6); *Gen. Elec. Capital Corp.* v.

*Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997).  In reviewing a Rule 12(b)(6)

---

[6] Hobbs voluntarily dismissed Counts VII through IX, which alleged *Monell* violations against the Cities of Waukegan and Zion and the Village of Vernon Hills, and Count XVII, a respondeat superior claim against municipal defendants.

[7] Hobbs also brings a claim for malicious prosecution in violation of the Fourth and Fourteenth Amendments (Count VI).  Hobbs acknowledges that there is no such claim under Seventh Circuit precedent, and asserts the claim merely to preserve the issue for United States Supreme Court review. This claim is therefore dismissed.  *See Ray* v. *City of Chicago*, 629 F.3d 660, 664 (7th Cir. 2011).

motion, the court takes as true all facts in the complaint and draws all reasonable inferences in favor of the plaintiff. *Dixon* v. *Page*, 291 F.3d 485, 486–87 (7th Cir. 2002). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of the claim's basis but must also establish that the requested relief is plausible on its face. *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); *see Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). The allegations in the complaint must be "enough to raise a right of relief above the speculative level." *Twombly*, 550 U.S. at 555. At the same time, the plaintiff need not plead legal theories. *Hatmaker* v. *Mem'l Med. Ctr.*, 619 F.3d 741, 742–43 (7th Cir. 2010), *cert. denied* 131 S. Ct. 1603, 179 L. Ed. 2d 500 (2011). Rather, it is the facts that count.

## II.     42 U.S.C. § 1983

To state a claim under § 1983, a plaintiff must allege that he or she was deprived of a federal right, privilege, or immunity by a person acting under color of state law. *West* v. *Atkins*, 487 U.S. 42, 49–50, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988). The Fourteenth Amendment states that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law," U.S. CONST. amend. XIV, § 1, and is the source of three distinct constitutional protections.

> First, the Clause incorporates many of the specific protections defined in the Bill of Rights. A plaintiff may bring suit under § 1983 for state officials' violation of his rights to, *e.g.*, freedom of speech or freedom from unreasonable searches and seizures. Second, the Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government action regardless of the fairness of the procedures used to implement them. . . . [Third,] [a] § 1983 action may be brought for a violation of procedural due process, but . . . [i]n procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of law."

*Colon* v. *Schneider*, 899 F.2d 660, 666 (7th Cir. 1990) (internal quotation marks, citations and emphasis omitted).

The Fifth Amendment, made applicable to the states by the Fourteenth Amendment, *Malloy* v. *Hogan*, 378 U.S. 1, 6, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964), requires that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. "The thrust of the Constitutional privilege against self-incrimination has two interrelated objectives, '[t]he Government may not use compulsion to elicit self-incriminating statements, and the Government may not permit use in a criminal [proceeding] of self-incriminating statements elicited by compulsion.'" *Napolitano* v. *Ward*, 457 F.2d 279, 282–83 (7th Cir. 1972) (quoting *Murphy* v. *Waterfront Comm'n of N.Y. Harbor*, 378 U.S. 52, 57 n. 6, 84 S. Ct. 1594, 12 L. Ed. 2d 678 (1964)); *see Chavez* v. *Martinez*, 538 U.S. 760, 766, 123 S. Ct. 1994, 155 L. Ed. 2d 984 (2003). Failure to give the warnings established by *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), during a custodial interrogation constitutes a Fifth Amendment violation if the unwarned statement is introduced into evidence in pretrial or trial proceedings. *See Chavez*, 538 U.S. at 766; *Sornberger* v. *City of Knoxville, Ill.*, 434 F.3d 1006, 1026–27 (7th Cir. 2006).

A civil conspiracy claim may also serve as a source of § 1983 liability provided the plaintiff can show that "he was deprived of a right secured by the Constitution or laws of the United States and that the deprivation was caused by a person acting under color of state law." *Kelley* v. *Myler*, 149 F.3d 641, 648 (7th Cir. 1998). The conspiracy itself is not an independent basis of § 1983 liability; there must be an underlying constitutional injury or the attendant conspiracy claim necessarily fails. *See Hill* v. *City of Chicago*, No. 06 C 6772, 2009 WL

13

174994, at *9 (N.D. Ill. Jan. 26, 2009). "To be liable as a conspirator [a defendant] must be a voluntary participant in a common venture . . . [and] it is enough if [the defendant] understand[s] the general objectives of the scheme, accept[s] them, and agree[s], either explicitly or implicitly, to do [his] part to further them." *Jones* v. *City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988).

Finally, in some circumstances, a state actor's failure to intervene in a violation of an another's constitutional rights can serve as a basis for § 1983 liability. *See Harper* v. *Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005) ("In order for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation."). A plaintiff may state a claim for failure to intervene by showing that "any constitutional violation has been committed by a law enforcement official; and the [defendant] had a realistic opportunity to intervene to prevent the harm from occurring." *Yang* v. *Hardin*, 37 F.3d 282, 285 (7th Cir. 1994) (emphasis omitted).

## ANALYSIS[8]

Defendants seek to dismiss all of the counts in the third amended complaint arguing that Counts I through V and XII are barred by the statute of limitations; Count I is duplicative of Count III; Count II is precluded by other state law remedies; defendant officers have qualified immunity on Count III; defendant prosecutors have absolute immunity on Counts I, III through V, X through XIII and XIV; defendant prosecutors have Eleventh Amendment immunity on Counts XI through XV; absolute executive privilege precludes liability on Count XV; and

---

[8] Hobbs's response to defendant officers' motion to dismiss will be noted as "Pl.'s Officer Resp." Hobbs's response to defendant prosecutors' motion to dismiss will be noted as "Pl.'s Prosecutor Resp."

Counts I, II through V, X, XIII, XV, and XVI fail to state a claim upon which relief may be granted.

**I.      Whether Counts II through V are Timely**[9]

Defendants have moved to dismiss Counts II through V arguing, *inter alia*, that they are barred by the statute of limitations.  The statute of limitations is an affirmative defense that need not be anticipated in the complaint to survive a motion to dismiss.  *United States* v. *Lewis*, 411 F.3d 838, 842 (7th Cir. 2005).  A plaintiff may, however, "plead [himself] out of court by pleading facts that establish an impenetrable defense to [his] claims."  *Tamayo* v. *Blagojevich*, 526 F.3d 1074, 1086 (7th Cir. 2008).  Where "the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense" the court may dismiss a claim in a Rule 12(b)(6) motion if the claim is precluded by a statute of limitations defense.  *Lewis*, 411 F.3d at 842; *see Brooks* v. *Ross*, 578 F.3d 574, 579 (7th Cir. 2009) (granting motion to dismiss based on statute of limitations defense where the relevant dates were set forth unambiguously in the complaint).  "Unless the complaint alleges facts that create an ironclad defense," however, "a limitations argument must await factual development" of the record.  *Foss* v. *Bear, Stearns & Co.*, 394 F.3d 540, 542 (7th Cir. 2005).

Section 1983 does not contain an express statute of limitations and to determine the limitations period the court looks to the forum state's statute of limitations for personal injury claims, which is two years.  *See Wallace* v. *Kato*, 549 U.S. 384, 387, 127 S. Ct. 1091, 166 L. Ed. 2d 973 (2007) (*Wallace II*), *aff'g Wallace* v. *City of Chicago*, 440 F.3d 421 (7th Cir. 2006) (*Wallace I*); 735 ILL. COMP. STAT. 5/13-202.  Although state law governs the statute of

---

[9] Because the court concludes that Count I must be dismissed on other grounds, *see* Part V.A., *infra*, it declines to consider whether Count I is timely.

limitations, federal law controls when the claim accrues. *See Wallace II,* 549 U.S. at 388; *Gonzalez* v. *Entress*, 133 F.3d 551, 554 (7th Cir. 1998). Accrual marks the date on which the statute of limitations begins to run. *Cada* v. *Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990). The court applies a two-part test to determine the accrual date of a § 1983 claim. *Hileman* v. *Maze*, 367 F.3d 694, 696 (7th Cir. 2004). "First, a court must identify the [constitutional] injury . . . [and second], it must determine the date on which the plaintiff could have sued for that injury." *Id.* A § 1983 claim accrues under federal law "when the plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief." *Wallace II*, 549 U.S. at 388 (internal quotation marks and citation omitted); *see Kelly* v. *City of Chicago*, 4 F.3d 509, 511 (7th Cir. 1993) (section 1983 claims "accrue when the plaintiff knows or should know that his or her constitutional rights have been violated").

### A.    Deferred Accrual under *Heck*

Defendants argue that Hobbs's federal claims arose out of his coerced confession and therefore accrued when his confession was obtained, not when the charges against him were dismissed. The question of whether Hobbs's federal claims are timely turns on whether *Heck* v. *Humphrey*, 512 U.S. 477, 114 S. Ct. 2364, 129 L. Ed. 2d 383 (1994) is controlling. In *Heck*, the United States Supreme Court held that a § 1983 plaintiff may not bring a claim that implies the invalidity of his criminal conviction, unless that conviction has been set aside by the court. *Id.* at 486–87; *see Gilbert* v. *Cook*, 512 F.3d 899, 900 (7th Cir. 2008). In *Heck*, the Court considered whether a state prisoner could challenge the constitutionality of his conviction in a suit for damages under § 1983. The plaintiff was convicted in state court of voluntary manslaughter for killing his wife. While his state appeal was pending, he filed a § 1983 lawsuit against those involved in his arrest and prosecution alleging various constitutional violations. His state

16

conviction was subsequently upheld, and the Seventh Circuit affirmed the dismissal of his §

1983 claims. *Heck* v. *Humphrey*, 977 F.2d 355, 359 (7th Cir. 1993). The Supreme Court

affirmed. *Heck*, 512 U.S. at 490. The Court analogized the plaintiff's § 1983 claims to a state

law claim for malicious prosecution. *Id.* at 484. One element of a malicious prosecution claim

is that the underlying criminal action be terminated in the accused's favor; an element that Heck

had not met. This led the Court to conclude that "when [a plaintiff] seeks damages in a § 1983

suit" and "judgment in favor of the plaintiff would necessarily imply the invalidity of his

conviction or sentence . . . the complaint must be dismissed unless the plaintiff can demonstrate

that the conviction or sentence has already been invalidated." *Id.* at 487.

In *Wallace II*, the Court declined to apply its holding in *Heck* to a Fourth Amendment

claim for false arrest, concluding that where an arrest is followed by a criminal proceeding, the

statute of limitations commences when the petitioner appears before the examining magistrate

and is bound over for trial, not when his conviction is invalidated. 549 U.S. at 391. In *Wallace

II*, the Court noted that a claim for false imprisonment, which it analogized to a claim for false

arrest, begins to run when "when the alleged false imprisonment ends," *i.e.*, when the prisoner is

bound over by a magistrate or arraigned on charges. *Id.* at 389. A malicious prosecution claim,

on the other hand, begins to run when the criminal proceeding is terminated in favor of the

accused. *See Heck*, 512 U.S. at 489. Noting this difference, the Court stated that

> the *Heck* rule for deferred accrual is called into play only when there exists a
> conviction or sentence that has *not* been invalidated, that is to say, an outstanding
> criminal judgment. It delays what would otherwise be the accrual date of a tort
> action until the setting aside of *an extant conviction* which success in that tort action
> would impugn.

17

*Wallace II*, 549 U.S. at 393 (internal quotation marks omitted, emphasis in original). The Court

held that *Heck* would not apply to Wallace's Fourth Amendment claim because "there was in

existence no criminal conviction that the cause of action would impugn." *Id.*

## B. Count II

In Count II Hobbs alleges that defendant officers violated his substantive due process

rights by using force and physical violence to coerce him into confessing to the crime in a

manner that is "shocking to the conscience." (3d Am. Compl. ¶¶ 199–201.) This claim accrued

at the time of the alleged violation and is unaffected by *Heck*. In *Hudson* v. *Cassidy*, No. 05 C

5623, 2006 WL 3524420, at **6–7 (N.D. Ill. Dec. 5, 2006), the court held that a substantive due

process claim, which alleged that the police obtained a false confession from the plaintiff

through physical and psychological force, accrued on the date that the force was applied.

Finding that there was "nothing in *Wallace* [*I*] that creates a different test for the accrual of

substantive due process claims than that used for other constitutional violations," the court

declined to apply *Heck* and dismissed the plaintiff's claim as untimely. *Id.* at *7. Here, the

constitutional injury for which Hobbs complains is the use of force and violence to coerce him

into confessing. As in *Hudson*, Hobbs had a complete claim for this injury on the day the force

was applied. Hobbs cites no authority to the contrary, and Count II must be dismissed unless it

is tolled as discussed in Part II, *infra*.

## C. Counts III, IV and V

In Count III Hobbs alleges that defendants forced him to incriminate himself against his

will by using his coerced confession against him in court on three occasions: first, at his bond

hearing on May 11, 2005; second, at the hearing on his motion to suppress in August 2006; and

third, at his hearing on his motion for review of bond on December 2, 2008. Hobbs admits that

the first two instances fall outside the statute of limitations but argues that Count III is a continuing violation that did not accrue until he was released on August 4, 2010. Alternatively, Hobbs argues that the use of his coerced confession was a series of discrete acts, each independently actionable, and that the present lawsuit was filed within two years of the last courtroom use of his confession on December 2, 2008.

Unlike many plaintiffs who bring Fifth Amendment claims,[10] Hobbs's situation is unique because his confession was used to detain him but was never used against him at trial. In similar extended detention cases, judges in this district have held that *Heck* does not apply to delay the accrual of the plaintiff's Fifth Amendment claim. *See, e.g., Williams* v. *City of Chicago*, No. 10-cv-2423, 2011 WL 2637238, at *2 (N.D. Ill. July 6, 2011) ("Fifth Amendment violations arising from coerced confessions begin to accrue on the date that the coerced confession was *first* used in a courtroom proceeding.") (emphasis in original); *Lanza* v. *City of Chicago*, No. 08 C 5103, 2009 WL 1543680, at *3 (N.D. Ill. June 2, 2009) ("Lanza learned of the coerced confession at his 2001 probable cause hearing and moved to have it suppressed at a hearing in 2002. Therefore, Lanza had a complete cause of action in either 2001 or 2002 and knew or reasonably should have known of the use of the confession against him at that time."); *Hudson*, 2006 WL 3524420, at *7 ("Plaintiff was on notice as early as January 2000, when the suppression hearing commenced, that the State sought to use the confession . . . against him in the criminal proceeding. Thus, any fifth amendment claim resulting from an attempt to use that confession accrued as early as January 2000.").

---

[10] *See, e.g., Tillman* v. *Burge*, 813 F. Supp. 2d 946, 970–71 (N.D. Ill. 2011) (collecting cases).

19

Hobbs acknowledges this authority but argues that the continuing violation doctrine applies to his claim. "The continuing violation doctrine allows a plaintiff to get relief for a time-barred act by linking it with an act that is within the limitations period. For purposes of the limitations period, courts treat such a combination as one continuous act that ends within the limitations period." *Selan* v. *Kiley*, 969 F.2d 560, 564 (7th Cir. 1992). A violation is considered "continuing" if "it would be unreasonable to require or even permit [a plaintiff] to sue separately over every incident of the defendant's unlawful conduct." *Heard* v. *Sheahan*, 253 F.3d 316, 319 (7th Cir. 2001) (holding that an Eighth Amendment deliberate indifference claim accrued not when the prisoner was denied medical care but when he was released from jail, finding that "[t]he injuries about which the plaintiff is complaining . . . are the consequence of a numerous and continuous series of events").

Hobbs argues that his coerced confession was used against him every day for five years to sustain the murder charges against him and to prolong his incarceration. The *Lanza* court considered a similar argument and rejected it, finding *Heard* distinguishable. *Lanza*, 2009 WL 1543680, at *4.

> First, *Heard* was a deliberate indifference claim under the Eighth Amendment and did not involve the Fifth Amendment. Second, Heard's claim was based on repeated denial of medical attention while in prison, which is different from the discrete use of an alleged coerced confession at issue in *Lanza's* case. Third, courts have not extended the [continuing violation] doctrine to include Fifth Amendment claims.

*Id.* (internal citations and parenthetical explanations omitted). Hobbs's confession was used against him in court on three discrete occasions. Although he may have experienced ongoing harm as a result of these uses, his injuries were not "the consequence of a numerous and continuous series of events." *Heard*, 253 F.3d at 319. The reasoning in *Lanza* is persuasive.

20

*See Williams*, 2011 WL 2637238, at *5 (distinguishing *Heard* and declining to apply the continuing violation doctrine to plaintiff's Fifth Amendment coerced confession claim).

In the alternative, Hobbs argues that each courtroom use of his coerced confession was its own distinct constitutional violation subject to its own accrual date. In *Williams* the plaintiff argued that the last courtroom use of his coerced confession marked the accrual date for all prior uses of the same. *Id.* at *1. The court rejected this theory and held that Williams's Fifth Amendment claim accrued on the first date his confession was used against him in court. *Id.* at *2. Hobbs picks up where Williams left off, arguing that the last courtroom use of his coerced confession, during the hearing on his motion for review of bond, is its own discrete violation. Under this theory, Hobbs would only be able to recover for the harm arising from this last in-court use. There is some legal support for Hobbs's position. *See Xechem, Inc.* v. *Bristol-Myers Squibb Co.*, 372 F.3d 899, 902 (7th Cir. 2004) ("The period of limitations for antitrust litigation runs from the most recent injury caused by the defendants' activities rather than from the violation's inception. . . . Each discrete act with fresh adverse consequences starts its own period of limitations.") (internal citations omitted); *Nat'l R.R. Passenger Corp.* v. *Morgan*, 536 U.S. 101, 113, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002) ("Each discrete discriminatory act starts a new clock for filing charges alleging that act" under Title VII.); *Davis* v. *Wells Fargo Bank*, No. 07 C 2881, 2008 WL 1775481, at *4 (N.D. Ill. April 17, 2008) (declining to apply the continuing violation doctrine but holding that "to the extent that . . . allegations [of discrete acts] fit within the claim-specific statutes of limitations, [the plaintiff] may use them to state her claims"); *see also Diaz* v. *Shallbetter*, 984 F.2d 850, 855 (7th Cir. 1993) ("[E]very constitutional tort actionable under § 1983 is treated as a personal injury, with the claim accruing when the injury is inflicted.") (emphasis omitted). Hobbs argues that he did not know until December 2,

21

2008 that defendants would use his coerced confession to defeat his motion for review of bond, which is the day the in-court hearing on his motion was held. As such, argues Hobbs, a new statute of limitations began to run on this date.

The court will allow Hobbs some leeway to develop this theory. "[B]ecause the period of limitations is an affirmative defense, it is rarely a good reason to dismiss under Rule 12(b)(6)." *Reiser* v. *Residential Funding Corp.*, 380 F.3d 1027, 1030 (7th Cir. 2004). Given the aforementioned legal authority, defendants' position on this issue cannot be fairly characterized as "ironclad." *Foss*, 394 F.3d at 542. As such, the court declines to foreclose relief at this stage in the proceedings and defendants' motion to dismiss as to the last courtroom use of Hobbs's confession (December 2, 2010) is denied. The first two uses of Hobbs's confession (May 11, 2005 and August 2006), however, are time barred unless tolled as discussed in Part II, *infra*.[11] Moreover, because at least one of Hobbs's constitutional claims remains viable, and defendants fail to challenge Counts IV and V (conspiracy and failure to intervene) on other grounds, defendants' motion to dismiss as to these two counts is also denied. *See Tillman* v. *Burge*, 813

---

[11] Defendant officers argue that they are only liable for the first in-court use of Hobbs's confession because this was the only time they testified against Hobbs in court. Since this use falls outside the statute of limitations, defendant officers contend that Count III is time barred as to them. Section 1983 imposes liability on every official who "subjects, *or causes to be subjected*, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983 (emphasis added). As explained by the Seventh Circuit, "[t]his provision must be read against the background of tort liability," and "[i]n constitutional-tort cases as in other cases, a man [is] responsible for the natural consequences of his actions." *Whitlock* v. *Brueggemann*, 682 F.3d 567, 582–83 (7th Cir. 2012) (internal quotation marks and citation omitted); *see id.* ("The actions of an official who fabricates evidence that later is used to deprive someone of liberty can be both a but-for and proximate cause of the due process violation."). The act of coercing a false confession from Hobbs could be the "but-for" and "proximate cause" of the harm resulting from the in-court use of his confession regardless of whether defendant officers testified against him. Defendant officers cite no authority to the contrary and their argument on this point is unpersuasive.

F. Supp. 2d 946, 990 (N.D. Ill. 2011); *Gordon* v. *Devine*, No. 08 C 377, 2008 WL 4594354, at *6 (N.D. Ill. Oct. 14, 2008).

## II.    Tolling of Hobbs's Federal Claims

For those claims that accrued before Hobbs filed his lawsuit, Hobbs argues that defendants' conduct equitably estops them from asserting the statute of limitations as a defense. In addition, Hobbs alleges that a change in the law tolled his claims. Federal law applies to Hobbs's equitable estoppel claim and state law applies to his equitable tolling claim. *See Smith* v. *City of Chicago Heights*, 951 F.2d 834, 840–41 (7th Cir. 1992).

A.  **Equitable Estoppel**

"Equitable estoppel prevents a party from asserting the expiration of the statute of limitations as a defense when that party's improper conduct has induced the other into failing to file within the statutory period." *Ashafa* v. *City of Chicago*, 146 F.3d 459, 462 (7th Cir. 1998). Federal estoppel law "focuses on whether the defendant acted *affirmatively* to stop or delay the plaintiff from bringing suit within the limitations period" *id.* (quoting *Smith*, 951 F.2d at 841) (emphasis in original), and "comes into play if the defendant takes active steps to prevent the plaintiff from suing in time." *Cada*, 920 F.2d at 451. To invoke equitable estoppel, "a plaintiff must show not only misconduct by the defendants, but also that he actually and reasonably relied on the misconduct." *Ashafa*, 146 F.3d at 463. Once the circumstance giving rise to the estoppel is removed the plaintiff must file suit. *See Shropshear* v. *Corp. Counsel of City of Chicago*, 275 F.3d 593, 597–98 (7th Cir. 2001).

Hobbs argues that defendants' deliberate and blameworthy conduct, namely their use of force and threats of violence, equitably estops them from asserting a statute of limitations defense. Specifically, Hobbs alleges that defendants threatened and battered him during his interrogation and that defendant Mermel intimidated him during the hearing on his motion to suppress. (*See* Pl.'s Officer Resp. at 7–8.)[12] For equitable estoppel to apply, Hobbs must allege "efforts by . . . the defendant[s] - above and beyond the wrongdoing upon which [his] claim[s] [are] founded - to prevent [him] from suing in time." *Cada*, 920 F.2d at 451; *see Smith*, 951 F.2d at 841. In *Cook* v. *City of Chicago*, No. 06 C 5930, 2008 WL 1883437, at *1 (N.D. Ill. April 25, 2008), the case upon which Hobbs relies, the plaintiff met this test. Cook alleged that police

---

[12]    It is unclear from the third amended complaint what action Hobbs alleges defendants Waller and Pavletic took.

officers illegally entered his home and beat and threatened him in front of his family. *Id.* When he reported the incident to the Chicago Police Department, an investigator told him that if he pursued his complaint the police would plant drugs on him and cause him to lose his job. *Id.* Cook delayed filing his § 1983 claims until after the offending officers were arrested on unrelated grounds. The court concluded that the investigator's threats qualified as blameworthy conduct and, as a result, the officers were estopped from arguing a statute of limitations defense. *Id.* at 2.

Unlike the plaintiff in *Cook*, Hobbs fails to allege that defendants took affirmative steps "above and beyond" those that support his claims to prevent him from filing the instant lawsuit. *See Ramirez* v. *City of Chicago*, No. 08 C 5119, 2009 WL 1904416, at *5 (N.D. Ill. July 1, 2009) (finding that "a general fear of police reprisal" is not enough for equitable estoppel to apply); *Reyes* v. *City of Chicago*, 585 F. Supp. 2d 1010, 1015 (N.D. Ill. 2008) (distinguishing *Cook* and dismissing claims as time barred where "there [were] no allegations describing any steps taken by defendants after the initial incident that prevented plaintiffs from filing a lawsuit"). For this reason, defendants' conduct during Hobbs's interrogation and criminal proceedings does not estop them from pleading the statute of limitations as an affirmative defense.

### B. Equitable Tolling

Next, Hobbs argues that the doctrines of equitable estoppel and equitable tolling combine to make his claims timely because the change in law occasioned by *Wallace II* equitably tolled his claims until February 21, 2007, and thereafter defendants actively prevented him from learning of the change in the law. "Equitable tolling permits a plaintiff to avoid the bar of the statute of limitations if despite the exercise of all due diligence he is unable to obtain vital information bearing on the existence of his claim." *Shropshear*, 275 F.3d at 595. Illinois law

25

controls the availability of equitable tolling in this case. *Smith*, 951 F.2d at 842. The Seventh

Circuit has stated that equitable tolling "permits a plaintiff to sue after the statute of limitations

has expired if through no fault or lack of diligence on his part he was unable to sue before, even

though the defendant took no active steps to prevent him from suing." *Singletary* v. *Cont'l Ill.*

*Nat'l Bank & Trust Co. of Chicago*, 9 F.3d 1236, 1241 (7th Cir. 1993). The Illinois Supreme

Court, on the other hand, has stated that "[e]quitable tolling . . . may be appropriate if the

defendant has actively misled the plaintiff, or if the plaintiff has been prevented from asserting

his or her rights in some extraordinary way." *Clay* v. *Kuhl*, 727 N.E.2d 217, 223, 189 Ill. 2d

603, 244 Ill. Dec. 918 (Ill. 2000). As noted by the Seventh Circuit and the lower courts, the

Illinois Supreme Court's "position appears to conflate the doctrines of equitable tolling and

equitable estoppel." *Richards* v. *Burgett, Inc.*, No. 10 C 7580, 2011 WL 6156838, at *5 (N.D.

Ill. Dec. 12, 2011) (citing *Hollander* v. *Brown*, 457 F.3d 688, 694 n. 3 (7th Cir. 2006) ("Illinois

cases appear, at times, to use 'equitable estoppel' interchangeably with the related principle of

equitable tolling")); *Fidelity Nat'l Title Ins. Co. of N.Y.* v. *Howard Sav. Bank*, 436 F.3d 836, 839

(7th Cir. 2006) ("The Illinois cases that mention the term [equitable tolling] seem to mean by it

equitable estoppel"). Whether the Illinois Supreme Court would recognize a distinction between

equitable tolling and equitable estoppel remains unresolved. *See Hollander*, 457 F.3d at 694 n.

3; *Fidelity Nat'l Title Ins. Co. of N.Y.*, 436 F.3d at 839.

Citing *Clay*,[13] Hobbs argues that a change in the law tolled his federal claims. As

explained in Part I.A.*, supra*. *Wallace II* changed the rule as to when a plaintiff may file a §

1983 claim. The previous rule under *Washington* v. *Summerville*, 127 F.3d 552 (7th Cir. 1997),

---

[13] Hobbs does not argue that the less demanding federal tolling doctrine should apply and instead relies *inter alia* on *Clay*.

prevented a § 1983 plaintiff from filing "a claim that, if successful, would necessarily imply the invalidity of the conviction on a pending criminal charge" until after that charge was dismissed in the plaintiff's favor. *Id.* at 556; *see Wiley* v. *City of Chicago*, 361 F.3d 994, 996 (7th Cir. 2004). This rule, however, was "soundly rejected" by the Supreme Court in *Wallace II*, making clear that *Heck* did not apply to pending convictions. *Lynch* v. *Nolan*, 598 F. Supp. 2d 900, 903 (C.D. Ill. 2009); *see Wallace II*, 549 U.S. at 393–94 (describing the application of *Heck* to "an anticipated future conviction" as "bizarre").

Under *Washington* and *Wiley*, Hobbs's § 1983 claims would not have accrued until his release in 2010 and Hobbs argues that the change occasioned by *Wallace II* created an "extraordinary circumstance" that tolled his claims until February 21, 2007. *See Harsgroves* v. *City of N.Y.*, 694 F. Supp. 2d 198, 211 (E.D.N.Y. 2010) ("the change in law occasioned by *Wallace* is the type of extraordinary circumstance that justifies equitable tolling"), *rev'd on other grounds* 411 Fed. Appx. 378 (2d Cir. 2011). After this date, argues Hobbs, defendants actively prevented him from learning of *Wallace II* and timely filing the present action by placing him in total isolation, preventing him from interacting with other inmates, denying him access to the law library, and preventing him from consulting with lawyers.

Even assuming *Wallace II* excused Hobbs's failure to file his claims prior to February 21, 2007, he fails to show that defendants played a direct role in preventing him from learning of the change. Hobbs makes no specific allegations as to the actions defendants took during his incarceration, alleging only that "police officers" told him that he was to be kept in isolation, and that "defendants" denied him access to the law library. (3d Am. Compl. ¶¶ 184, 239.) Hobbs's position is perplexing considering that defendants were not his jailers; and the complaint fails to allege that defendants somehow controlled the day-to-day conditions of his incarceration. Hobbs

27

must plead facts that plausibly suggest that defendants prevented him from learning of *Wallace II* once he was in jail. *See Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.")  His position on this point proves too much; equitable estoppel and equitable tolling do not combine to prevent defendants from pleading the statute of limitations as an affirmative defense.

Finally, Hobbs argues that defendants and his jailers prevented him from learning of *Wallace II*, which "prevented [him] from asserting his . . . rights in some extraordinary way" thereby tolling his claims until his release.  *Clay*, 727 N.E.2d at 223.  Hobbs alleges that he was denied access to legal counsel for his civil claims and prevented from interacting with inmates and accessing legal materials during his incarceration.  Essentially, Hobbs argues that his conditions of confinement tolled his claims.  As explained by the Illinois Appellate Court,

> The limitations period can be tolled against a defendant who did not mislead the plaintiff if the plaintiff faced an extraordinary barrier to asserting her rights in a timely fashion.  Extraordinary barriers include legal disability, an irredeemable lack of information, or situations where the plaintiff could not learn the identity of proper defendants through the exercise of due diligence.

*Thede* v. *Kapsas*, 897 N.E.2d 345, 351, 386 Ill. App. 3d 396, 325 Ill. Dec. 97 (Ill. App. Ct. 2008).  *Thede* provides an illustrative list of extraordinary barriers.  Whether Hobbs's conditions of confinement constituted such a barrier is not clear from the complaint.  Hobbs was incarcerated for five years.  He must plead specific facts demonstrating that despite his due diligence, he was unable to learn of the accrual of his claims under *Wallace II* and was otherwise prevented from filing his claims during this time.  Rather than foreclose relief, the court will allow Hobbs leave to replead his tolling claim to allege specific facts that show that the

28

conditions of his confinement prevented him from asserting his rights in some extraordinary way.

## III.     Whether Count XII is Timely

Count XII alleges a state law claim of intentional infliction of emotional distress against defendants.  Defendant officers argue that the claim is time-barred because the one-year statute of limitations provided by the Illinois Tort Immunity Act[14] accrued from "the date of the last injury or the date the tortious acts cease," *Feltmeier* v. *Feltmeier*, 798 N.E.2d 75, 85, 207 Ill. 2d 263, 278 Ill. Dec. 228 (2003), which defendant officers argue was in August 2006 when some of them testified at Hobbs's suppression hearing.  Hobbs counters that because his IIED claim is intertwined with his malicious prosecution claim, it did not accrue until criminal proceedings were terminated in his favor.

Applying the continuing violation rule[15] courts have held that when a plaintiff's IIED claim incorporates the conduct underlying his malicious prosecution claim, the claim does not accrue until the criminal proceedings against him are terminated.  *See Chagolla* v. *City of Chicago*, No. 07 C 4557, 2012 WL 403920, at *9 (N.D. Ill. Feb. 8, 2012); *Carroccia* v. *Anderson*, 249 F. Supp. 2d 1016, 1028 (N.D. Ill. 2003) (collecting cases).  Hobbs alleges that defendant officers physically and mentally abused him during his interrogation and failed to come forward with a truthful version of events during his detention.  He alleges that defendants Waller and Pavletic participated in this coercion by advising defendant officers how to proceed,

---

[14]   The parties agree that the one-year statute of limitations contained in the Illinois Local Governmental and Governmental Employees Tort Immunity Act applies to Hobbs's IIED claim.  *See* 745 ILL. COMP. STAT. 10/8-101(a) ("No civil action . . .  may be commenced in any court against a local entity or any of its employees for any injury unless it is commenced within one year from the date that the injury was received or the cause of action accrued.").

[15]   *See* Part I.C., *supra*.

and that defendant prosecutors initiated and maintained criminal proceedings against him using evidence they knew to be false. Hobbs's IIED claim incorporates the same allegations as his malicious prosecution claim, *see* 3d Am. Compl. ¶¶ 248, 243, and the two are sufficiently intertwined to demonstrate that defendants' wrongful conduct continued through the termination of his criminal proceedings. This is the date upon which Hobbs's IIED claim accrued. *See, e.g., Wallace* v. *City of Zion*, No. 11 C 2859, 2011 WL 3205495, at *5 (N.D. Ill. July 28, 2011) (holding that "[b]ecause Plaintiffs' IIED claim is based on the facts that support Plaintiffs' malicious prosecution claim, Plaintiffs' IIED claim did not accrue until the charges against them were dismissed); *Gvozden* v. *Mill Run Tours, Inc.*, No. 10-CV-4595, 2011 WL 1118704, at *10 (N.D. Ill. Mar. 28, 2011) (finding IIED claim accrued upon termination of criminal proceedings where plaintiff "claims that throughout the investigation and the trial Defendants suppressed exculpatory evidence that resulted in severe emotional distress"); *Beaman* v. *Souk*, 10-cv-1019, 2011 WL 832506, at **13–14 (C.D. Ill. Mar. 3, 2011) (*Beaman I*) (finding that were defendants allegedly suppressed and/or conspired to suppress exculpatory evidence throughout the investigation and trial, IIED claim accrued at the same time as malicious prosecution claim); *Walden*, 755 F. Supp. 2d at 962 (finding IIED claim accrued at the same time as malicious prosecution claim where plaintiff alleged *inter alia* that defendant officers tortured a false confession from plaintiff, fabricated, coerced and suppressed evidence and continued his false imprisonment after procuring his wrongful conviction); *see also Parish* v. *City of Elkhart*, 614 F.3d 677, 684 (7th Cir. 2010) (applying Indiana law, concluding that IIED claim did not accrue until criminal conviction was favorably disposed where the "heart" of plaintiff's complaint was "that the defendant officers fabricated an entire case against him that led to his wrongful conviction"); *but see Brooks*, 578 F.3d at 579 (holding that IIED claim accrued at the

30

time of plaintiff's indictment, not upon the dismissal of his criminal case "even if the damages that [plaintiff] suffered . . . continued throughout his trial"); *Evans* v. *City of Chicago*, 434 F.3d 916, 935 (7th Cir. 2006) (declining to apply the continuing violation doctrine to extend the statute of limitations for plaintiff's IIED claim against police).[16]  Hobbs's IIED claim against defendants is timely because he filed it within one year of the date that his criminal conviction was *nolle prosequi* by the state.

## IV.    **Immunity from Suit**

### A.    **Defendant Officers**

To the extent that Count III is not time barred, defendant officers argue that it must be dismissed because they are entitled to qualified immunity.  "Government officials performing discretionary functions enjoy qualified immunity from suit to the extent that their conduct 'could reasonably have been thought consistent with the rights they are alleged to have violated.'" *Sornberger*, 434 F.3d at 1013 (quoting *Anderson* v. *Creighton*, 483 U.S. 635, 638–39, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)); *see Harlow* v. *Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982).  The court follows a two-step inquiry to determine whether a police officer qualifies for this defense.  *Sornberger*, 434 F.3d at 1013.  First, the court "ask[s] whether the plaintiff has asserted the violation of a federal constitutional right"; second, if such a violation occurred, the court determines "whether the right was so clearly established at the time of the alleged violation that a reasonable officer would know that his actions were unconstitutional."  *Id.*; *see Anderson*, 483 U.S. at 640.  "[T]his is not to say that an official action

---

[16]  *Brooks* and *Evans* are distinguishable because the court failed to consider if and how the plaintiffs' IIED claims were intertwined with their malicious prosecution claims.  *See Beaman I*, 2011 WL 832506, at *13 (distinguishing *Evans*).

is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640 (internal citation omitted); *see Chelios* v. *Heavener*, 520 F.3d 678, 690–91 (7th Cir. 2008) (a clearly established right is one where "there is a clearly analogous case establishing a right to be free from the specific conduct at issue or that the conduct is so egregious that no reasonable person could have believed that it would not violate clearly established rights") (internal quotation marks and citation omitted); *see also Baird* v. *Renbarger*, 576 F.3d 340, 345 (7th Cir. 2009) ("In ascertaining whether a right is clearly established, this court looks to controlling Supreme Court and 7th Circuit precedent."). The plaintiff bears the burden of establishing that the constitutional right was clearly established. *Snyder* v. *Nolen*, 380 F.3d 279, 290 (7th Cir. 2004).

Hobbs has satisfied the first prong of the test because Count III adequately alleges a Fifth Amendment violation. The remaining question is whether this violation was clearly established at the time of Hobbs's interrogation. Since 1936, the Supreme Court has recognized that "[s]tatements compelled by police interrogations . . . may not be used against a defendant at trial." *Chavez*, 538 U.S. at 767 (citing *Brown* v. *Mississippi*, 297 U.S. 278, 286, 56 S. Ct. 461, 80 L. Ed. 682 (1936)); *see also United States* v. *Verdugo-Urquidez*, 494 U.S. 259, 264, 110 S. Ct. 1056, 108 L. Ed. 2d 222 (1990) ("The privilege against self-incrimination guaranteed by the Fifth Amendment is a fundamental trial right of criminal defendants . . . [and] a constitutional violation occurs only at trial.") (citations omitted). In 1966, in the landmark case of *Miranda* v. *Arizona*, the Court held that a police officer must inform a suspect in custody of his right to remain silent and his right to an attorney before interrogating him. 384 U.S. at 444–45. The remedy for such a violation, however, was exclusion of the un-*Mirandized* statement from trial,

not an action for damages under § 1983. *See Husband* v. *Turner*, No. 07-CV-391-bbc, 2008 WL

2002737, at *4 (W.D. Wis. May 6, 2008) (collecting cases). Indeed, until recently, the Court has

declined to acknowledge *Miranda* as establishing a constitutional right. *See Dickerson* v. *United*

*States*, 530 U.S. 428, 440, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000) (holding that *Miranda* was

"constitutionally based" but declining to "go further than *Miranda*" to establish a constitutional

right); *Michigan* v. *Tucker*, 417 U.S. 433, 444, 94 S. Ct. 2357, 41 L. Ed. 2d 182 (1974)

(describing the "procedural safeguards" required by *Miranda* as "not themselves rights protected

by the Constitution but . . . measures to insure that the right against compulsory

self-incrimination was protected" to "provide practical reinforcement for the right").

In 2003, a plurality of the Court recognized that a violation of *Miranda* could constitute a

Fifth Amendment violation but held that "mere coercion does not violate the text of the Self-

Incrimination Clause absent use of the compelled statements in a criminal case against the

witness." *Chavez*, 538 U.S. at 769.[17] Thus, "at the very least . . . the instigation of legal

---

[17] The Seventh Circuit summarized the holding in *Chavez* as follows:

In *Chavez*, the § 1983 plaintiff Martinez had made incriminating statements while in police custody without receiving *Miranda* warnings. He never was prosecuted, but filed a § 1983 action against Chavez, the officer who had questioned him. In that action, Martinez alleged that Chavez violated his Fifth Amendment right to be free from self-incrimination as well as his Fourteenth Amendment substantive due process right to be free from coercive questioning. The Supreme Court, in a plurality opinion, held that the police officer's questioning of Martinez without *Miranda* warnings did not violate his rights under the Self-Incrimination Clause of the Fifth Amendment because his compelled statements had not been used against him in a criminal case. The plurality reasoned that *Miranda* "created prophylactic rules designed to safeguard the core constitutional right protected by the Self-Incrimination Clause," [*Chavez*, 538 U.S.] at 770, 123 S. Ct. 1994, namely that "[n]o person . . . shall be compelled *in any criminal case* to be a witness against himself," *id.* at 766, 123 S. Ct. 1994 (citing, with added emphasis, U.S. Const. amend. V). The phrase "criminal case," as it is employed in the Self-Incrimination Clause, requires, at the very least, the initiation of a legal proceeding, rather than mere police questioning, before a suspect's self-incrimination rights are implicated. *Id.* at 767, 123 S. Ct. 1994. . . . Martinez never was prosecuted. Consequently, the absence of a criminal case "in which Martinez was compelled

(continued...)

33

proceedings" was required before a *Miranda* violation could rise to the level of a constitutional injury. *Id.* at 766. Four years later, in *Sornberger* the Seventh Circuit clarified *Chavez* by holding that "where . . . a suspect's criminal prosecution was not only initiated, but was commenced because of her allegedly un-warned confession, the 'criminal case' contemplated by the Self-Incrimination Clause has begun." 434 F.3d at 1026–27. After *Sornberger*, the law in this circuit was clear that "[f]ailure to give Miranda warnings during a custodial interrogation is not by itself a Fifth Amendment violation." *Hoeft* v. *Anderson*, 409 Fed. Appx. 15, 17 (7th Cir. 2011) (*Hoeft II*), *aff'g Hoeft* v. *Anderson*, No. 09-CV-138-WMC, 2010 WL 2720002, at *5 (W.D. Wis. July 6, 2010) (*Hoeft I*). Rather, "[t]he government violates a suspect's privilege against self-incrimination only if it introduces the unwarned statement into evidence in pretrial or trial proceedings." *Id.*; *see Nuzzi* v. *Nguyen*, No. 07-2238, 2009 WL 1409703, at *7 (C.D. Ill. May 20, 2009).

Defendant officers argue that they are entitled to qualified immunity because at the time of Hobbs's interrogation in May 2005 the failure to administer a *Miranda* warning and the use of un-warned statements at pretrial proceedings was not a clearly established constitutional violation. In support, defendant officers cite two cases in this circuit that have held as much. *See Hoeft I*, 2010 WL 2720002, at *5 ("In the absence of clear Supreme Court authority, a failure to give a *Miranda* warning was not clearly established as a constitutional violation until *Sornberger* . . . was decided in 2006."); *accord Husband* v. *Turner*, No. 07-CV-391-bbc, 2008

---

(...continued)
  to be a 'witness' against himself" defeated his claim for damages based on the Self-
  Incrimination Clause. *Id.* at 773, 123 S. Ct. 1994.

*Sornberger*, 434 F.3d at 1024.

WL 2002737, at *5 (W.D. Wis. May 6, 2008); *see Orosco* v. *Swyers*, No. 08-CV-833, 2010 WL 3522499, at *6 (E.D. Wis. Sept. 8, 2010) (not cited by defendants but holding the same).  Unlike the plaintiff in those cases, however, Hobbs has alleged not only that defendant officers failed to give him a *Miranda* warning and denied him access to legal counsel but also that they used unjust violence against him to coerce his confession.  (*See* 3d Am. Compl. ¶¶ 203–04.)

In *Stoot 2 City of Everett*, 582 F.3d 910 (9th Cir. 2009), the Ninth Circuit considered similar allegations of coercion and held that the defendant officer was not entitled to qualified immunity on the plaintiff's Fifth Amendment claim because "[t]he qualified immunity evaluation must . . . focus on an officer's duties, not on other aspects of the constitutional violation." *Id.* at 927.  The plaintiffs in *Stoot,* a minor child and his parents, brought a § 1983 lawsuit alleging that a police officer interrogated the minor plaintiff (then 14 years old) for two hours without his parents present, convinced him to sign a *Miranda* waiver and coerced him, through threats and promises of leniency, into confessing to sexually assaulting another minor. This confession was later used against the minor plaintiff in pretrial proceedings.  The charges were eventually dismissed, however, when the court determined that the minor plaintiff lacked the capacity to consent to the *Miranda* waiver and his confession was suppressed. *Id.* at 913–917.

Attempting to avoid § 1983 liability, the officer in *Stoot* argued that he was entitled to qualified immunity because a reasonable officer interrogating a suspect in 2003 would have believed that a Fifth Amendment violation does not occur until the coerced statement is used against a defendant at trial, not at a pretrial proceeding. *Id.* at 927.  In rejecting this position, the Ninth Circuit "disagree[d] that the uncertainty resulting from *Chavez* is pertinent to the qualified immunity determination." *Id.*  As explained by the court,

35

> [the officer's] immunity cannot turn on whether, and in what way, a prosecutor
> ultimately "used" the statements allegedly coerced during [the] interrogation of [the
> minor plaintiff], as [the officer's] role in the constitutional violation ended before
> that use. At the time of the interrogation, [the officer] was on notice under clearly
> established law that if he failed to provide [the minor plaintiff] with appropriate
> *Miranda* warnings or physically or psychologically coerced a statement from [the
> minor plaintiff], the use of the confessions could ripen into a Fifth Amendment
> violation. . . . That the allegedly coerced confession did not "ripen" into a Fifth
> Amendment violation until it was "used" against [the minor plaintiff] in a criminal
> case does not change this analysis, as [the officer] had no reason to believe that the
> statements would not be used against [the minor plaintiff].

*Id.* (internal citation omitted). In reversing the lower court, the Ninth Circuit held that "a

properly-instructed jury could find that some 'use' of [the minor plaintiff's] confession was

reasonably foreseeable to [the officer] at the time of the interrogation" and therefore, the officer

was not entitled to qualified immunity. *Id.* at 927–28.

Although *Stoot* is not binding on this court, its reasoning is persuasive. Like the

plaintiffs in *Stoot*, Hobbs claims that the defendant officers violated his *Miranda* rights *and* used

threats, (and in Hobbs's case physical violence) to coerce him into giving a false confession. By

May 2005, the time of Hobbs's interrogation, the law was clear that use of a coerced confession

against a suspect in a "legal proceeding" violated the Fifth Amendment, *see Chavez*, 538 U.S. at

769, and that the use of such a confession at "trial" constituted a similar violation. *See Brown*,

297 U.S. at 286. That defendant officers did not know the precise "use" to which Hobbs's

confession would put at the time they solicited it is of little consequence. *See Stoot*, 582 F.3d at

927 ("The question . . . is not whether a reasonable officer could have discerned the precise

meaning of 'use' in a criminal case under *Chavez*, but rather whether the officer obtained the

allegedly coerced statements so that they could later be used against the suspect in a criminal

case."). In May 2005, "a reasonable public official interrogating a criminal suspect would have

recognized that coercing a confession by abusive language and physical contact, along with

coaching the suspect as to the details of the confession, clearly violates the suspect's constitutional right against self-incrimination." *Hill*, 2009 WL 174994, at *8 (holding that police officers were not entitled to qualified immunity where they used threats and physical violence against the plaintiff in March 1992 to coerce a confession that was later used to convict him of murder); *see also Alvarado* v. *Litscher*, 267 F.3d 648, 651 (7th Cir. 2001) ("a complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds"). Defendant officers are not entitled to the defense of qualified immunity on Count III.[18]

## B.  Defendant Prosecutors

### i.  Federal Claim (Count III)

To the extent that Count III is not time-barred, defendant prosecutors argue they are absolutely immune from liability. The Supreme Court has recognized that some government officials perform "'special functions,' which, because of their similarity to functions that would have been immune when Congress enacted § 1983, deserve absolute protection from damages liability." *Buckley* v. *Fitzsimmons*, 509 U.S. 259, 268–69, 113 S. Ct. 2606, 125 L. Ed. 2d 209 (1993) (*Buckley III*). To determine whether a defendant qualifies for absolute immunity, the court applies a "functional approach," which "looks to the nature of the function performed, not the identity of the actor who performed it." *Id.* at 269. Typically, "[i]f a [prosecutor's] function was quasi-judicial, the [prosecutor] enjoys absolute immunity. If the function was administrative

---

[18] Defendant officers argue that the Seventh Circuit's affirmance in *Hoeft II* demonstrates that the question of whether they intended to use Hobbs's confession in a criminal proceeding is irrelevant. The question, however, is not whether defendants intended for Hobbs's confession to used against him but whether a reasonable officer would have known at the time of Hobbs's interrogation that his actions were unconstitutional. *See Sornberger*, 434 F.3d at 1013. In *Hoeft II*, the Seventh Circuit did not reach the issue of qualified immunity, concluding that because the plaintiff's un-*Mirandized* statement had not been introduced into evidence at a court proceeding that there could be no Fifth Amendment violation. *Hoeft*, 409 Fed. Appx. at 17–18. Moreover, *Hoeft II* is distinguishable in that the plaintiff alleged only a violation of *Miranda*, not physical and mental coercion as discussed *supra*.

or investigatory, the [prosecutor] enjoys only qualified immunity." *Henderson* v. *Lopez*, 790 F.2d 44, 46 (7th Cir. 1986); *see Buckley III*, 509 U.S. at 273 ("When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.") (internal quotation marks and citation omitted); *Imbler* v. *Pachtman*, 424 U.S. 409, 431, 96 S. Ct. 984, 47 L. Ed. 2d 128 (1976) (Prosecutors are absolutely immune for core prosecutorial actions, such as "initiating a prosecution and . . . presenting the State's case."). As aptly summarized by Judge McCuskey,

> The Supreme Court has [recognized] that absolute immunity applies when a prosecutor prepares to initiate a judicial proceeding, or appears in court to present evidence in support of a search warrant application. Prosecutorial absolute immunity . . . [also] extends to [p]reparation, both for the initiation of the criminal process and for a trial, [and] may require the obtaining, reviewing, and evaluating of evidence. Alternatively, absolute immunity does not apply when a prosecutor gives advice to police during a criminal investigation, when the prosecutor makes statements to the press, or when a prosecutor acts as a complaining witness in support of a warrant application.

*Speagle* v. *Ferguson*, 852 F. Supp. 2d 1096, 1102 (C.D. Ill. 2012) (internal quotation marks and citations omitted). As the officials seeking immunity, defendant prosecutors "bear[] the burden of showing that such immunity is justified for the function in question." *Burns* v. *Reed*, 500 U.S. 478, 486, 111 S. Ct. 1934, 114 L. Ed. 2d 547 (1991).

As to Count III, Hobbs argues that defendants Waller and Pavletic[19] are not immune for advising defendant officers on how to coerce his videotaped confession. Recall that Count III alleges that defendants forced Hobbs to incriminate himself against his will by denying him access to a lawyer and using threats and violence to coerce him into giving a false confession, which was later used against him in a criminal proceeding. As to defendants Waller and Pavletic, Hobbs alleges that they arrived at the police station after he gave his written confession but before he was arrested; they met with members of the task force and received the details of his interrogation; they knew that his written confession was coerced; they coached and prepared defendant officers to obtain a video confession by threatening Hobbs with Sheila's arrest; and they watched and listened to both videotaped confessions and knew that Hobbs had been threatened and battered in the first video.

Whether Waller and Pavletic are entitled to absolute immunity turns on the function they were performing when they acted. The Supreme Court has held that a prosecutor's "professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made" is entitled to absolute immunity. *Buckley III*, 509 U.S. at 273. In *Hunt* v. *Jaglowski*, 926 F.2d 689, 693 (7th Cir. 1991), the Seventh Circuit affirmed a directed verdict in favor of the defendant prosecutor where the plaintiff allegedly told the prosecutor that the police had coerced his

---

[19]  The parties appear to agree that defendant prosecutors are absolutely immune for their use of Hobbs's confession in his criminal proceedings. *See, e.g., Buckley* v. *Fitzsimmons*, 20 F.3d 789, 795 (7th Cir. 1994) (*Buckley IV*) ("Prosecutors are entitled to absolute immunity for actions as advocates before the grand jury and at trial even if they present unreliable or wholly fictitious proofs."); *Henry* v. *Farmer City State Bank*, 808 F.2d 1228, 1238 (7th Cir. 1986) (prosecutorial immunity applies even when a prosecutor "initiates charges maliciously, unreasonably, without probable cause, or even on the basis of false testimony or evidence"). As it relates to Count III, Hobbs fails to allege that defendant Mermel was present during his interrogation or that Mermel took actions unrelated to presenting the state's case. Mermel is therefore entitled to absolute immunity on this count.

39

agreement to confess, the prosecutor said he could do nothing about it, and the police threatened

the plaintiff until he signed the confession. Noting that prosecutors are absolutely immune in

their "function in gathering and evaluating evidence in order to make a prosecutorial decision as

to whether or not to file charges," *id.* (quoting *Boyd* v. *Village of Wheeling*, 83 C 4768, 1985 WL

2564, at **20–21 (N.D. Ill. Sept. 12, 1985), the court held that the prosecutor was immune from

liability because his "function in being present was merely to review, approve or disapprove [the

evidence], and issue the charges the police were seeking." *Id.* at 693.

Defendant prosecutors rely on *Hunt* to argue that Waller and Pavletic are absolutely

immune for actions they took after Hobbs confessed because, at that point, they were functioning

to review the evidence and initiate charges not assisting in the investigation of Hobbs. *See*

*Andrews*, 660 F. Supp. 2d at 878 ("The prosecutor acts within his core functions when he

evaluates the evidence gathered by police and, in the case of a confession, takes steps to see that

the words of the defendant are properly preserved."); *accord Kitchen* v. *Burge*, 781 F. Supp. 2d

721, 731 (N.D. Ill. 2011); *Patterson* v. *Burge*, No. 03 C 4433, 2010 WL 3894438, at *11 (N.D.

Ill. Sept. 27, 2010) (*Patterson II*); *but see Williams* v. *Valtierra*, No. 00 C 5743, 2001 WL

686782, at *3 (N.D. Ill. June 18, 2001) (distinguishing *Hunt* and denying prosecutors' motion to

dismiss where the plaintiff alleged that the prosecutors actively engaged in coercing a false

confession and denied him medical care); *Orange* v. *Burge*, No. 04 C 168, 2005 WL 742641, at

*19 (N.D. Ill. Mar. 30, 2005) (denying prosecutor's motion to dismiss where the prosecutor was

allegedly complicit in the plaintiff's torture and the subsequent cover up).

Like Hunt, Hobbs alleges defendant prosecutors were aware of and failed to stop

officers' attempts to coerce his confession. Unlike Hunt, however, Hobbs alleges that

prosecutors actively advised the police about how to proceed. In *Buckley III*, the Supreme Court

40

stated that "prosecutors are not entitled to absolute immunity for their actions in giving legal advice to the police." 509 U.S. at 271; *see Burns*, 500 U.S. at 493 ("We do not believe . . . that advising the police in the investigative phase of a criminal case is so intimately associated with the judicial phase of the criminal process that it qualifies for absolute immunity.") (internal quotation marks and citation omitted). Taken in the light most favorable to Hobbs, it is plausible that Waller and Pavletic were present at the police station not simply to review the evidence but to advise the police on how to effectively coerce Hobbs into giving a videotaped confession. *See Tillman*, 813 F. Supp. 2d at 967 (denying absolute immunity where plaintiff alleged that the prosecutor "personally participated in his interrogation . . . and then suppressed the truth concerning those events"); *id.* at 966–67 (collecting cases). In addition, Hobbs alleges that Waller and Pavletic knew that his first confession was false and there was no other evidence that would have given defendants probable cause to arrest him. *See Buckley III*, 509 U.S. at 274 ("A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested."). The Supreme Court has cautioned that absolute immunity should be sparingly applied. *Id.* at 269. Unlike in *Hunt*, the record in this case is not complete. Although Waller and Pavletic may eventually be entitled to summary judgment on this claim, the complaint will stand. Their motion to dismiss Count III on the basis of absolute immunity is denied**.** For the reasons discussed in Part IV.A., *supra*, qualified immunity does not apply.

### ii.    State Law Claims (Counts XI, XII, and XIII)

Defendant prosecutors also argue that they are entitled to absolute immunity on state law Counts XI (malicious prosecution), XII (IIED), and XIII (conspiracy).[20] Under Illinois law, the

---

[20] The court declines to discuss Count IV (failure to intervene), Count V (§ 1985 conspiracy),

(continued...)

"[state] and federal doctrines of prosecutorial immunity are coterminous" and, as a result, prosecutors acting within the scope of their prosecutorial duties are absolutely immune from liability under state law. *Kitchen*, 781 F. Supp. 2d at 737; *see, e.g., Beaman* v. *Souk*,---F. Supp.2d----, 2012 WL 1029612, at *11 (C.D. Ill. Mar. 26, 2012) (*Beaman II*); *Patterson II*, 2010 WL 3894438, at *11; *Andrews* v. *Burge*, 660 F. Supp. 2d 868, 879 (N.D. Ill. 2009). There is some dispute as to whether a prosecutor who acts with malice is deprived of state law immunity. *Compare Horstman* v. *Cnty. of DuPage*, 284 F. Supp. 2d 1125, 1133 (N.D. Ill. 2003); *Aboufariss* v. *City of DeKalb*, 713 N.E.2d 804, 812, 305 Ill. App. 3d 1054, 239 Ill. Dec. 273 (Ill. App. Ct. 1999) *with Hughes* v. *Krause*, No. 06 C 5792, 2008 WL 2788722, at **1–2 (N.D. Ill. 2008) (on reconsideration); *Barham* v. *McIntyre*, No. 04-cv-4027-JPG, 2007 WL 1576484, at *8 (S.D. Ill. May 30, 2007). The "more recent trend," however, "has been to apply to state law claims the same absolute immunity given to prosecutors on federal claims" even when the plaintiff alleges that prosecutors acted with malice. *Stevens* v. *Dewitt Cnty., Ill.*, No. 11–3162, 2012 WL 1066886, at *9 (C.D. Ill. Mar. 28, 2012) (collecting cases); *accord Gordon*, 2008 WL 4594354, at *17. The court finds the reasoning in these more recent cases persuasive. "Although under Illinois law there is a doctrine of public official immunity which has a lack of malice requirement, such is not the immunity afforded prosecutors [who], like judges, must be allowed to perform the functions of their jobs fearlessly and without fear of consequence." *Hughes*, 2008 WL 2788722, at *2; *accord Beaman II*, 2012 WL 1029612, at *11. As previously discussed, defendant prosecutors are absolutely immune for initiating and maintaining criminal

---

(...continued)

and Count X (denial of access to the courts) because it finds that these counts fail to state a claim against defendant prosecutors, as discussed in Parts V.C. & D., *infra*.

proceedings against Hobbs, *see Imbler*, 424 U.S. at 431; *Henry*, 808 F.2d at 1238, and presenting false and incomplete evidence in court, *see Burns*, 500 U.S. at 489–90, but they are not absolutely immune for taking certain actions before probable cause attaches, *Buckley III*, 509 U.S. at 274, advising the police on their investigation, *see Burns*, 500 U.S. at 493, and making statements to the press. *See Buckley III*, 509 U.S. at 277–78. Defendant prosecutors' motion to dismiss Count XI is therefore denied. The same reasoning applies to Count XII (IIED) and Count XIII (conspiracy), which also survive defendants' motion to dismiss.

### iii. Eleventh Amendment

Finally, defendant prosecutors argue that the state law counts must be dismissed under Rule 12(b)(1) because the Eleventh Amendment deprives this court of jurisdiction.[21] The Eleventh Amendment provides, "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. Although this amendment speaks only of foreign subjects, both the Supreme Court and the Seventh Circuit have held that "the Eleventh Amendment bars an action in federal court against a state, its agencies, or its officials in their official capacity." *Gossmeyer* v. *McDonald*, 128 F.3d 481, 487 (7th Cir. 1997) (citing *Pennhurst State Sch. & Hosp.* v. *Halderman*, 465 U.S. 89, 100–02, 104 S. Ct. 900, 79 L. Ed. 2d 67 (1984); *Scott* v. *O'Grady*, 975 F.2d 366, 369 (7th

---

[21] Defendant prosecutors allege that subject matter jurisdiction is not evident from the face of the complaint, and as such the court analyzes the motion to dismiss under Rule 12(b)(1) as any other motion to dismiss. *United Phosphorous, Ltd.* v. *Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003) (en banc), *overruled on other grounds by Minn-Chem, Inc.* v. *Agrium Inc.*, 683 F.3d 845 (7th Cir. 2012). When presented with a facial challenge, "the court does not look beyond the allegations in the complaint, which are taken as true for purposes of the motion." *Apex Digital, Inc.* v. *Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009).

Cir. 1992), *cert. denied*, 508 U.S. 942, 113 S. Ct. 2421, 124 L. Ed. 2d 643 (1993)). Under

Illinois law, state's attorneys are considered state officials, not county or local officials, and a

lawsuit against a state's attorney may in some circumstances be brought against the state. *See*

*McGrath* v. *Gillis*, 44 F.3d 567, 571 (7th Cir. 1995); *Ingemunson* v. *Hedges*, 549 N.E.2d 1269,

1273, 133 Ill. 2d 364, 140 Ill. Dec. 397 (Ill. 1990).

The Illinois State Lawsuit Immunity Act provides that the state cannot be sued except as

provided, *inter alia*, in the Court of Claims Act. 745 ILL. COMP. STAT. 5/1. The Court of Claims

Act requires all claims against the state "sounding in tort" to be heard in that court. 705 ILL.

COMP. STAT. 505/8(d). As such, if Hobbs's state law claims are brought against the state itself,

rather than against defendant prosecutors individually, the claims must dismissed without

prejudice and litigated in the Court of Claims. *See Jinkins* v. *Lee*, 807 N.E.2d 411, 417, 209 Ill.

2d 320, 282 Ill. Dec. 787 (Ill. 2004). "Whether an action is in fact one against the State, and

hence one that must be brought in the Court of Claims, depends not on the formal identification

of the parties but rather on the issues involved and the relief sought." *Healy* v. *Vaupel*, 549

N.E.2d 1240, 1247, 133 Ill. 2d 295, 140 Ill. Dec. 368 (Ill. 1990). As it relates to the issues

involved, the Illinois Supreme Court has stated that an action is against the state when there are

> (1) no allegations that an agent or employee of the State acted beyond the scope of
> his authority through wrongful acts; (2) the duty alleged to have been breached was
> not owed to the public generally independent of the fact of State employment; and
> (3) where the complained-of actions involve matters ordinarily within that
> employee's normal and official functions of the State . . .

*Id.* "Sovereign immunity affords no protection, [therefore], when it is alleged that the State's

agent acted in violation of statutory or constitutional law or in excess of his authority." *Nichol* v.

*Stass*, 735 N.E.2d 582, 586, 192 Ill. 2d 233, 248 Ill. Dec. 931 (Ill. 2000).

Hobbs argues that his claims are not brought against the state because he alleges that defendant prosecutors acted with malice, thus making their actions outside the scope of their authority. (*See* 3d Am. Compl. ¶¶ 244, 250, 253.) The Illinois Appellate Court has recognized that "malice, if well pleaded, is outside the scope of a State employee's authority and [the claim] must be brought in the circuit court and not the Court of Claims." *Welch* v. *Ill. Supreme Court*, 751 N.E.2d 1187, 1195, 322 Ill. App. 3d 345, 256 Ill. Dec. 350 (Ill. App. Ct. 2001); *Mgmt. Ass'n of Ill., Inc.* v. *Bd. of Regents of N. Ill. Univ.*, 618 N.E.2d 694, 705, 248 Ill. App. 3d 599, 188 Ill. Dec. 124 (Ill. App. Ct. 1993). In *Patterson* v. *Burge*, the plaintiff alleged that prosecutors acted intentionally and maliciously by physically abusing him, coercing his confession and fabricating oral admissions and reports that were later used against him at trial. 328 F. Supp. 2d 878, 884 (N.D. Ill. 2004) (*Patterson I*). The court found these allegations sufficient to demonstrate that prosecutors had acted outside the scope of their authority. *Id.* at 887; *see Cannon* v. *Burge*, No. 05 C 2192, 2006 WL 273544, at *17 (N.D. Ill. Feb. 2, 2006) (holding that the defendant prosecutor acted outside his authority where he made false public statements discrediting evidence of torture, refused to investigate and suppressed evidence of torture, and used his position to maintain the plaintiff's wrongful conviction); *see also Orange*, 2005 WL 742641, at *18 (holding that the defendants acted outside their authority where the plaintiff alleged that they participated in actions that deprived him of various constitutional rights). Hobbs alleges that defendant prosecutors acted maliciously in violating his constitutional rights and he supports these allegations with facts specific to each defendant. (*See* 3d Am. Compl. ¶¶ 198, 207, 211, 240). This is sufficient to show that defendant prosecutors acted beyond the scope of their

45

authority through wrongful acts.  Their motion to dismiss on the grounds of Eleventh Amendment sovereign immunity will be denied.[22]

## V.     Failure to State a Claim

### A.     Count I:  Procedural Due Process

Defendants argue that Count I (coerced confession in violation of procedural due process) should be dismissed as duplicative of Count III (coerced confession in violation of the right against self-incrimination).  One count may be dismissed as duplicative of another where "the parties, claims, facts and requested relief are substantially the same."  *Van Vilet* v. *Cole Taylor Bank*, No. 10 CV 3221, 2011 WL 148059, at *2 (N.D. Ill. Jan. 18, 2011); *see also Norfleet* v. *Stroger*, 297 Fed. Appx. 538, 540 (7th Cir. 2008).  It is undisputed that the parties (defendants) and the requested relief (compensatory and punitive damages) are the same for both counts.  Although Count III alleges a violation of *Miranda* whereas Count I does not, the remaining factual allegations are largely the same; namely, defendants used unjust violence against Hobbs causing him to falsely confess, and these false statements were then used against him in court resulting in his prolonged detention.  (*See* 3d Am. Compl. ¶¶ 194–198, 202–307; *see also* Pl.'s Officer Resp. at 34 ("[T]he core of Defendants' [Fifth Amendment] constitutional violation does not stem solely from their failure to provide *Miranda* warnings, but rather from

---

[22]  In their reply brief, defendant prosecutors argue that if the court finds that they acted outside the scope of their authority, then it must also dismiss the indemnity claim against Lake County (Count XVI).  Because this argument was raised for the first time in reply and Hobbs has not had an opportunity to respond, the court declines to address it.  *See, e.g., Wright* v. *United States*, 139 F.3d 551, 553 (7th Cir.1998) (arguments in support of a motion that are raised for the first time in a reply brief are waived).  In addition, because some of Hobbs's claims against defendant prosecutors are not subject to dismissal, Count XVI will not be dismissed.

their elicitation of a false confession through the use of abusive language and coaching.")
(internal citations omitted)).

Hobbs cites *Scott* v. *City of Chicago*, No. 07 C 3684, 2010 WL 1433313 (N.D. Ill.
April 8, 2010), to support his position that Count I and Count III seek to remedy two distinct
constitutional violations. *Scott* is of little help, however, because it holds that a Fifth
Amendment claim, like the one asserted in Count III, is distinct from a substantive due process
claim, like the one asserted in Count II. *Id.* at *6; *see Wallace I*, 440 F.3d at 429. Count I,
however, alleges a violation of procedural due process. (*See* Pl.'s Officer Resp. at 24.)

In circumstances such as these, where the plaintiff alleges that he was coerced into giving
a false confession, the Seventh Circuit has declined to recognize a stand alone procedural due
process claim. *See Wallace I*, 440 F.3d at 429. As summarized in *Walden* v. *City of Chicago*,
755 F. Supp. 2d 942 (N.D. Ill. 2010),

> the Seventh Circuit in *Wallace* [*I*] rejected the notion that "there is a free-standing
> due process claim whenever unfair interrogation tactics . . . are used to obtain a
> confession." 440 F.3d at 429. Instead, due process claims involving coerced
> confessions must "shock the conscience and thereby implicate the Supreme Court's
> substantive due process rulings" or be "grounded in traditional notions of what is
> required for a fair trial, including the *Brady* right to be given exculpatory material."
> *Id.*

*Id.* at 964–65 (collecting cases). Under *Wallace I*, therefore, Count I remains viable only to the
extent that it alleges a *Brady* violation.

In *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), the
United States Supreme Court held that the "suppression by the prosecution of evidence favorable
to an accused upon request violates due process where the evidence is material either to guilt or

47

to punishment."[23]  This rule requires "the prosecutor turn over to the defense all potentially exculpatory [or impeaching] evidence" and extends to police officers "insofar as they must turn over potentially exculpatory [or impeaching] evidence when they turn over investigative files to the prosecution."  *Harris* v. *Kuba*, 486 F.3d 1010, 1014 (7th Cir. 2007); *see Carvajal* v. *Dominguez*, 542 F.3d 561, 566 (7th Cir. 2008).

Hobbs does not argue that Count I seeks to remedy a *Brady* violation.  Indeed, a *Brady* violation occurs at trial, and Hobbs was never brought to trial in his criminal case.  *See Ray* v. *City of Chicago*, 629 F.3d 660, 664 (7th Cir. 2011); *Bielanski* v. *Cnty. of Kane*, 550 F.3d 632, 645 (7th Cir. 2008).  Moreover, "a coerced confession alone cannot constitute a *Brady* violation, as no 'suppression' occurs because the plaintiff is aware of his own confession."  *Walden*, 755 F. Supp. 2d at 965; *see Sornberger*, 434 F.3d at 1029 ("Teresa knew herself what occurred during the interrogation, and the police were under no *Brady* obligation to tell her again that they coerced her into confessing."); *accord Padilla* v. *City of Chicago*, No. 07 CV 5253, 2011 WL 3793413, at *4 (N.D. Ill. Aug. 24, 2011).  Given that Counts I and III involve substantially the same parties, facts and requested relief, and that the Seventh Circuit has foreclosed procedural due process relief where the coercive conduct is not hinged to a trial, Count I will be dismissed. *See Marshall* v. *Buckley*, 644 F. Supp. 2d 1075, 1079 (N.D. Ill. 2009).

### B.    Count III:  Fifth and Fourteenth Amendments

---

[23] "In order to bring a *Brady* claim, a plaintiff must demonstrate that: (1) the prosecution suppressed evidence; (2) the evidence was favorable to the accused; and (3) the evidence was material, that is, there was a reasonable probability that prejudice ensued."  *Alexander* v. *McKinney*, ---F.3d----, 2012 WL 3194929, at *3 (7th Cir. Aug. 8, 2012).  "Evidence is 'suppressed' when (1) the prosecution failed to disclose the evidence in time for the defendant to make use of it, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence."  *Carvajal* v. *Dominguez*, 542 F.3d 561, 567 (7th Cir. 2008).

Defendant prosecutors argue that Count III fails to state a claim upon which relief may be granted because Hobbs fails to comply with Rule 8(a). Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This statement need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. As to Count III, Hobbs alleges that Waller and Pavletic participated in coercing his videotaped confession, and that defendant prosecutors used this confession against him in a criminal proceeding to his detriment. This is sufficient to put defendant prosecutors on notice of the nature of Hobbs's claim.

### C.     Count IV:  Failure to Intervene

Defendant prosecutors argue that Count IV fails to state a claim because prosecutors do not have a duty to intervene to prevent the police from violating suspect's constitutional rights. *See Gordon*, 2008 WL 4594354, at *17 ("neither the Seventh Circuit, nor any Northern District of Illinois court, has recognized a failure to intervene claim against a prosecutor"); *Andrews*, 660 F. Supp. 2d at 876 n.6 ("In Illinois . . . a prosecutor does not have police powers, nor do prosecutors have command of police operations . . . Judge Aspen was clearly correct in deciding that the duty to intervene applicable to police officers is not to be imposed on prosecutors.") (citing *Gordon*, 2008 WL 4594354, at *17). Hobbs acknowledges this authority but argues that because prosecutors have an ethical duty to ensure that justice is carried out in a constitutional and humane manner, they should be held accountable for failing to intervene in a constitutional violation. This court finds the reasoning in *Gordon* and *Andrews* persuasive and declines to extend Count IV to defendant prosecutors; it is dismissed as to them.

### D.     Count V:  § 1985 Conspiracy

As to Count V,[24] Hobbs alleges that defendant officers conspired among and between themselves for the purpose of depriving him of his constitutional rights and that defendants acted in furtherance of this conspiracy by arresting him without probable cause, coercing his confession, falsifying police reports and presenting fabricated evidence to initiate proceedings against him. (3d Am. Compl. ¶¶ 212–217.) Section 1985(2) contains two parts. "The first part concerns certain interference with federal court proceedings and the second part concerns interference with state court proceedings in violation of equal protection of the laws or when a person is trying to enforce the equal protection of the laws." *Skolnick* v. *Doria*, No. 93 C 7037, 1994 WL 445088, at *3 (N.D. Ill. Aug. 16, 1994). The first clause of § 1985(2) prohibits conspiracy to interfere with federal court proceedings; the second clause prohibits the same in state courts. *See Kush* v. *Rutledge*, 460 U.S. 719, 725, 103 S. Ct. 1483, 75 L. Ed. 2d 413 (1983). To state a claim under the second subsection, as Hobbs attempts to do here, he must allege that "the defendants were motivated in their actions by racial or some other type of invidious, class-based discrimination." *Lowe* v. *Letsinger*, 772 F.2d 308, 311 (7th Cir. 1985). Because Hobbs fails to allege that race or class-based discrimination motivated defendants, Count V is dismissed.

### E.     Count X:  Denial of Access to the Courts

In Count X, Hobbs alleges that each defendant, acting individually, jointly and in a conspiracy, denied him access to the law library, legal material and/or legal counsel while he was incarcerated, thereby depriving or diminishing his ability to bring Counts I through IX of this lawsuit. (3d Am. Compl. ¶ 239.) The due process clause provides inmates with a right of

---

[24] Hobbs clarified in his response that Count V is brought under subsection (2) of § 1985. (Pl.'s Prosecutor Resp. at 18.)

"meaningful access to the courts." *Bounds* v. *Smith*, 430 U.S. 817, 824, 97 S. Ct. 1491, 52 L. Ed. 2d 72 (1977) *overruled in part on other grounds by Lewis* v. *Casey*, 518 U.S. 343, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996). This requires prison authorities to provide inmates with the tools they need "to attack their sentences, directly or collaterally, [or] . . . to challenge the conditions of their confinement." *Lewis*, 518 U.S. at 355; *see also Wolff* v. *McDonnell*, 418 U.S. 539, 579, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974) (extending the universe of relevant claims to actions under § 1983 to vindicate "basic constitutional rights") *abrogated in part on other grounds by Sandin* v. *Connor*, 515 U.S. 472, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995). This right applies to pre-trial detainees and not just convicts. *Johnson by Johnson* v. *Brelje*, 701 F.2d 1201, 1207 (7th Cir. 1983). To recover, an inmate must suffer an "actual injury" as a result of the denial. *Ortiz* v. *Downey*, 561 F.3d 664, 671 (7th Cir. 2009) (citing *Lewis*, 518 U.S. at 350). "To establish an 'actual injury,' an inmate must show that an attempt to pursue nonfrivolous litigation was hindered by unjustified acts or conditions caused by the defendants." *Purkey* v. *Marberry*, 385 Fed. Appx. 575, 578 (7th Cir. 2010); *see Campbell* v. *Clarke*, 481 F.3d 967, 968 (7th Cir. 2007) (the plaintiff must allege that "a lack of access to legal materials has undermined," or caused to founder, "a concrete piece of litigation").

Hobbs has failed to adequately plead such a claim here. A denial of access to the courts claim is most often brought against prison officials who bear responsibility for an inmate's access to legal materials, not against an inmate's arresting officers and prosecutors. *See, e.g., Purkey*, 385 Fed. Appx. at 576 (warden and educational superintendent); *Johnson* v. *Barczak*, 338 F. 3d 771, 772 (7th Cir. 2003) (department of corrections officials); *Bease* v. *Todd*, 35 Fed. Appx. 241, 242 (7th Cir. 2002) (prison guards). Although Hobbs details the acts that each defendant took in procuring his false confession and subsequent detention, he makes no

51

allegations as to what steps defendants took, outside of his interrogation and prosecution, to prevent him from accessing the law library, legal material and/or legal counsel while he was incarcerated. *See generally Iqbal*, 556 U.S. at 678 (a complaint will not suffice "if it tenders naked assertions[s] devoid of . . . factual enhancement"). Hobbs cites no authority for his position that the acts of arresting officers and prosecutors, individual who typically have little control over the conditions of confinement, are sufficient to state a claim for denial of access to the courts. In addition, he fails to allege how his ability to bring the present lawsuit was deprived or diminished. *See Pratt* v. *Tarr*, 464 F.3d 730, 731 (7th Cir. 2006) ("[W]hen a plaintiff alleges a denial of the right to access-to-courts, he must usually plead specific prejudice to state a claim, such as by alleging that he missed court deadlines, failed to make timely filings, or that legitimate claims were dismissed because of the denial of reasonable access to legal resources."); *accord Marshall* v. *Knight*, 445 F.3d 965, 968 (7th Cir. 2006); *see also Cannon*, 2006 WL 273544, at *19 (dismissing access claim as inadequately pleaded); *accord Patterson I*, 328 F. Supp. 2d at 898. Count X is therefore dismissed.

### F.      Count XIII:  Conspiracy

Count XIII alleges a claim for state law conspiracy. Under Illinois law, the "elements of civil conspiracy are: (1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Fritz* v. *Johnston*, 807 N.E.2d 461, 470, 209 Ill. 2d 302, 282 Ill. Dec. 837 (2004); *see also Borsellino* v. *Goldman Sachs Grp., Inc.*, 477 F.3d 502, 509 (7th Cir. 2007). Hobbs alleges that defendants conspired among and between themselves for the purpose of prosecuting him without probable cause and to inflict severe emotional distress, and that

52

defendants acted in furtherance of this conspiracy by, *inter alia*, coercing his confession, falsifying police reports, presenting fabricated evidence to initiate proceedings against him, and prolonging his incarceration despite the existence of exculpatory DNA evidence.  (3d Am. Compl. ¶¶ 252–256.)  Hobbs's allegations are sufficient to state a claim for conspiracy under Illinois law.  *See, e.g., Gardunio* v. *Town of Cicero*, 674 F. Supp. 2d 976, 988 (N.D. Ill. 2009) (arrestee stated a claim for state law conspiracy); *Howard* v. *City of Chicago*, No. 03 C 8481, 2004 WL 2397281, at *15 (N.D. Ill. Oct. 25, 2004) (prisoner stated the same).

### G.    Count XV:  False Light against Defendant Waller

Defendant prosecutors next move to dismiss Count XV, which alleges that defendant Waller placed Hobbs in a false light before the public on August 4, 2010.  Waller held a press conference where he stated that "he was not convinced that Hobbs didn't have a role in the killings" but that "he didn't believe that the case could be proved beyond a reasonable doubt." He also stated that he had studied the case and "[he didn't] believe that law enforcement did anything wrong."  Defendant prosecutors argue that these statements are absolutely privileged.[25]

To state a claim for false light invasion of privacy under Illinois law, a plaintiff must plead that:

> (1) he or she was placed in a false light before the public as a result of the defendants' actions; (2) the false light in which the plaintiff was placed would be highly offensive to a reasonable person; and (3) the defendant acted with actual malice, that is, with knowledge that the statements were false or with reckless disregard for whether the statements were true or false.

---

[25]  Because the court finds Waller's statements to be absolutely privileged it declines to address defendant prosecutors' arguments that the statements were not "of or concerning" Hobbs and were constitutionally protected opinion.

*Kurczaba* v. *Pollock*, 742 N.E.2d 425, 434–35, 318 Ill. App. 3d 686, 252 Ill. Dec. 175 (Ill. App.

Ct. 2000) (internal quotation marks, omission indicators and citation omitted); *see also*

*Muzikowski* v. *Paramount Pictures Corp.*, 322 F.3d 918, 927 (7th Cir. 2003).  Under Illinois law,

"[a]n attorney at law is absolutely privileged to publish defamatory matter concerning another in

communications preliminary to a proposed judicial proceeding, or in the institution of, or during

the course and as a part of, a judicial proceeding in which he participates as counsel, if it has

some relation to the proceeding."  *Golden* v. *Mullen*, 693 N.E.2d 385, 389, 295 Ill. App. 3d 865,

230 Ill. Dec. 256 (Ill. App. Ct. 1997) (quoting Restatement (Second) of Torts § 586 (1977)).

"Thus, the privilege is available only when the publication: (1) was made in a judicial

proceeding; (2) had some connection or logical relation to the action; (3) was made to achieve

the objects of the litigation; and (4) involved litigants or other participants authorized by law."

*August* v. *Hanlon*,---N.E.2d----, 2012 IL App (2d) 111252, at *12 (Ill. App. Ct. Sept. 6, 2012).

Waller made the disputed statements on the day Hobbs's case was *nolle prosequi*, and as

such, Hobbs argues that Waller's statements were not published "during the course and as a part

of, a judicial proceeding."  Restatement (Second) of Torts § 586 (1977).  Hobbs cites no

authority for this position, and the court believes that his reading of the Restatement proves too

narrow.  The policy behind the privilege is to allow "attorneys as officers of the court the utmost

freedom in their efforts to secure justice for their clients," *id.* cmt. a, and the Illinois Appellate

Court has acknowledged that "the effective functioning of our system of government is

dependent largely upon the force of an informed public opinion as to the quality of service

rendered by public officials, and free and unfettered action by the public's representatives."

*Ware* v. *Carey*, 394 N.E.2d 690, 697, 75 Ill. App. 3d 906, 31 Ill. Dec. 488 (Ill. App. Ct. 1979).

54

The need to facilitate open communication between the public and its elected representatives weighs in favor of recognizing the privilege under the circumstances presented here.

In *Ware* v. *Carey*, the Illinois Appellate Court held that the defendant Cook County State's Attorney was absolutely privileged to issue a press release responding to statements by the plaintiff Deputy Superintendent of Police and others that the police force was no longer corrupt.  394 N.E.2d at 692.  In his press release, the defendant prosecutor accused the plaintiff police superintendent of "whitewash[ing]" police corruption and vowed that his office would seek out the "extortionists and shakedown artists" and eliminate them from within the police department.  *Id.*  In affirming summary judgment for the defendant prosecutor, the court held that the absolute executive privilege protected him from liability for defamation actions arising from the performance of his duties, which included the duty to ensure that the laws are faithfully executed and enforced.  *Id.* at 694–95.  The court acknowledged that the plaintiff was not under investigation or prosecution at the time if the press release, but stated that this argument "misse[d] the point."  *Id.* at 697.  "The fact that no formal investigation or charging of [the plaintiff] based upon an intent to protect corruption took place does not militate against [the defendant's] responsibility to mitigate what he believed were damaging remarks by [the plaintiff]" that the police force was no longer corrupt.  *Id.*  As such, the court concluded that the defendant's statements were absolutely privileged.

As in *Ware*, there was no judicial proceeding pending at the time the allegedly illegal statements were made.  Nevertheless, defendant Waller undoubtedly felt obligated to inform the public about issues surrounding the *nolle prosequi* of Hobbs's case.  The court can discern no principled reason why the protection afforded the defendant in *Ware* should not extend to defendant Waller here.  *See Patterson I*, 328 F. Supp. 2d at 902 (holding that prosecutors'

55

defamatory statements to the press after plaintiff was pardoned were absolutely privileged); *see also Golden* v. *Mullen*, 693 N.E.2d 385, 390, 295 Ill. App. 3d 865, 230 Ill. Dec. 256 (Ill. App. Ct. 1997) ("[W]e hold that the absolute privilege which attaches to defamatory statements made by an attorney incidental to a pending legal proceeding also applies to post-litigation defamatory statements made by an attorney to the client he or she represented in such proceeding."). Count XV is therefore dismissed.

## CONCLUSION AND ORDER

For the foregoing reasons, the motions to dismiss by defendant officers (dkt. #98 #103, #106), defendant prosecutors and Lake County (dkt. #100) and municipal defendants (dkt. #103, #106, #107, #109, #111) are granted in part and denied in part. Hobbs is given leave to file a fourth amended complaint by October 12, 2012 to replead his tolling allegations as stated herein. Counts I, V, and X against defendant officers and defendant prosecutors are dismissed. Count III against defendant officers and Waller and Pavletic is dismissed in part; the first two courtroom uses of plaintiff's confession are time barred, the last courtroom use is not. Count III is dismissed as to defendant Mermel. Count II against defendant officers is dismissed as is Count IV against defendant prosecutors. Count XV against defendant Waller is dismissed. These counts are dismissed with prejudice to the extent they remain unaffected by the tolling allegations in Hobbs's fourth amended complaint. The City of Waukegan's motion to dismiss Count VII (#107), the City of Zion's motion to dismiss Count VIII (#111), and the Village of Vernon Hill's motion to dismiss Count IX (#114) are moot pursuant to Hobbs's notice of voluntary dismissal (#139). Counts VII through IX are dismissed without prejudice. The following counts remain viable: Count III (in part), Count IV (against defendant officers),

56

Counts XI, XII, XIII against defendant prosecutors, and Count XIV against defendant Mermel.

Status hearing is set for October 16, 2012 at 8:30 a.m.


Dated:  September 28, 2012          Enter: _____
                                          JOAN HUMPHREY LEFKOW
                                          United States District Judge